**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,

Defendant.

Case No.: 1:05cv02462 RMU

JURY TRIAL DEMANDED

**FIRST AMENDED COMPLAINT**

Plaintiff, Federal National Mortgage Association ("Fannie Mae"), brings this action against Defendant, National Union Fire Insurance Co. of Pittsburgh, Pennsylvania ("National Union" or "Defendant"), and in support, alleges as follows:

**NATURE OF ACTION**

1. This action arises out of National Union's failure to honor its contractual obligations, under a Financial Institution Bond it sold to Fannie Mae, to provide coverage for the theft by Olympia Mortgage Corporation ("OMC") of loan payoff proceeds OMC was supposed to have remitted to Fannie Mae but instead stole. OMC is a mortgage loan "Seller/Servicer" – an entity that sells loans to Fannie Mae and then services those loans for Fannie Mae. The Financial Institution Bond specifically provides coverage for thefts by a Seller/Servicer, like OMC, in the course of its servicing of loans for Fannie Mae. The Financial Institution Bond also provides coverage for certain types of mortgage fraud that could be committed by a Seller/Servicer in the course of its sale of new loans to Fannie Mae. National Union, however, wrongfully and

without reasonable basis asserts that the Financial Institution Bond does not provide coverage for the loss caused to Fannie Mae by OMC's theft.

2. Fannie Mae's loss solely and directly resulting from OMC's theft exceeds $43 million. Fannie Mae seeks a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure and Section 2201 and 2202 of Title 28 of the United States Code, that National Union is obligated to pay Fannie Mae the full $25 million limit of liability under the Financial Institution Bond. Fannie Mae also seeks damages for National Union's breach of contract by reason of its failure to honor its obligations under the Financial Institution Bond and contractual breach of its duty of good faith and fair dealing, including Fannie Mae's attorneys fees and costs, pre-judgment interest and such other and further relief as the Court may deem just and proper.

## PARTIES

3. Fannie Mae is a government-sponsored enterprise, which operates under a congressional charter, which directs Fannie Mae to channel its efforts into increasing the availability and affordability of homeownership for low, moderate and middle-income American individuals and families. In 1968, the government amended that charter and today Fannie Mae is also a shareholder-owned corporation.

4. Defendant National Union is an insurance company. Upon information and belief, National Union is a corporation organized under the laws of the state of Pennsylvania and maintains its principal place of business in New York. It is licensed to transact and does transact business in the District of Columbia.

## JURISDICTION AND VENUE

5. Federal subject matter jurisdiction exists under 28 U.S.C. § 1332 in that the named parties to this action are of completely diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interests and costs. Fannie Mae is deemed to be a citizen of the District of Columbia for purposes of jurisdiction and venue (12 U.S.C. §1717(a)(2)(B)). This Court has personal jurisdiction over National Union because, upon information and belief, National Union is licensed to do business and does business in the District of Columbia.

6. Federal subject matter jurisdiction also exists under 28 U.S.C. § 1331 as this matter also arises under 12 U.S.C. § 1723 a, which grants Fannie Mae authority "to sue and be sued, and to complain and defend, in any court of competent jurisdiction, State or Federal."

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because this District has personal jurisdiction over National Union and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## GENERAL ALLEGATIONS

### A. THE BOND

8. Fannie Mae purchased from National Union Financial Institution Bond No. 600-97-48 effective June 30, 2004 through June 30, 2005 (the "Bond") (A true and accurate copy of the Bond is attached hereto as Exh. A). The Bond provides coverage, over a $5 million deductible, up to $25 million per loss, beyond which Fannie Mae also maintains excess coverage. Fannie Mae is the named insured under the Bond.

