A

# Proof of Loss

# Federal National Mortgage Association

**National Union Fire Insurance Company
Of Pittsburgh, Pa.
Financial Institution Bond No. 600-97-48**

National Union Claim Nos.: 165-029680, 165-029681
Matter: Olympia Mortgage

# Submitted 6/23/05 and Updated 12/21/05

## Table of Contents

|     |     | Page |
| --- | --- | --- |
| I.   | Introduction | 1 |
| II.  | Olympia's Servicer Obligations to Fannie Mae and the Loan Servicing Process | 1 |
| III. | Description of the Theft | 4 |
|      | A. The Fraud Perpetrated on Fannie Mae by Olympia | 4 |
|      | B. Olympia's Concealment of the Theft | 4 |
|      | C. Fannie Mae's Discovery of Olympia's Fraud | 5 |
| IV.  | Identification of the Loans and Summary of Verification Procedures Undertaken by Fannie Mae and Navigant Consulting | 7 |
|      | A. Introduction | 7 |
|      | B. Proof that Olympia and the Borrowers Entered into the 257 Refinance Transactions That Gave Rise to the Theft | 7 |
|      | C. Proof That Olympia Received Payments For The B Loans | 8 |
|      | D. Proof That Olympia Failed to Remit Payoff Payments to Fannie Mae | 9 |
| V.   | Ongoing Efforts to Mitigate the Loss | 10 |
| VI.  | Summary | 10 |

**Attachments to Addendum:**

Attachment A:  List of 257 Loans and Unpaid Principal Balance of Each

Attachment B:  Mortgage Selling and Servicing Contract Entered Into by Olympia Mortgage Corporation

Attachment C:  Sample Loan and Olympia Generated Documents

Attachment D:  Wire Transfer Payments For Refinance Loans

Attachment E:  Sample Wire Transfer Information

Attachment F:  Sample Cover Up Check Payments

## Proof of Loss – Olympia Mortgage Matter

I. **INTRODUCTION**

Olympia Mortgage Corporation ("Olympia") stole payoff proceeds for 257 loans it was servicing for Federal National Mortgage Association ("Fannie Mae").[1] Specifically, Olympia failed to remit loan payoff proceeds to Fannie Mae for such loans, failed to report to Fannie Mae as required that the loans were to be paid off, and engaged in elaborate efforts to conceal its theft.[2] In each instance, borrowers executed loan documents (the "B Loans") with Olympia for the purpose of reducing their interest rates or modifying the terms of outstanding loans (the "A Loans") on the same property. Olympia sold the B Loans to Fannie Mae. But, Olympia, as servicer of the A Loans, failed to remit funds to Fannie Mae to payoff the outstanding balance of the A Loans. Rather, Olympia stole the payoff proceeds for its own purposes. Olympia took numerous steps to conceal its fraud, including continuing to report to Fannie Mae the A Loans as open and current. The loss to Fannie Mae as a result of Olympia's fraud is: the non-recovered outstanding balance of the 257 A Loans (**$43,918,500.42**);[3] and amounts, now in excess of **$540,000**, that Fannie Mae has incurred (and will incur) for the work performed by Navigant Consulting to determine, verify and calculate the loss.

This document provides further evidence and support for Fannie Mae's claim for coverage for Fannie Mae's loss under National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") Financial Institution Bond No. 600-97-48 and excess bonds. To assist in the investigation of this fraud and the preparation of Fannie Mae's claim, Fannie Mae engaged Navigant Consulting, Inc. ("Navigant Consulting"), a national consulting firm that focuses on complex business litigation and forensic accounting issues. Navigant Consulting reviewed and analyzed various documents prepared by both Fannie Mae and Olympia. These documents include loan files, transactional documents involving the sales of various mortgage notes, electronic listings of mortgages, wire transfers and various business records of Olympia. Navigant Consulting and Fannie Mae also interviewed various current and former Olympia personnel. Information developed by Navigant Consulting and from Fannie Mae forms the support for Fannie Mae's claim.