9. The Bond covers loss "discovered" by Fannie Mae during the Bond Period. (Bond, Section 4). "Discovery occurs when the Director of Corporate Risk and/or General Counsel first becomes aware of facts which would cause a reasonable person to assume that a

loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known." *Id.*

10. The Bond specifically provides to Fannie Mae insurance coverage for thefts by a servicing contractor of moneys the servicing contractor, in the course of fulfilling its servicing duties, is supposed to remit to Fannie Mae. Rider #2 (the "Servicing Contractor Insuring Agreement") of the Bond states that:

> 1. This bond is extended to include the following Insuring Agreement (H):
>
> (H) Loss resulting solely and directly from one or more dishonest or fraudulent acts by a Servicing Contractor whether committed alone or in collusion with others, which acts are committed by the Servicing Contractor with the manifest intent,
>
> (a) to cause the Insured to sustain such loss; and
>
> (b) to obtain thereby an improper personal financial benefit for the Servicing Contractor,
>
> and which acts in fact result in the Servicing Contractor obtaining such benefit.
>
> Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or any other benefits of a type which may be earned in the normal course of employment or performance of a servicing contract shall not constitute improper personal financial benefit.

(Bond, Rider #2, Para. 1).

11. The term Servicing Contractor is defined to mean:

> 2. . . . a natural person, partnership, corporation, limited liability company, real estate investment trust or other entity and their employees, duly authorized by the Insured (Fannie Mae) under written agreement with the Insured to perform servicing activities, including any of the following with respect to mortgage loans owned by the Insured and other types of loans the Insured is authorized by its charter to own:

> (a) collecting and recording borrower payments and remitting same to the insured;

while acting in that capacity.

12. Coverage for certain types of mortgage fraud is provided for in Rider #3, which extends the Bond to include Insuring Agreement (I) (the "Mortgage Fraud Insuring Agreement") which provides coverage for, among other things:

> (I) Loss resulting directly from the Insured having in good faith and in the ordinary course of business purchased any Mortgage Loan which proves to:
>
> * * *
>
> (f) be based on the fact that the Mortgage Loan has previously been sold to the Insured, in whole or in part; or
>
> (g) have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgage or grantor through trick, artifice, fraud or false pretenses.

13. The Bond also provides Fannie Mae with up to $250,000 of "fidelity claim expense" or indemnity for:

> (G) Fees and expenses incurred and paid by the Insured with the prior approval of the Underwriter for independent outside accountants to determine the amount and extent of the loss covered under Insuring Agreements of this bond.

14. The Bond contains various coverage exclusions, but none preclude coverage for Fannie Mae's loss.

15. All conditions and requirements imposed on Fannie Mae by the Bond, including payment of premiums, giving notice of claim, and submission of proof of loss and information requested by the insurer, have been either satisfied or waived or are subject to an estoppel against National Union.

**B. OMC'S THEFT OF FANNIE MAE PAYOFF PROCEEDS**

**(1) OMC's Servicer Obligations to Fannie Mae and the Loan Servicing Process.**

16. Fannie Mae does not originate mortgage loans but rather purchases loans from Seller/Servicers, like OMC, in the secondary mortgage market.

17. Fannie Mae then often retains the Seller/Servicers to service the mortgage loans Fannie Mae purchases.

18. Fannie Mae purchases loans through its Asset Acquisition & Custody ("AA&C") group. After loans are acquired by the AA&C group, the loans are transferred to a separate group within Fannie Mae – Asset Development & Management ("AD&M") – which is responsible for the collection of principal and interest payments on such loans until the final payment or loan payoff amount is received by Fannie Mae.

19. As is its usual practice, Fannie Mae purchased loans from OMC and retained OMC to service the loans. The agreement that governed the relationship between Fannie Mae and OMC is called the "Mortgage Selling and Servicing Contract" (the "Contract"). The Contract incorporates by reference Fannie Mae's Servicing Guide, which sets forth additional obligations and responsibilities that OMC agreed to comport with as part of its relationship with Fannie Mae.

20. Pursuant to Fannie Mae's Servicing Guide, OMC, as a servicer, was required, among other things, to:

- collect the monthly principal and interest ("P&I") payments, along with any tax, insurance, and other escrow payments, made by the borrower and to place the P&I payments into certain custodial bank accounts from which Fannie Mae can draft, on a monthly basis, the remittances due to Fannie Mae;
- collect and remit payoff amounts when a borrower, through a refinance or otherwise, pays off a loan;

- report (electronically via Fannie Mae's servicing system known as LASER) the status of each loan it services each month, informing Fannie Mae whether the loan is current and whether Fannie Mae should draft P&I or payoff payments from a custodial account; and

- deposit tax and insurance payments into separate custodial accounts, and ensure that taxes and insurance on the borrowers' properties are paid from those accounts.