II. **OLYMPIA'S SERVICER OBLIGATIONS TO FANNIE MAE AND THE LOAN SERVICING PROCESS**

Fannie Mae is a private, shareholder-owned company that channels its efforts into increasing the availability and affordability of homeownership for low-, moderate-, and middle-

---

[1] As Fannie Mae reserved its rights to do when it submitted its proof of loss on June 23, 2005, Fannie Mae submits this updated proof of loss to provide its further understanding of the fraud committed by Olympia and address misimpressions National Union appears to have based on Fannie Mae's June 23, 2005 proof of loss. Neither the amount of Fannie Mae's loss stated in the June 23, 2005 proof of loss nor the attachments thereto have changed.

[2] A list of the 257 loans along with their outstanding balances as of the end of October 2004, shortly after Olympia was terminated, is attached hereto as Attachment A.

[3] The outstanding balance of the loans at issue is approximately $2.6 million less than when Olympia stole the payoff funds because, to hide the fraud, Olympia itself made payments on the loans thereby reducing their outstanding balance.

income Americans. Fannie Mae does not originate mortgage loans but rather purchases loans from mortgage lenders, like Olympia, in the secondary mortgage market. Fannie Mae then often retains lenders (or "Seller/Servicers") to service the mortgage loans Fannie Mae purchases.

Fannie Mae purchases loans through its Asset Acquisition & Custody ("AA&C") group. After loans are acquired by the AA&C group, the loans are transferred to a separate group within Fannie Mae – the Asset Development & Management ("AD&M") group – which is responsible for the collection of principal and interest payments on such loans until the final payment or loan payoff amount is received by Fannie Mae.

As is its usual practice, Fannie Mae, through its AA&C group, purchased loans from Olympia and retained Olympia to "service" the loans. The agreement that governed the relationship between Fannie Mae and Olympia is called the "Mortgage Selling and Servicing Contract" (the "Contract").[4] The Contract incorporates by reference Fannie Mae's Servicing Guide, which sets forth additional obligations and responsibilities that Olympia agreed to comport with as part of its relationship with Fannie Mae.

Olympia agreed to diligently perform all servicing duties (Contract §V(A)(1)) and to service the loans in accordance with Fannie Mae's Servicing Guide (Contract §V(A)(3)). Pursuant to Fannie Mae's Servicing Guide, Olympia, as a servicer, was required, among other things, to:

- collect the monthly principal and interest ("P&I") payments, along with any tax, insurance, and other escrow payments, made by the borrower and to place the P&I payments into certain custodial bank accounts from which Fannie Mae can draft, on a monthly basis, the remittances due to Fannie Mae;

- collect and remit payoff amounts when a borrower, through a refinance or otherwise, pays off a loan;

- report (electronically via Fannie Mae's LASER system, as described below) the status of each loan it services each month, informing Fannie Mae whether the loan is current and whether Fannie Mae should draft P&I or payoff payments from a custodial account;

- deposit tax and insurance payments into separate custodial accounts, and ensure that taxes and insurance on the borrowers' properties are paid from those accounts.

Under the Servicing Guide, all servicers have certain responsibilities when a borrower, through a refinance or for any other reason, chooses to pay off a loan. For example, the Fannie Mae Servicing Guide specifically states:

---

[4] The Contract is attached hereto at Attachment B.

2

**Proof of Loss – Olympia Mortgage Matter**

- "The servicer must assure that the total amount required to satisfy the indebtedness – principal, interest, outstanding advances, etc. – is received and remitted to us." (III, 102.03: Payments in Full);

- "As soon as the servicer verifies that the amount required to pay a mortgage in full has been received, it must take all the steps necessary to assure that . . . our share of the payoff proceeds is remitted in accordance with the remittance schedule established for the remittance type under which the mortgage is reported . . . . The servicer must code the payoff as an Action Code 60." (VI, 101: Notification of Mortgage Payoff);

- "The servicer must remit payoff proceeds to us as part of its regular monthly remittance." (VI, 106.03: "Scheduled/Scheduled" Remittance Types);

- "A servicer must report removal transactions – payoff, repurchase, and foreclosure actions (Action Codes 60, 65, 67, 70, 71, and 72) -- in sufficient time for us to receive the notification by the second business day of the month following the cutoff date for the reporting period in which the activity occurred." (X, 103.01: Removal Transactions);

All of these servicing requirements applied to Olympia as a servicer of Fannie Mae loans.