21. Additionally, under the Servicing Guide, all servicers, including OMC, have certain responsibilities when a borrower, through a refinance or for any other reason, chooses to pay off a loan. For example, the Fannie Mae Servicing Guide specifically states:

- "The servicer must assure that the total amount required to satisfy the indebtedness – principal, interest, outstanding advances, etc. – is received and remitted to us." (III, 102.03: Payments in Full);

- "As soon as the servicer verifies that the amount required to pay a mortgage in full has been received, it must take all the steps necessary to assure that . . . our share of the payoff proceeds is remitted in accordance with the remittance schedule established for the remittance type under which the mortgage is reported . . . . The servicer must code the payoff as an Action Code 60." (VI, 101: Notification of Mortgage Payoff);

- "The servicer must remit payoff proceeds to us as part of its regular monthly remittance." (VI, 106.03: "Scheduled/Scheduled" Remittance Types);

- "A servicer must report removal transactions – payoff, repurchase, and foreclosure actions (Action Codes 60, 65, 67, 70, 71, and 72) -- in sufficient time for us to receive the notification by the second business day of the month following the cutoff date for the reporting period in which the activity occurred." (X, 103.01: Removal Transactions).

22. All of these servicing requirements applied to OMC as a servicer of Fannie Mae loans.

23. OMC and Fannie Mae maintained custodial accounts for the benefit of Fannie Mae at two institutions, Independence Community Bank and Midwood Federal Credit Union, under documents entitled "Letters of Authorization." Each month, for loans OMC serviced on Fannie Mae's behalf, OMC informed the AD&M group through LASER of the amounts of P&I

(including prepayments and payoffs) OMC deposited into the custodial accounts for Fannie Mae to withdraw and the AD&M group withdrew such monies.

**(2) The Fraud Perpetrated on Fannie Mae By OMC.**

24. OMC acting in its role as a loan servicer, stole borrower payoff proceeds for 257 of the thousands of loans it was servicing for Fannie Mae.

25. In each instance, borrowers obtained loans (the "B Loans") from OMC for the purpose of refinancing (through interest rate reductions and term modifications) outstanding loans (the "A Loans") on the same property.

26. OMC sold the B Loans to Fannie Mae through Fannie Mae's AA&C group, and remitted to Fannie Mae monthly borrower principal and interest payments for the B Loans as is normal and to be expected.

27. Because OMC was the servicer on the A Loans, when the outstanding principal balances of the A Loans were refinanced, OMC was obligated to report to Fannie Mae through LASER that the outstanding principal balances on those loans should be considered paid off and OMC, again as servicer, was obligated to remit those outstanding balances or Loan A final payoffs to Fannie Mae.

28. OMC, however, failed to remit to Fannie Mae payoff proceeds for the A Loans, failing also to notify Fannie Mae's AD&M group through LASER that the A Loans were to be paid off.

29. Instead, OMC stole the payoff amounts for its own purposes, demonstrating manifest intent to cause Fannie Mae to sustain a loss and to obtain an improper financial benefit for OMC.

30. OMC also undertook elaborate efforts to conceal its theft of the loan payoff proceeds for the A Loans.

31. After stealing the payoff proceeds on any given A Loan, OMC continued to report to Fannie Mae's AD&M group each month through LASER the loan as current. At the same time, OMC failed to report through LASER the required payoff code – Action Code 60.

32. OMC then deposited into the Fannie Mae custodial account from OMC's own operating account the principal and interest payments that would have been due to Fannie Mae if the A Loans were current and not to be paid off.

33. OMC informed Fannie Mae's AD&M group through LASER that the principal and interest payments were in the custodial account for Fannie Mae to withdraw, just as if the loans were, indeed, current.