Olympia and Fannie Mae maintained custodial accounts for the benefit of Fannie Mae at two institutions: Independence Community Bank and Midwood Federal Credit Union under documents entitled "Letters of Authorization." Pursuant to the Letters of Authorization, each month Fannie Mae withdrew monies from the P&I custodial accounts to collect repayment of principal (including prepayments and payoffs) and payment of interest on loans being serviced by Olympia on Fannie Mae's behalf.

Servicers communicate to Fannie Mae or, more specifically, to Fannie Mae's AD&M group, the status of outstanding loans they are servicing through an automated Fannie Mae loan servicing system known as LASER. As stated in Fannie Mae's Servicing Guide, "[t]he LASER Reporting System is an integrated investor reporting system that is used to capture loan-level detail for all regularly amortizing mortgages that a servicer services for Fannie Mae. . . . Under LASER, the servicer must report information on all of its mortgage portfolio each month. . . ." (X, Chapter 1: General Requirements). Accordingly, it is through LASER that a servicer, like Olympia, is required to inform Fannie Mae's AD&M group of the amounts of principal and interest being deposited into the custodial account for Fannie Mae to withdraw. Servicers are also required to use LASER to inform Fannie Mae's AD&M group that a loan is paid off and that AD&M should withdraw the payoff amount from the custodial account. Olympia used LASER in connection with the loans Olympia serviced for Fannie Mae, including the 257 at issue.

In sum, under the Servicing Guide, when a loan was to be paid off (whether through a refinancing or otherwise), Olympia had an obligation to notify Fannie Mae's AD&M group of that fact through LASER and to deposit the outstanding balance into the custodial account for

3

Fannie Mae to withdraw. After notification, AD&M would withdraw the payoff amounts from the custodial account and close the loan.

### III. DESCRIPTION OF THE THEFT

#### A. The Fraud Perpetrated on Fannie Mae by Olympia

With respect to each loan that is the subject of the fraud committed by Olympia, borrowers modified or refinanced outstanding mortgage loans (the A Loans) through Olympia for the purpose of obtaining lower rate (or modified term) mortgage loans (the B Loans) from Olympia on the same property.[5] Olympia sold the B Loans to Fannie Mae, and remitted to Fannie Mae monthly borrower principal and interest payments for the B Loans as is normal and to be expected. Because Fannie Mae had previously purchased the A Loans from Olympia, the outstanding principal balances of the refinanced A Loans were owed to Fannie Mae, and Olympia, as the servicer of the A Loans, was to have remitted those outstanding balances or final Loan A payoffs to Fannie Mae.[6]

Olympia, though, as the servicer of the 257 A Loans at issue, failed to remit payoff proceeds to Fannie Mae (or specifically to the appropriate custodial account Olympia shared with Fannie Mae), failing also to notify Fannie Mae's AD&M group through LASER that the first loans (A Loans) were to be paid off. Instead, Olympia stole the payoff amounts for its own purposes. As described below, Olympia, as servicer of the A Loans, then took numerous steps to conceal its theft of the Loan A payoff proceeds. In contrast to the 257 A Loans at issue, Olympia routinely notified Fannie Mae's AD&M group through LASER that other loans it refinanced and sold to Fannie Mae were to be paid off and remitted the payoff proceeds into the appropriate custodial account for Fannie Mae to withdraw.

#### B. Olympia's Concealment of the Theft

Olympia, functioning as a servicer, undertook elaborate efforts to conceal its theft of the loan payoff proceeds for the A Loans. First, after stealing the payoff proceeds on any given loan, Olympia continued to report to Fannie Mae's AD&M group each month through LASER the loan as current. At the same time, Olympia failed to report through LASER the required payoff

---

[5] The document executed by borrowers is referred to as a Reduction, Extension, and Modification Agreement ("REMA") (also commonly called a Consolidated, Extension, and Modification Agreement ("CEMA")). The REMA is used to conduct mortgage rate reductions or term modifications ("refinances") pursuant to a practice in New York and some other states that allows a borrower to limit the amount of mortgage recording tax he/she must pay when "refinancing" a mortgage. From a practice and systems perspective, the REMA or B Loan is treated as a refinance of the A Loan.