34. OMC tracked the loans for which it stole the payoff proceeds on a list referred to as the "Code 59 List."

35. Each of the 257 A Loans for which OMC stole the payoff proceeds is on the Code 59 List Fannie Mae obtained from OMC after Fannie Mae suspected a problem.

36. OMC tracked the principal and interest payments it used to cover up the fraud with a special notation – "branch payment" – within its servicing system. Further, whenever an A Loan was refinanced, the OMC servicing personnel would note the resulting required escrow account adjustments in the A Loan file and record the reason for the adjustment as "refinance."

37. Fannie Mae's loss, resulting solely and directly from OMC's theft of loan payoff proceeds is **$43,918,500.42**, which represents the outstanding unpaid principal balance of the 257 loans as of October, 2004. Fannie Mae has also incurred in excess of **$540,000** for the work performed by a forensic accounting firm to determine, verify and calculate the loss.

**(3) Fannie Mae's Discovery of OMC's Fraud and Fannie Mae's Efforts to Mitigate its Losses.**

38. On September 29, 2004, during the period of the Bond, Fannie Mae received information from an anonymous caller that a servicer had stolen loan payoff proceeds from Fannie Mae. After an internal review, Fannie Mae identified the servicer as OMC.

39. Fannie Mae took immediate steps to determine which loans were at issue and to mitigate the loss.

40. As part of its mitigation efforts, Fannie Mae, on October 20, 2004, delivered a formal notice of termination to OMC and took immediate action to transfer servicing of the loans being serviced by OMC to a new vendor (Cenlar, FSB.). Fannie Mae also seized files related to the loans OMC had sold Fannie Mae and the loans it serviced for Fannie Mae.

41. Fannie Mae initiated conversations with the New York Banking Commission and the FBI. In addition, Fannie Mae initiated a lawsuit on November 16, 2004 against OMC and Lieb Pinter (a former principal of OMC ) and obtained a court order putting in place a receiver ("Receiver") to oversee the orderly winding down of OMC's affairs and to assist in tracing the funds stolen by OMC. These matters are ongoing, and Fannie Mae not yet recovered any of the payoff proceeds stolen by OMC.

**(4) National Union's Failure to Honor Its Contractual Obligations Under the Bond.**

42. By letter dated October 28, 2004 addressed to Willis of New York (the broker of the Bond) and in accordance with the terms of the Bond, Fannie Mae provided timely notice to National Union of OMC's fraud and Fannie Mae's loss. Willis, in turn, provided formal written notice of Fannie Mae's loss to National Union by letter dated October 29, 2004.

43. Subsequently, Fannie Mae has had a least four face-to-face meetings with National Union and several conference calls in which Fannie Mae has described OMC's theft and Fannie Mae's loss and answered National Union's questions about the same.

44. Fannie Mae has also provided, on several occasions, detailed written responses to information requests propounded by National Union, and has made available and produced documents requested by National Union.

45. On April 7, 2005, Fannie Mae submitted a detailed and documented draft proof of loss to National Union followed by a detailed sworn proof of loss, with supporting documentation, on June 23, 2005. An updated proof of loss, containing information Fannie Mae had provided to National Union since submitting its original proof of loss, was submitted to National Union on December 22, 2005. (A true and accurate copy of Fannie Mae's proof of loss, without exhibits, is attached hereto as Exh. B.)

46. The Servicing Contractor and Mortgage Fraud Insuring Agreements in the Bond were designed to cover losses to Fannie Mae resulting from the fraudulent servicing of loans for Fannie Mae or the fraudulent sale of loans to Fannie Mae. Accordingly, the loss caused to Fannie Mae by OMC's theft of loan payoff proceeds OMC was obligated to remit to Fannie Mae is a classic example of the type of loss covered by National Union under the Bond.

47. Nonetheless, on various occasions, starting with a "reservation of rights" letter dated August 2, 2005, National Union has suggested or asserted that the loss to Fannie Mae caused by OMC's fraud does not fall within either the Servicing Contractor Insuring Agreement or Mortgage Fraud Insuring Agreement.