[6] Two hundred thirty-five of the A Loans previously had been placed by Fannie Mae into various pools of mortgage backed securities ("MBS") while twenty-two of the A Loans remained in Fannie Mae's own loan portfolio. In the late January and February 2005 time period, Fannie Mae, as required by the terms of its MBS guaranty obligation (as described in the MBS trust indenture and MBS Prospectus) and as trustee of the MBS Trusts, paid the full principal balance of the 235 MBS loans from Fannie Mae's own funds to the holders of the various MBS certificates. Fannie Mae also wrote off the remaining twenty-two A Loans that were in Fannie Mae's portfolio. Olympia has never reimbursed Fannie Mae for any of these amounts.

code – Action Code 60. Olympia then deposited into the custodial account from its own operating account the principal and interest payments that would have been due to Fannie Mae if the A Loans were current and not to be paid off. Then, Olympia informed Fannie Mae's AD&M group through LASER that the principal and interest payments were in the custodial account for Fannie Mae to withdraw, just as if the loans were, indeed, current.

Olympia also discontinued its customer service functions for the A Loans. For example, Olympia made sure that the borrowers did not continue to receive payment booklets for the A Loans or any other correspondence the borrowers would have received from Olympia had the borrowers not refinanced the A Loans. Olympia also stopped collecting from the borrowers the tax and insurance or escrow payments for the A Loans.

All of these efforts to conceal the theft of the payoff proceeds were performed by Olympia through its servicing of the A Loans for Fannie Mae. Olympia tracked the loans for which it kept the payoff proceeds on a list referred to as the "Code 59 List." Each of the 257 A Loans at issue is on the Code 59 List Fannie Mae obtained from Olympia after Fannie Mae suspected a problem (as described below). Olympia servicing personnel knew Olympia was reporting the Code 59 List loans to Fannie Mae's AD&M group through LASER as current and that checks were being written from the Olympia's operating account to the custodial account for the principal and interest payments the borrowers would have made had the A Loans not been refinanced. Olympia tracked the principal and interest payments it used to cover up the fraud with a special notation – "branch payment" – within its servicing system. Further, whenever an A Loan was refinanced, the Olympia servicing personnel would note the resulting required escrow account adjustments in the A Loan file and record the reason for the adjustment as "refinance." Notwithstanding that the servicing personnel accordingly were aware that the A Loan was refinanced, they continued to report to Fannie Mae's AD&M group the A Loan as current and make the expected monthly principal and interest payments as if such payments were being made by the borrowers themselves.

### C. Fannie Mae's Discovery of Olympia's Fraud

#### 1. The Anonymous Call

On September 29, 2004, Fannie Mae received information from an anonymous caller that led it to investigate Olympia. The anonymous caller said that a friend of his was an officer with a mortgage lender that was headquartered on the east coast and had west coast operations, and the lender was not a depository institution. The caller also described the owners of the company.

The caller said further that his friend had become aware that the lender appeared to be refinancing loans that had been sold to Fannie Mae but not remitting the final payoff proceeds for the outstanding loans to Fannie Mae. According to the caller, in order to avoid detection the lender itself would continue to make payments on the loan. In addition, the caller stated that the lender was also delivering to Fannie Mae the new, refinanced mortgages and remitting the payments made by the borrowers on them.

On the basis of the information provided by the anonymous caller, Fannie Mae was able to identify Olympia as the company most likely to be the one described. Fannie Mae undertook

Proof of Loss – Olympia Mortgage Matter
___

a search of its records to see if Olympia had delivered to Fannie Mae multiple first lien loans secured by the identical property. Fannie Mae came to suspect that, in fact, Olympia had failed to report and remit the payoff proceeds for certain loans it serviced for Fannie Mae.

### 2. Fannie Mae's Immediate Efforts To Investigate and Mitigate the Loss

Upon completing its initial review, Fannie Mae took immediate steps to mitigate the loss and further determine which loans were at issue. First, Fannie Mae took steps to move the remaining balance of funds held in the custodial accounts to other accounts, outside the control of Olympia. Then Fannie Mae officials visited Olympia's offices unannounced on October 19, 2004 to confirm what Fannie Mae had suspected and to review Olympia's records as they pertained to Fannie Mae's accounts.