48. Though one of OMC's servicing functions was to report loan payoffs to Fannie Mae and remit to Fannie Mae the loan payoff amounts, National Union asserts that the OMC

fraud did not occur in the context of OMC performing its servicing function for Fannie Mae on the A Loans but rather in OMC's capacity as an originator of the B Loans and, for that reason, does not fall within the Servicing Contractor Insuring Agreement.

49. At the same time, National Union asserts that any fraud OMC perpetrated in the origination and sale to Fannie Mae of the B Loans does not fall within the Mortgage Fraud Insuring Agreement.

50. Upon information and belief, National Union's position is that none of the other insuring agreements of the Bond provide coverage either.

51. Demonstrating National Union's own doubts about the validity of its position, National Union asserts in the alternative that even if the loss falls within the Servicing Contractor or Mortgage Fraud Insuring Agreements, then certain exclusions associated with those insuring agreements preclude coverage for Fannie Mae's loss.

52. In a meeting on November 14, 2005 between an AIG (National Union's parent company) representative, National Union's outside counsel and representatives of Fannie Mae, National Union asserted that it needed no additional information or investigation to deny Fannie Mae's claim.

53. Further demonstrating, however, that National Union itself does not believe that it has a reasonable basis upon which to formally deny Fannie Mae's claim or is recklessly disregarding that it lacks any reasonable basis upon which to deny Fannie Mae's claim, National Union, instead of denying Fannie Mae's claim in writing, chose to orally convey to Fannie Mae the coverage defenses that National Union has developed as well as National Union's position that it has sufficient information to deny Fannie Mae's claim.

54. Counsel for Fannie Mae, by letter dated November 29, 2005, refuted National Union's stated bases for National Union's position that Fannie Mae's claim is not covered. In response, by letter dated December 19, 2005, National Union reaffirmed its arguments against coverage and asserted that "it is likely coverage is not afforded for the claim." And, notwithstanding that Fannie Mae has provided information about its loss to National Union orally and in writing many times, and has produced documents evidencing the loss and others requested by National Union, National Union suggested that it seeks yet additional information (though National Union has not said that there may be certain types of information it does not have that would, in fact, cause National Union to change its view – formulated over many months -- that Fannie Mae's claim is not covered).

55. The loss Fannie Mae suffered as a result of OMC's theft of the loan payoff amounts is covered under the terms of the Bond, and National Union was and is contractually obligated to pay the loss to Fannie Mae up to the $25 million limit of the Bond.

56. National Union has failed to honor its contractual obligations to cover Fannie Mae's loss and, in doing so, has also breached its implied duty of good faith and fair dealing by, among other things: unreasonably asserting that the loss to Fannie Mae caused by OMC's theft of loan payoff proceeds is not covered under the Bond when National Union knew or should have known that there was no reasonable basis for denying coverage; disregarding Fannie Mae's legal and contractual interests and rights so as to advance National Union's interests; failing to evaluate Fannie Mae's claim in a fair, impartial and objective manner; and delaying payment of Fannie Mae's claim.

57. Fannie Mae, accordingly, is deprived of the benefit of insurance coverage for which it paid substantial premiums and has suffered additional consequential damages, including

without limitation, attorney fees and other expenses in bringing this action, lost earnings on amounts wrongfully withheld by National Union, and lost executive time and productivity, which damages are not subject to the Bond's limit of liability.

**COUNT ONE: DECLARATORY JUDGMENT**

58. Fannie Mae incorporates paragraphs 1 through 57 as if fully set forth herein.

59. This is a claim for declaratory relief pursuant to 28 U.S.C. §§2201 and 2202, and Federal Rule of Civil Procedure 57, to determine the parties' rights and obligations under the Bond with respect to coverage for the loss suffered by Fannie Mae resulting from OMC's theft of the loan payoff amounts.

60. An actual and present controversy exists between Fannie Mae and National Union concerning National Union's obligation to cover Fannie Mae's losses resulting from OMC's theft of the loan payoff amounts.