At Olympia, Fannie Mae met with Barry Goldstein, one of Olympia's principals. Mr. Goldstein, upon being informed about Fannie Mae's suspicions, reviewed the information against Olympia's books and confirmed the existence of the multiple first lien loans on the same property. Mr. Goldstein then provided Fannie Mae with access to Olympia's books, records and staff.

The following day, Fannie Mae delivered a formal notice of termination to Olympia and took immediate action to transfer servicing of the loans being serviced by Olympia to a new vendor (Cenlar, Inc.). Fannie Mae also seized files related to the loans Olympia had sold Fannie Mae and the loans it serviced for Fannie Mae. Over the course of the next few weeks, through a review of Olympia's files and interviews with its employees, evidence of a large-scale fraud began to emerge. As a result, Fannie Mae initiated conversations with the New York Banking Commission and the FBI. In addition, as discussed more fully below, Fannie Mae initiated a lawsuit on November 16, 2004 against Olympia and Lieb Pinter[7] and obtained a court order putting in place a receiver ("Receiver") to oversee the orderly winding down of Olympia's affairs and to assist in tracing the funds stolen by Olympia.

### 3. Fannie Mae's Notice to Bond Carriers

By letter dated October 28, 2004 addressed to Willis of New York and in accordance with the terms of the Bond, Fannie Mae provided notice to its Bond insurers of Olympia's fraud and Fannie Mae's loss.[8]

___

[7] Lieb Pinter is a former principal of Olympia.

[8] Fannie Mae also provided notice of this loss under Olympia's Mortgage Bankers Bond (MBB-03-00195). According to counsel for the underwriters of that Bond, the aggregate limit of liability is $1,350,000 with a retroactive date of April 1, 2004 for the last $100,000 of such limit. It is unclear whether the Receiver intends to file a proof of loss under this Bond.

Proof of Loss – Olympia Mortgage Matter

IV. **IDENTIFICATION OF THE LOANS AND SUMMARY OF VERIFICATION PROCEDURES UNDERTAKEN BY FANNIE MAE AND NAVIGANT CONSULTING**

A. **Introduction**

Using the property addresses on Olympia's "Code 59 List" (the list Olympia used to track the loans for which it kept the payoff proceeds), Fannie Mae confirmed within its system 257 outstanding loans for which Olympia should have remitted payoff proceeds but did not. Olympia personnel have admitted, in interviews conducted by Fannie Mae representatives, that Olympia failed to report the 257 loans as paid off, failed to remit to Fannie Mae the payoff proceeds for these loans and engaged in efforts to conceal the theft of the borrower payoff proceeds. Set forth below is a description of documents that demonstrate the fraud and support Fannie Mae's proof of loss.

B. **Proof that Olympia and the Borrowers Entered into the 257 Refinance Transactions That Gave Rise to the Theft**

Various forms of documentary evidence demonstrate that borrowers entered into the modification or refinance transactions creating the B Loans. For most of the 257 loans, Fannie Mae has the HUD-1 and/or Reduction, Extension, and Modification Agreement ("REMA") forms executed by borrowers when obtaining the refinanced B Loans. The HUD-1 is a closing statement or settlement sheet that lists all closing costs on a real estate purchase or refinance transaction, including, if a modification or refinance, the existing lien that is to be paid off. The REMA (also commonly known as a "CEMA") is a document used to conduct mortgage interest rate reductions or term modifications ("refinances") under the statutory provisions of New York pursuant to a practice that is used in New York and some other states. In practice, REMAs are treated as refinances (or new loans). These documents, as well as the Uniform Residential Loan Application, show the borrowers' instructions to Olympia to modify or "refinance" their outstanding loans (A Loans) creating Olympia's obligation to payoff the A Loans on the borrowers' properties.

Attachment C is a compilation of various documents used in the loan process and documents that demonstrate Olympia's fraud for one of the 257 loans (Loan No. 257 – "        " – on Attachment A). The first set of documents within Attachment C is the loan application, HUD-1 and REMA for the loan that should have been paid off by Olympia – Loan A. The documents demonstrate that the address of the property is                    and the original balance of the outstanding loan (which itself happened to be a refinance of an earlier loan) on that property was $293,777.00. The Loan A REMA shows that the loan was originated by Olympia on November 24, 2003 and that its Olympia loan number was           .