61. Fannie Mae requests that this Court declare that National Union is obligated to provide coverage in the amount of the full limit of the Bond ($25 million) for Fannie Mae's loss resulting from OMC's theft of loan payoff amounts.

**COUNT TWO: BREACH OF CONTRACT (FAILURE TO PROVIDE COVERAGE)**

62. Fannie Mae incorporates paragraphs 1 through 61 as if fully set forth herein.

63. National Union breached its contractual obligations under the Bond to cover the loss caused to Fannie Mae by OMC's theft of loan payoff amounts.

64. As a direct result of National Union's breach of the Bond, Fannie Mae remains uncompensated by National Union for any portion of Fannie Mae's loss.

65. As a direct and proximate result of National Union's breach of the Bond, Fannie Mae has yet to be paid the sums owed to it under an excess financial institution bond (No. DOX

G21660061 002) ("Excess Bond") issued by ACE American Insurance Company which provides $15 million in coverage in excess of the $25 million in coverage provided by National Union.

66. As a direct and proximate result of National Union's breach of the Bond, Fannie Mae has incurred additional consequential damages, including without limitation, attorney fees and other expenses in bringing this action, lost earnings on amounts wrongfully withheld by National Union, and lost executive time and productivity, which damages are not subject to the Bond's limit of liability.

67. As a direct and proximate result of the aforesaid actions by National Union, Fannie Mae has suffered damages in an amount to be proved at trial, but in excess of $75,000.00 exclusive of interests and costs.

**COUNT THREE: BREACH OF CONTRACT (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

68. Fannie Mae incorporates paragraphs 1 through 67 as if fully set forth herein.

69. National Union owes to Fannie Mae under the Bond a duty of good faith and fair dealing.

70. National Union has breached its duty of good faith and fair dealing by, among other things;

(a) unreasonably asserting that the loss to Fannie Mae caused by OMC's theft of loan payoff proceeds is not covered under the Bond when National Union knew or should have known that there was no reasonable basis for denying coverage;

(b) disregarding Fannie Mae's legal and contractual interests and rights so as to advance National Union's interests;

(c) failing to evaluate Fannie Mae's claim in a fair, impartial and objective manner;

(d) failing to implement and/or adhere to appropriate claims-handling standards and procedures;

(e) delaying payment of Fannie Mae's claim; and

(f) making a settlement offer intended to force Fannie Mae to accept less than the true value of its compensable claim.

71. By engaging in such improper and unfair tactics, National Union has destroyed or injured Fannie Mae's right to receive the benefits provided for under the Bond for this loss, is evading the spirit of the Bond, and is willfully rendering National Union's performance under the Bond imperfect.

72. National Union's actions were oppressive or in willful and wanton disregard of Fannie Mae's rights under the Bond.

73. National Union's breaches of the implied duty of good faith and fair dealing have caused Fannie Mae to suffer damages, including being deprived of the benefit of the Bond and the Excess Bond, attorney fees and other expenses in bringing this action, lost earnings on amounts wrongfully withheld by National Union, and lost executive time and productivity, which damages are not subject to the Bond's limit of liability.

**PRAYER FOR RELIEF**

WHEREFORE, Fannie Mae requests that the Court enter judgment against National Union as follows:

(i) On Count One, a declaration that National Union is obligated to provide coverage in the amount of the full limit of the Bond for Fannie Mae's loss resulting from OMC's theft of loan payoff amounts;

(ii) On Count Two, judgment against National Union in the amount of twenty-five million dollars ($25 million Bond limit) plus compensatory and other damages, including

but not limited to attorneys fees and costs incurred in connection with this suit, in amounts to be determined at trial, and interest according to law;

(iii) On Count Three, judgment against National Union in the amount of twenty-five million dollars ($25 million Bond limit) plus compensatory and other damages, including but not limited to attorneys fees and costs incurred in connection with this suit, in amounts to be determined at trial, and interest according to law; and

(iv) Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Matthew Schlesinger by AMZ

Matthew J. Schlesinger, DC Bar #429689
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202-414-9200
Fax 202-414-9299

Counsel for Plaintiff
FANNIE MAE

Dated: January 9, 2006