The next set of documents in the attachment includes the loan application, HUD-1 and REMA for the refinanced loan – Loan B. These documents show that the amount of the existing lien on the property located at                                              was $290,575.00 and that the purpose of the new loan is a rate/term refinance of the outstanding loan – Loan A. The HUD-1 indicates that the principal amount of the refinance is $290,575.00 – the same

amount as the existing mortgage lien. The REMA shows that Olympia originated the refinance – the Loan B – on July 21, 2004 and that the Olympia loan number for it was                    .

Attachment C also includes a copy of the Olympia list of "Code 59" loans (or A Loans) as it existed on October 25, 2004. Again, this is the list of the loans, as maintained by Olympia, for which Olympia deliberately and fraudulently failed to remit the payoff proceeds to Fannie Mae. The outstanding            loan, including the Olympia loan number            for it and street address of the property, is on this list and is highlighted in yellow on the top of the third page.

Finally, a loan history report generated from Olympia's loan servicing system for the initial loan (i.e., Loan A) is provided. Note that within the loan history of the original loan, the term "branch payment" appears for all P&I payments made after Olympia was supposed to have remitted funds to Fannie Mae to pay off the initial loan – further evidence of Olympia's efforts to cover up the fraud.

While Attachment C contains documents for one specific loan, similar information has been complied for each of the 257 loans.

### C. Proof That Olympia Received Payments For The B Loans

Wire transfer documents show that Fannie Mae paid Olympia for the B Loans (the "refinance" loans). Fannie Mae's wire transfer data is maintained electronically for 2000-2004 and in hard copy for the pre-2000 time period.

Most Fannie Mae wire transfers to Olympia show payment for a series of loans or loan pools or sub-pools.[9] These wire transfers specifically identify the date, time and amount of the funds transfer. Separate electronic files detail the loan pools (or, more frequently, sub-pools) and/or specific loans (where a loan was purchased individually rather than as part of a pool) that were purchased pursuant to these wire transfers. Also, an individual loan that is part of a pool or sub-pool can be identified using Fannie Mae's loan servicing system. When the wire transfers are viewed with the individual loan data, one can identify the specific wire transfer that served as payment for each loan purchased by Fannie Mae from Olympia during the relevant time period.

Navigant Consulting, accordingly, identified wire transfers that were used to pay for the B Loans.[10] A summary list of the wires used to pay for each Loan B (along with the loan purchased through each wire) is included as Attachment D. The majority of the 257 loans were

---

[9] Fannie Mae's process of securitizing its acquired loans involves the placement of these loans into mortgage loan "pools." These pools are generally assigned a six-digit number (e.g., "253626"). These pools combine loans from various lenders around the country so as to diversify the various risks associated with these securities. Olympia could make several contributions of loans to a loan pool during the course of a month (e.g., 4 loans on the 3rd of the Month, 6 loans on the 12th of the month, and 3 loans on the 23rd of the month). Each of these contributions are considered to be a "sub-pool" and are labeled accordingly by Fannie Mae (e.g., the first contribution during a month would be Pool 253626-A, the second contribution would be 253626-B, etc.).

[10] Fannie Mae has provided wire transfer information to the government in response to a grand jury subpoena.

purchased using wire transfers that were directly deposited into Olympia's operating account at Independence Community Bank.[11]

Attachment E contains exemplars of the wire transfer information used to create the list in Attachment D. These exemplars relate, once again, to the _____ loan (see Attachment C). Attachment E contains three documents. The first document is a report prepared by Navigant Consulting that summarizes Fannie Mae's electronic wire transfer and loan information. As the report demonstrates, the _____ loan was one of twenty-four loans purchased by Fannie Mae through a $3,037,595 wire transfer processed on July 23, 2004. The amount paid for the _____ loan was $286,137.[12] The second and third documents within Attachment E trace the flow of the $3,037,595 from Fannie Mae's account into Olympia's operating account at Independence Community Bank. The second document is a Fannie Mae electronic wire transfer summary, which identifies all wire transfers from Fannie Mae to Olympia for 2004. Page fourteen of that report shows the July 23, 2004 transfer from Fannie Mae to Independence Community Bank for $3,037,595. The final document is the July 2004 bank statement for the Olympia operating account at Independence Community Bank. The third page of this bank statement shows the receipt by Olympia of the $3,037,595 wire transfer from Fannie Mae on July 23, 2004. In combination, these three documents demonstrate that Fannie Mae purchased the refinanced _____ loan from Olympia and transferred into Olympia's bank account the funds necessary to pay for that purchase. Proof of payment from Fannie Mae to Olympia for the other refinance loans has also been compiled.

### D.   Proof That Olympia Failed to Remit Payoff Payments to Fannie Mae

Among the evidence of Olympia's failure to notify Fannie Mae's AD&M group of the payoffs (and the failure to subsequently transmit the payoff proceeds) is that all 257 A Loans were reported by Olympia in LASER as current and performing after Olympia should have reported the loans as closed and remitted the payoff proceeds. Olympia's failure to remit the payoff proceeds for the 257 A Loans is further demonstrated by the P&I payments that Olympia reported to Fannie Mae's AD&M group and made to conceal the fraud.

Tellingly, after Olympia was shut down in October 2004, and servicing was transferred to the new servicer (Cenlar), the principal and interest payments on the A Loans ceased to be made. Once the fraud was uncovered and Olympia was no longer servicing the loans, the ruse of making payments on the "Code 59" loans (or A Loans) could no longer continue. In contrast,

---

[11] Prior to late 2001, the operating account was maintained at Citibank. In a few instances, moneys were wired to other operating accounts maintained by Olympia.

[12] Fannie Mae forwarded to Olympia a significant portion of the purchase price of many of the refinance loans within 72 hours of the receipt (and acceptance) of the refinance loan documents from Olympia. The remaining amounts were forwarded to Olympia when the pools within which the loans were placed were closed. In this case, the original loan amount for the _____ loan was $290,575 (see Loan B in Attachment C) and the amount wired on July 23 was $286,137 (approximately 98.5% of the total loan amount). The balance of the monies due to Olympia, net of certain fees and discounting, was remitted to Olympia as part of a second wire transfer (for $131,273.24) on August 3, 2004.

the principal and interest payments on the refinanced loans (or B Loans) and other loans that were not the subject of this theft continued to be made by the borrowers.

Navigant Consulting has specifically identified individual checks that were written by Olympia to cover the P&I payments for A Loans after Olympia stole the payoff proceeds for such loans. A sample of a check written for the _____ loan is included as Attachment F. As noted, the Olympia check registers show that a significant number of P&I checks were written each month by Olympia's servicing personnel as part of Olympia's effort to conceal the fraud. Examples of P&I checks written by Olympia have been compiled for other loans.

## V.    ONGOING EFFORTS TO MITIGATE THE LOSS

In an attempt to recover the unpaid principal balances, on November 16, 2004 Fannie Mae brought suit against Olympia and Lieb Pinter, one of its principals, in Federal District Court in the Eastern District of New York for breach of contract and fraud. By way of preliminary relief, Fannie Mae sought the appointment of a receiver to accomplish the orderly transition of the servicing and administration of outstanding loans and to search for and secure assets. By Order dated November 23, 2004, Judge Nina Gershon appointed Karen Balmer to serve as receiver to identify, secure and recover Olympia assets for the benefit of Olympia's creditors. Fannie Mae is also taking other steps to identify recoverable assets and other potentially liable persons or entities. To date, Fannie Mae has recovered no portion of the **$43,918,500.42** outstanding balance of the 257 A Loans.

## VI.   SUMMARY

Olympia stole payoff proceeds that it was supposed to have reported to Fannie Mae through LASER and remitted to Fannie Mae with respect to 257 A Loans Olympia was servicing for Fannie Mae. The financial loss to Fannie Mae resulting directly from Olympia's theft of the payoff proceeds is the total unpaid principal balance for the 257 A Loans as of the end of October 2004, which amounts to **$43,918,500.42**. These balances reflect the application of all payments received from Olympia prior to Fannie Mae's transfer of servicing for these loans from Olympia to a new servicer. Fannie Mae has also incurred (and will continue to incur) costs in excess of **$540,000** for the work Navigant Consulting has done to determine and verify the amount and extent of Fannie Mae's loss.[13]

As Fannie Mae's investigation into Olympia's fraud continues, Fannie Mae reserves the right to supplement this proof of loss as necessary and appropriate.

---

[13] Fannie Mae has incurred (and continues to incur) other costs as well, including significant sums on efforts to mitigate its loss and recover amounts stolen.



AIG Technical Services, Inc.
175 Water Street
New York, NY 10038

CLAIM #: <u>165-029680, 165-029681</u>

# FIDELITY BOND CLAIM DEPARTMENT PROOF OF LOSS

| EACH STATEMENT MUST BE MADE UNDER OATH |

ORIGINALLY SUBMITTED 6/23/05 AND UPDATED 12/21/05

1. Claim is hereby made upon the National Union Fire Insurance Company of Pittsburgh, PA pursuant to the terms of Bond No./Policy No. <u>600-97-48</u> for a loss sustained in the amount of $ <u>See Attached</u>, consisting of property and/or money as described in the schedule (Item #4) submitted below, which loss was discovered by us on the _____ day of the month of <u>See Attached</u>, 20____.

2. The loss *is* a direct result of (check and complete one of the boxes below):

| 1 | | **Employee Dishonesty (Give** Name of Employee(s)) |
|---|---|---|
| 2 | | **Loss on the Premises** (Give Loss Location) |
| 3 | | **Loss Away From the Premises** (Give Loss Location) |
| 4 | | **Forgery or Alteration** of a Negotiable Instrument (Attach Forged Instrument and Affidavit of Forgery) |

3. And occurred under the following circumstances:

   <u>See Attached</u>

4. The loss consisted of property valued as itemized and described in the table below, (Use extra pages as necessary).

| Date of Loss | Owner | Quanity And Description | Approximate Date Purchased | Place Purchased | Actual Cost | Amount Claimed |
|---|---|---|---|---|---|---|
| | | | See Attached | | | |

Claim # <u>165-029680, 165-029681</u>

Total  
Less salary, commission, profit, etc.  
*Net Loss*  
(SEE REVERSE SIDE)

$ <u>See Attached</u>  
$_____  
$ <u>See Attached</u>

5. The Insured has no other suretyship/property insurance or other insurance under which the above claim, or any part thereof, is claimable, except the following:

6. Circumstances were reported to the police department as follows:

| Police Department | Officer | Phone No. | Case No. | Date |
|---|---|---|---|---|
| | | | | |

7. It is understood and agreed that the furnishing of this form to the insured or its preparation by any representative of the Company, or the acceptance or retention of the proof thereafter by the Company shall not constitute a waiver of any of the conditions fo the polcy.

Date 12-22-05

Federal National Mortgage Association
_____ Insured
By _____
Name and Title of Officer Making Affidavit
**David Hisey, Senior Vice President and Controller**

Subscribed and sworn to before me, the undersigned, at _____
on the ___22___ day of the month of ___December, 2005___

Betty A. Ferrier
Notary Public
Notary Public, District of Columbia
My Commission Expires February 14, 2007

### INSTRUCTIONS FOR MAKING PROOF

Statement of loss should be an itemized account showing names, dates, amounts, and description of individual items, of money, securities or property, misappropriated, stolen or embezzled, as nearly as can be ascertained, and if representing collections made, the dates, names and addresses of the persons, firms or corporations from which the collections were made.

Credits should be similarly entered in detail, as to commissions or salary due and unpaid and any securities, notes, etc., should he listed individually with full description.

Attach to proof all original vouchers, or otherwise verified copies of same and any further evidence in explanation or support of the amount or amounts for which claim is made.

If other security, indemnity or surety against loss is held, list the amounts, names and addresses of the indemnities or sureties with Ml description of Same.

### NOTICE TO NEW YORK APPLICANTS

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

### NOTICE TO OHIO APPLICANTS:

Any person who, with intent to defraud of knowing that he is facilitating a fraud against an insurer, submits an application or film s claim containing a false or deceptive statement is guilty of insurance fraud.

### NOTICE TO KENTUCKY APPLICANTS:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals for the purpose of misleading, information omitting any fact material thereto commits a fraudulent insurance act, which is a crime.