**B**



# FINANCIAL INSTITUTUION BOND

# AND COMPUTER CRIME

## EFFECTIVE JUNE 30, 2004- JUNE 30, 2005

### INSURER:
### NATIONAL UNION FIRE INSURANCE COMPANY
### OF PITTSBURGH, PA

Copy Control Number
FIB 006

# FINANCIAL INSTITUTION BOND

## SECTION 1

National Union Fire Insurance Company of Pittsburgh, Pa.
(A Stock Insurance Company, herein called the Company)

**DECLARATIONS**

Bond Number **600-97-48**

Item 1.  Name of Insured (herein called Insured)

**FANNIE MAE** and all wholly owned or majority owned subsidiary companies or corporations as now or hereinafter constituted or acquired, and notified to Underwriters hereon with the provisions of General Agreement B of Financial Institution Bond and General Condition (C) of Electronic and Computer Crime Policy, and all Pension Plans or Trusts and Employee Welfare Plans or Trusts now or hereinafter owned and controlled by the Insured and all as agreed by Underwriter hereon.

Principal Address:
3900 Wisconsin Avenue N. W,
Washington, DC 20016-2899

Item 2.  Bond Period: from 12:01 a.m. on June 30, 2004 to 12:01 a.m. on June 30, 2005

Item 3.  The Aggregate Liability of the Underwriter during the Bond Period shall be $50,000,000 combined for Sections 1 and 2

Item 4.  Subject to Sections 3 and 11 hereof,
the Single Loss Limit of Liability is          $25,000,000
the Single Loss Deductible is                  $ 5,000,000

Provided, however, that if any amounts are inserted below opposite specified Insuring Agreements or Coverage, those amounts shall be controlling. Any amount set forth below shall be part of and not in addition to amounts set forth above. (If an Insuring Agreement or Coverage is to be deleted, insert "Not Covered.")

| Amount applicable to: | Single Loss Limit of Liability/Aggregate | Single Loss Deductible |
|---|---|---|
| Insuring Agreement (A)-FIDELITY | $25,000,000 | $5,000,000 |
| Insuring Agreement (B)-ON PREMISES | $25,000,000 | $5,000,000 |
| Insuring Agreement (C)-IN TRANSIT | $25,000,000 | $5,000,000 |
| Insuring Agreement (D)-FORGERY OR ALTERATION | $25,000,000 | $5,000,000 |
| Insuring Agreement (E)-SECURITIES | $25,000,000 | $5,000,000 |
| Insuring Agreement (F)-COUNTERFEIT CURRENCY | $25,000,000 | $5,000,000 |

1

Optional Insuring Agreements and Coverages:

| | | NIL |
|---|---|---|
| Insuring Agreement (G)-FIDELITY CLAIM EXPENSE | $   250,000/$250,000 | |
| Insuring Agreement (H)-SERVICING CONTRACTORS | $25,000,000 | $5,000,000 |
| Insuring Agreement (I)-FORGED/FRAUDULENT MORTGAGES (with respect to credit unions and deposit taking institutions) | $25,000,000 | $3,000,000 |
| Insuring Agreement (I)-FORGED/FRAUDULENT MORTGAGES (all entities other then credit unions and deposit taking institutions) | $25,000,000 | $5,000,000 |
| Trading Loss Coverage | $25,000,000 | $5,000,000 |

If "Not Covered" is inserted above opposite any specified Insuring Agreement or Coverage, such Insuring Agreement or Coverage and any other reference thereto in this bond shall be deemed to be deleted therefrom.

**Item 5.**     The liability of the Underwriter is subject to the terms of the following riders attached hereto:
Section 1, Riders No. 1 through 5; Section 2, Rider No. 1; Sections 1 & 2, Riders No. 1 through 3

**Item 6.**     The Insured by the acceptance of this bond gives notice to the Underwriter terminating or canceling prior bond(s) or policy(ies) No.(s) **2825046** such termination or cancellation to be effective as of the time this bond/policy becomes effective.

**Item 7.**     LOSSES TO BE NOTIFIED TO:     WILLIS OF NEW YORK
7 HANOVER SQUARE
NEW YORK, NY 10004
ATTN: STEPHEN LEGGETT

By: _____
AUTHORIZED REPRESENTATIVE

2

**POLICYHOLDER DISCLOSURE STATEMENT**
**UNDER**
**TERRORISM RISK INSURANCE ACT OF 2002**

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage.  The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review.  There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act.  Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

Unless you sign this form and return it to us rejecting Terrorism Coverage under the Federal Act, you will be covered for Terrorism as defined in the Act and your premium for that coverage is $4,650 _____ .

_____   I hereby reject coverage in accordance with the Act.

_____
Signature of Insured

_____
Print Name/Title

_____
Date

**COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE**

Insured Name: *FANNIE MAE*

Policy Number: *600-97-48*
Policy Period Effective Date From: *June 30, 2004*        To: *June 30, 2005*

81285 (1/03)

The Underwriter, in consideration of an agreed premium, subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

## INSURING AGREEMENTS

### FIDELITY

(A)    (1)    Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee:

(a)    to cause the Insured to sustain such loss; or
(b)    to obtain financial benefit for the Employee or another person or entity.

Notwithstanding the foregoing, however, it is agreed that with regard to Loans and/or Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to make and which results in:

(i)    a financial benefit for the Employee;
(ii)    a financial benefit for another person or entity with whom the Employee committing the dishonest or fraudulent act was in collusion, provided that the Insured establishes that the Employee intended to participate in the financial benefit; or
(iii)    the intentional transfer of funds or Property to the benefit of an innocent third party, committed by the Employee in the knowledge that such third party was not lawfully entitled to such funds or Property and which funds or Property is not lawfully recoverable by the Insured.

(A)    (2)    Physical loss of or damage to Property, Electronic Data or Electronic Data Processing Media as a result of acts committed by an Employee (including malicious acts of Employees), whether committed alone or in collusion with others, which acts are committed with the intent to cause the Insured to sustain such loss.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions. The term "funds or Property" does not include any loan or transaction in the nature of or amounting to a loan or a lease or an extension of credit.

Notwithstanding the above, it is agreed that in determining the amount of any loss payable under this bond, the Insured may include payments to individual Employees which are bonuses, commissions and profit sharing as part of such loss provided that such payments have been solely as the result of the Employee committing a dishonest or fraudulent act as described in this Insuring Agreement.

3

As used herein:

Loans means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions in which the Insured assumes an existing creditor relationship.

Trading means trading or other dealings in securities, commodities, futures, options, foreign or Federal Funds, currencies, foreign exchange and the like.

Electronic Data means facts or information converted to a form useable in a Computer System and which is stored on Electronic Data Processing Media for use by computer programs.

Electronic Data Processing Media means punched cards, magnetic tapes, punched tapes or magnetic discs or other bulk media on which data is recorded.

## ON PREMISES

(B)   (1)   Loss of Property resulting directly from

    (a)   robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, while the Property is lodged or deposited within offices or premises located anywhere, or

    (b)   theft, false pretenses, common law or statutory larceny, committed by a person

        (i)   present in an office of or on the premises of the Insured, or
        (ii)  present on the premises in which the Property is lodged or deposited.

   (2)   Loss of or damage to

    (a)   furnishings, fixtures, supplies or equipment within an office of the Insured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief, or

    (b)   such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief, provided that

        i)   the Insured is the owner of such furnishings, fixtures, supplies, equipment or office or is liable for such loss or damage, and
        ii)  the loss is not caused by fire.

4

## IN TRANSIT

(C)   (1)   Loss of Property resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or otherwise made away with, and damage thereto or destruction thereof, while the Property is in the custody of a person designated by the Insured to act as its messenger (or a person acting as messenger or custodian during an emergency arising from the incapacity of such designated messenger) and while the Property is in transit anywhere, such transit to begin immediately upon receipt of such Property by said messenger and to end immediately upon delivery to the designated recipient or its agent.

(2)   Loss by reason of any non-negotiable instruments being lost from any peril set forth in paragraph (1) above while in transit in the custody of a carrier for hire, such transit to begin immediately upon receipt of such property by the transporting person(s) and to end immediately upon delivery to the designated recipient or its agent.

## FORGERY OR ALTERATION

(D)   Loss resulting directly from

(1)   Forgery or alteration of, on or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, withdrawal order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit,

(2)   transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or banking institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems sent by a person other than the said customer or banking institution purporting to send such instructions or advices shall be deemed to bear a signature which is a Forgery.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

## SECURITIES

(E)   Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1)   acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

(a)   Security,
(b)   Document of Title,
(c)   deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,
(d)   Certificate of Origin or Title,
(e)   Evidence of Debt,
(f)   corporate, partnership or personal Guarantee, or
(g)   Security Agreement
(h)   statements of uncertificated securities of any book entry facility with written instructions

which

i)    bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or
ii)   is altered, or
iii)  is lost or stolen;

(2)   guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (h) above;

(3)   acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any item listed in (a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

## COUNTERFEIT CURRENCY

(F)   Loss resulting directly from the receipt by the Insured, in good faith, of any Counterfeit Money, coin or currency of the United States of America, Canada or any other country.

## FIDELITY CLAIM EXPENSE

(G)   Fees and expenses incurred and paid by the Insured with the prior approval of the Underwriter, for independent outside accountants to determine the amount and extent of loss covered under Insuring Agreements of this bond.

6

## GENERAL AGREEMENTS

### NOMINEES

A.     Loss sustained by any nominee organized by the Insured for the purpose of handling certain of its business transactions and composed exclusively of its officers, clerks or other employees shall, for all the purposes of this bond and whether or not any partner of such nominee is implicated in such loss, be deemed to be loss sustained by the Insured.

### ADDITIONAL OFFICES OR EMPLOYEES – CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE

B.     If the Insured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase of assets of, another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the premium period. If the Insured shall, while this bond is in force, consolidate or merge with, or purchase assets of, another institution, the Insured shall not have such coverage as is afforded under this bond for loss which

     (a)     has occurred or will occur in offices or premises, or

     (b)     has been caused or will be caused by an employee or employees of an institution, or

     (c)     has arisen or will arise out of the assets acquired by the Insured as a result of such consolidation, merger or purchase of assets; unless the Insured shall

         i)     give the Underwriter written notice of the proposed consolidation, merger or purchase of assets at least 60 days prior to the proposed effective date of the consolidation, merger or purchase of assets, and

         ii)     obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, Employees and other exposures, and

         iii)     pay to the Underwriter an additional premium computed pro rata from the date of such consolidation, merger or purchase of assets to the end of the current premium period.

Notwithstanding the foregoing, the Underwriter agrees to automatically extend such coverage as is afforded under this bond to any consolidated, merged or acquired institution which has less than twenty (20%) percent of the Insured's assets without the payment of additional premium for the remainder of the premium period provided, however, that the Insured gives the Underwriter written notice of such consolidation, merger or purchase, or acquisition of assets or liabilities within ninety (90) days after the effective date of such action.

7

## CHANGE OF CONTROL -NOTICE

C.    When the Insured learns of a transfer of its outstanding voting stock which results in a change of control of the Insured, it shall within sixty (60) days give written notice to the Underwriter setting forth

    (a)    the names of the transferors and transferees (or the names of the beneficial owners if the shares are registered in another name), and

    (b)    the total number of shares owned by the transferors and the transferees (or the beneficial owners), both immediately before and after the transfer, and

    (c)    the total number of outstanding shares of voting stock.

As used in this General Agreement, control means the power to determine the management or policy of the Insured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of twenty (20%) percent or more of the outstanding voting stock of the Insured shall be presumed to result in a change of control for the purpose of the required notice.

Failure to give the required notice shall result in termination of coverage of this bond, effective upon the date of stock transfer, for any loss in which any transferee is implicated.

## WARRANTY

D.    No statement made by or on behalf of the Insured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

## JOINT INSURED

E.    If two or more Insureds are covered under this bond, the first named Insured shall act for all Insureds. Payment by the Underwriter to the first named Insured of loss sustained by any Insured shall fully release the Underwriter on account of such loss. If the first named Insured ceases to be covered under this bond, the Insured next named shall thereafter be considered as the first named Insured. Knowledge possessed or discovery made by any Insured shall constitute knowledge or discovery by all Insureds for all purposes of this bond. The liability of the Underwriter for loss or losses sustained by all Insureds shall not exceed the amount for which the Underwriter would have been liable had all such loss or losses been sustained by one Insured.

8

## COURT COSTS AND ATTORNEYS' FEES

F.  (a)  <u>Collectible Loss</u>

The Underwriter shall indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under this bond in excess of any Deductible Amount. Such indemnity shall be a part of the Aggregate Limit of Liability and the Sub-Limit for the applicable Insuring Agreement(s).

However, if multiple causes of action are alleged in any such suit or legal proceeding some of which causes of action, if established against the Insured, would not constitute a collectible loss under the bond, then the Insured shall bear for its own expense the court costs and attorneys' fees incurred in the defense of such alleged causes of action.

(b)  <u>Calculation of Costs and Fees</u>

(1)  Aggregate Limit or sub-limit not reduced

The following formula is to apply solely for the purpose of calculating how court costs and attorneys' fees are to be pro-rated when the Aggregate Limit of Liability or a sub-limit has not been reduced:

If the amount of the Insured's liability or alleged liability is greater than the amount recoverable under this bond, or if a Deductible Amount is applicable, or both, the liability of the Underwriter under this General Agreement F is limited to the proportion of court costs and attorneys' fees incurred and paid by the Insured or by the Underwriter that the amount recoverable under this bond bears to the total of such amount plus the amount which is not so recoverable.

(2)  Aggregate Limit or sub-limit reduced

The following formula is to be applied solely for the purpose of calculating how court costs and attorneys' fees are to be prorated when the Aggregate Limit of Liability or a sub-limit has been reduced in part:

If the amount of the Insured's liability or alleged liability is greater than the reduced amount recoverable under this bond at the time court costs and attorneys' fees are to be calculated, or if a Deductible Amount is applicable, or both, the liability of the Underwriter under this General Agreement F is limited to the proportion of court costs and attorneys' fees incurred and paid by the Insured or by the Underwriter that the reduced amount recoverable under this bond bears to the total of such amount plus the amount which is not so recoverable.

9

(c)    <u>Reimbursement of Excess Payment</u>

If the Underwriter pays court costs and attorneys' fees in excess of its proportionate share of such costs and fees, the Insured shall promptly reimburse the Underwriter for such excess.

(d)    <u>Reduction of Aggregate Limit of Liability or sub-limit</u>

Court costs and attorneys' fees indemnified to the Insured under this General Agreement F. shall be a part of, and not in addition to, the Aggregate Limit of Liability or applicable sub-limit and payments made under this bond, including payments of court costs and attorneys' fees shall reduce the amount of the Aggregate Limit of Liability or sub-limit stated in Item 3. of the Declarations.

(e)    <u>Notice of Legal Proceedings</u>

The Insured shall promptly give notice to the Underwriter of the institution of any suit or legal proceeding referred to in paragraph (a) above and at the request of the Underwriter shall furnish it copies of all pleadings and other papers therein.

(f)    <u>Election to Defend</u>

At the Underwriter's election, the Insured shall permit the Underwriter to conduct the defense of such suit or legal proceeding, in the Insured's name, through attorneys of the Underwriter's selection.

In such event, the Insured shall give all reasonable information and assistance which the Underwriter shall deem necessary to the defense of such suit or legal proceeding.

(g)    <u>Payment of Court Costs and Attorneys' Fees</u>

The Underwriter shall not be liable to indemnify the Insured for court costs and attorneys' fees until after final judgment or settlement of any suit or legal proceeding.

<u>**CONDITIONS AND LIMITATIONS**</u>

<u>DEFINITIONS</u>

Section 1. As used in this bond:

(a)    Acceptance means a draft which the drawee has, by signature written thereon, engaged to honor as presented.

(b)    Certificate of Deposit means an acknowledgment in writing by a financial institution of receipt of Money with an engagement to repay it.

(c)   Certificate of Origin or Title means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(d)   Counterfeit means an imitation which is intended to deceive and to be taken as an original.

(e)   Document of Title means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

(f)   Employee means

(1)   an officer or other employee of the Insured, while employed in, at or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises;

(2)   an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured;

(3)   a person provided by an employment contractor to perform employee duties for the Insured under the Insured's supervision at any of the Insured's offices or premises covered hereunder;

(4)   an employee of an institution merged or consolidated with the Insured prior to the effective date of this bond;

(5)   each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured, herein called Processor. (Each such Processor, and the partners, officers and employees of such Processor shall, collectively, be deemed to be one Employee for all the purposes of this bond, excepting, however, the second paragraph of Section 12. A Federal Reserve Bank or clearing house shall not be construed to be a processor);

(6)   each natural person, partnership, or corporation authorized by the Insured to design, prepare, supply or service electronic instructions for the Insured's computer systems herein called Independent Software Contractors. Each such Independent Software Contractor and its parent, officers, and employees shall collectively be deemed to be one employee;

(7)   consultants that have a valid written contract with the Insured.

11

(g)    Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

(h)    Forgery means the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose.

(i)    Guarantee means a written undertaking obligating the signer to pay the debt of another to the Insured or its assignee or to a financial institution from which the Insured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(j)    Letter of Credit means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(k)    Money means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

(l)    Negotiable Instrument means any writing:

    (1)    signed by the maker or drawer; and

    (2)    containing an unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and

    (3)    is payable on demand or at a definite time; and

    (4)    is payable to order or bearer.

(m)    Property means Money, Securities, Negotiable Instruments to include negotiable mortgage notes and any other negotiable instruments used by FANNIE MAE, Certificates of Deposit, Documents of Title, Acceptances, Evidences of Debt, Security Agreements, withdrawal orders, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records whether recorded in writing or electronically, gems, jewelry, precious metals in bars or ingots, and tangible items of personal property which are not hereinbefore enumerated.

(n)    Security means an instrument which

    (1)    is issued in bearer or registered form; and

    (2)    is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

    (3)    is either one of a class or series or by its terms is divisible into a class or series of instruments; and

(4)    evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

(o)    Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

## EXCLUSIONS

Section 2.  This bond does not cover:

(a)    loss resulting directly or indirectly from Forgery or alteration, except when covered under Insuring Agreements (A),(D),(E) or (F);

(b)    loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit in the circumstances recited in Insuring Agreement (C), and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Insured in initiating such transit;

(c)    loss resulting directly or indirectly from the effects of nuclear fission or fusion or radioactivity; provided, however, that this paragraph shall not apply to loss resulting from industrial uses of nuclear energy;

(d)    loss resulting directly or indirectly from any acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured;

(e)    loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D), (E) or (I);

(f)    loss of Property contained in customers' safe deposit boxes, except when the Insured is legally liable therefor and the loss is covered under Insuring Agreement (A);

(g)    loss through cashing or paying forged or altered travelers' checks or travelers' checks bearing forged endorsements, except when covered under Insuring Agreement (A); or loss of unsold travelers' checks or unsold money orders placed in the custody of the Insured with authority to sell, unless (a) the Insured is legally liable for such loss and (b) such checks or money orders are later paid or honored by the drawer thereof, except when covered under Insuring Agreement (A);

(h)    loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property;

(i)    loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreements (A), (D) or (E);

(j)    shortage in any teller's cash due to error, regardless of the amount of such shortage, and any shortage in any teller's cash which is not in excess of the normal shortage in the tellers' cash in the office where such shortage shall occur shall be presumed to be due to error;

(k)    loss resulting directly or indirectly from the use of credit, debit, charge, access, convenience, identification or other cards

    (1)    in obtaining credit, or

    (2)    in gaining access to automated mechanical devices which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans, or

    (3)    in gaining access to point of sale terminals, customer-bank communication terminals, or similar electronic terminals of electronic funds transfer systems,

whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under Insuring Agreement (A);

(l)    loss involving automated mechanical devices which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans, unless such automated mechanical devices are situated within an office of the Insured which is permanently staffed by an Employee whose duties are those usually assigned to a bank teller, even though public access is from outside the confines of such office, but in no event shall the Underwriter be liable for loss (including loss of Property)

    (1)    as a result of damage to such automated mechanical devices from vandalism or malicious mischief perpetrated from outside such office, or

    (2)    as a result of failure of such automated mechanical devices to function properly, or

    (3)    through misplacement or mysterious unexplainable disappearance while such Property is located within any such automated mechanical devices, except when covered under Insuring Agreement (A);

(m)   loss through the surrender of Property away from an office of the Insured as a result of a threat

     (1)   to do bodily harm to any person, except loss of Property in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Insured of any such threat, or

     (2)   to do damage to the premises or property of the Insured,

    except when covered under Insuring Agreement (A);

(n)   loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or except when covered under Insuring Agreement (A);

(o)   loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or except when covered under Insuring Agreement (A);

(p)   loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreements (A), (E), (F) or (I);

(q)   loss of any tangible item of personal property which is not specifically enumerated in the paragraph defining Property and for which the Insured is legally liable, if such property is specifically insured by other insurance of any kind and in any amount obtained by the Insured, and in any event, loss of such property occurring more than 60 days after the Insured shall have become aware that it is liable for the safekeeping of such property, except when covered under Insuring Agreements (A) or (B)(2);

(r)   loss of Property while in the mail or with a carrier for hire (other than an armored motor vehicle company), except when covered under Insuring Agreement (A) or Insuring Agreement (C)(2);

(s)   loss of potential income or profit including, but not limited to, interest, dividends, commissions and the like;

(t)   damages of any type for which the Insured is legally liable, except direct compensatory damages arising from a loss covered under this bond;

(u)   costs, fees and other expenses incurred by the Insured in establishing the existence of, or amount of, loss covered under this bond, except when covered under Insuring Agreement (G) FIDELITY CLAIM EXPENSE;

(v)   indirect or consequential loss of any nature.

## AGGREGATE LIMIT OF LIABILITY/NON-ACCUMULATION OF LIABILITY

**Section 3.**

The total liability of the Underwriter for all losses discovered during the Bond Period set forth in Item 2. of the Declarations and including court costs and attorneys' fees is limited to the Aggregate Limit of Liability stated in Item 3. of the Declarations of this bond or amendments thereto. The sub-limit of any Insuring Agreement(s) is part of and not in addition to the Aggregate Limit of Liability and the total liability of the Underwriter for all losses, including court costs and attorneys' fees, concerning any such Insuring Agreement(s) is limited to the amount of the sub-limit, irrespective of the total amount of such loss or losses.

The Aggregate Limit of Liability shall be reduced by the amount of any payment made under this bond. Upon the exhaustion of the Aggregate Limit of Liability by such payments, the Underwriter shall have no further liability:

    (a)    to indemnify the Insured under any Insuring Agreement(s) of this bond for any loss or losses; and/or

    (b)    to indemnify the Insured under General Agreement F. of this bond for any court costs and attorneys' fees; and/or

    (c)    to continue the defense of the Insured under General Agreement F. of this bond, in the event of Underwriter's election to conduct the defense of any suit or legal proceedings. Upon notice by the Underwriter to the Insured that the Aggregate Limit of Liability has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

In addition to the Aggregate Limit of Liability being reduced, the sub-limit of any applicable Insuring Agreement(s) stated in Item 4. of the Declarations shall be reduced by the amount of any payment made in connection with said Insuring Agreement(s). Upon exhaustion of the sub-limit applicable to said Insuring Agreement(s) by such payments, the Underwriter shall have no further liability:

    (a)    to indemnify the Insured under said Insuring Agreement(s) of this bond for loss or losses; and/or

    (b)    to indemnify the Insured under General Agreement F. of this bond for any court costs and attorneys' fees incurred in connection with said loss or losses; and/or

    (c)    to continue the defense of the Insured under General Agreement F. of this bond in the event of the Underwriter's election to conduct the defense of any suit or legal proceeding in connection with said loss or losses. Upon notice by the Underwriter to the Insured that the sub-limit has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

16

If, by reason of payments made under this bond, the Aggregate Limit of Liability is reduced to an amount less than the amount stated for any sub-limit in Item 4. of the Declarations of this bond, then the amount of any such sub-limit shall be accordingly reduced so that the total amount available under such sub-limit for any loss or losses, including court costs and attorneys' fees, does not exceed the reduced amount remaining available under the Aggregate Limit of Liability.

Neither the Aggregate Limit of Liability nor any sub-limit shall be reinstated in whole or in part by any recovery effected subsequent to any payment made under this bond.

Regardless of the number of years this bond shall continue in force or any subsequent renewals or replacements and the number of premiums which shall be payable or paid, the liability of the Underwriter shall not be cumulative in amounts from year to year or from period to period.

If a loss is covered under more than one Insuring Agreement, the maximum amount payable with respect to such loss shall not exceed the largest amount available under any one Insuring Agreement.

In the event that a loss of Property discovered during the Bond Period set forth in Item 2. of the Declarations of this bond is settled by the Underwriter through the use of a lost instrument bond or indemnity agreement, such loss, to the extent that the Underwriter is not called upon to pay under said lost instrument bond or indemnity agreement or otherwise remains unpaid by the Underwriter, shall not reduce the Aggregate Limit of Liability or any applicable sub-limit remaining for the payment of any loss or losses. However, any payment by the Underwriter under such lost instrument bond or indemnity agreement shall be deemed to be a payment under this bond.

The exhaustion or reduction of the Aggregate Limit of Liability or any sub-limit shall not affect the Underwriter's obligations in connection with any lost instrument bond or indemnity agreement issued prior to the exhaustion or reduction of the Aggregate Limit of Liability or any applicable sub-limit.

## DISCOVERY

Section 4.

This bond applies to loss discovered by the Insured during the bond period.  Discovery occurs when the Director of Corporate Risk and/or General Counsel first becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Director of Corporate Risk and/or General Counsel receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would create a loss under this bond.

## NOTICE/PROOF – LEGAL PROCEEDINGS

Section 5.

(a)    At the earliest practicable moment, not to exceed ninety (90) days after notification to the Director of Corporate Risk and/or General Counsel of discovery of loss, the Insured shall give the Underwriter hereon notice thereof.

17

(b)     Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

(c)     Lost Certificated  Securities listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued therewith.

(d)     Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against the Insured in any suit mentioned in General Agreement F, or to recover attorneys' fees paid in any such suit, shall be brought within 24 months from the date upon which the judgment in such suit shall become final.

(e)     If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(f)     This bond affords coverage only in favor of the Insured. No suit, action or legal proceedings shall be brought hereunder by anyone other than the named Insured.

## VALUATION

Section 6.

Any loss of Money, or loss payable in Money, shall be paid, at the option of the Insured, in the Money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange published by the Wall Street Journal at the time of such loss.

### Securities

The Underwriter shall settle in kind its liability under this bond on account of loss of any Securities or, at the option of the Insured shall pay to the Insured the cost of replacing such Securities, determined by the market value thereof at the time of such settlement. In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of Securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof. If such Securities cannot be replaced or have no quoted market value or if such privileges have no quoted market value their value shall be determined by agreement or arbitration.

However, if prior to the settlement of the claim by the Underwriter, the Insured shall be compelled by law or by market rules with force of law to purchase equivalent Securities and give written notification of this to the Underwriter, the cost incurred by the Insured shall be taken as the value of those Securities.

18

If the applicable coverage of this bond is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the Insured in full for the loss of Securities for which claim is made hereunder, the liability of the Underwriter under this bond is limited to the payment for or the duplication of so much of such Securities as has value equal to the amount of such applicable coverage.

Securities held in book entry form or in bulk by the issuer, clearing agency or custodian, may be identified in proof of loss by the presentation of the statement(s) of such issuers, clearing agency or custodian reflecting the Insured's interest therein, instead of by certificate number.

Books of Account and Other Records

In case of loss, or damage to, any books of account or other records used by the Insured in its business, the Underwriter shall be liable under this bond only if such books or records are actually reproduced and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such books and other records.

Property other than Money, Securities or Records

In case of loss of, or damage to, any Property other than Money, Securities, books of account or other records, or damage covered under Insuring Agreement (B)(2), the Underwriter shall not be liable for more than the actual cash value of such Property, or of items covered under Insuring Agreement (B)(2). The Underwriter may, at its election, pay the actual cash value of, replace or repair such Property. Disagreement between the Underwriter and the Insured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.

Electronic Data Processing Media

In case of loss of, or damage to Electronic Data Processing Media used by the Insured in its business, the Underwriter shall be liable under this bond only if such items are actually reproduced by other Electronic Data Processing Media of the same kind or quality and then for not more than the cost of the blank media plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such Electronic Data Processing Media, subject of course, to the applicable Limit of Liability.

Electronic Data

In case of loss of Electronic Data, the Underwriter shall be liable under this bond only if such data is actually reproduced by other Electronic Data of the same kind and quality and then for not more than the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such Electronic Data subject, of course, to the applicable Limit of Liability.

However, if such Electronic Data cannot be reproduced and said Electronic Data represents Securities, or financial instruments having a value, including Evidences of Debt, then such loss will be valued as indicated in the Securities and other Property paragraphs of this Section.

## Computation of Loss

In determining the amount collectible under this bond for any loss, all Money received by the Insured from any source whatsoever in connection with any matter from which a claimed loss has arisen, including payments and receipts of principal, interest, dividends, commissions and the like whenever received, shall be deducted from the amount actually paid out, advanced, withdrawn, taken or otherwise lost. The value of all Property received by the Insured from any source whatsoever and whenever received in connection with any matter from which a claimed loss has arisen shall likewise be deducted from the Insured's claimed loss.

## ASSIGNMENT - SUBROGATION - RECOVERY - COOPERATION

Section 7.

(a)    In the event of payment under this bond, the Insured shall deliver, if so requested by the Underwriter an assignment of such of the Insured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b)    In the event of payment under this bond, the Underwriter shall be subrogated to the Insured's rights of recovery therefor against any person or entity to the extent of such payment.

(c)    Recoveries, whether effected by the Underwriter or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the Insured's loss in excess of the amount paid under this bond, secondly, to the Underwriter as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount. Recovery on account of loss of Securities as set forth in the second paragraph of Section 6, or recovery from reinsurance and/or indemnity of the Underwriter shall not be deemed a recovery as used herein.

(d)    Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Insured shall

    (1)    submit to examination by the Underwriter and subscribe to the same under oath; and

    (2)    produce for the Underwriter's examination all pertinent records; and

    (3)    cooperate with the Underwriter in all matters pertaining to the loss.

(e)    The Insured shall execute all papers and render assistance to secure to the Underwriter the rights and causes of action provided for herein. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.

20

## LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE

**Section 8.**

With respect to any loss covered by this bond which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Underwriter to the Insured or to any predecessor in interest of the Insured and terminated or canceled or allowed to expire and in which the period of discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Underwriter under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount be larger.

If the coverage of this bond supercedes in whole or in part the coverage of any other bond or policy of insurance issued by an Insurer other than the Underwriter and terminated, canceled or allowed to expire, the Underwriter, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under this bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

## OTHER INSURANCE OR INDEMNITY

**Section 9.**

Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured, or by one other than the Insured on Property subject to exclusion (q), or by an armored motor vehicle company, or by another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the Property involved.

## OWNERSHIP

**Section 10.**

This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable. This bond is for the sole use and benefit of the Insured named in the Declarations.

However, coverage provided under the Insuring Agreements of this bond shall be deemed to include amounts which the Insured is legally liable to pay a third party as a direct result of loss otherwise meeting the conditions and limitations of this bond. It is understood by the Underwriter and the Insured that the addition of this rider to the bond is not an admission that such coverage did or did not already exist under this bond.

21

## DEDUCTIBLE AMOUNT

**Section 11.**

The Underwriter shall be liable hereunder, subject to the Aggregate Limit of Liability or any sub-limit, only for the amount by which each and every loss exceeds the Deductible Amount for the Insuring Agreement applicable to such loss.

If a loss is covered under more than one Insuring Agreement, the largest Deductible Amount of any one Insuring Agreement shall be applicable to such loss.

## TERMINATION OR CANCELLATION

**Section 12.**

This bond may not be cancelled by the Underwriter or the Named Insured except: (i) by the Underwriter in the event of the Named Insured's non-payment of premium; or (ii) in accordance with the conditions described in paragraphs (b) or (c) of this clause.

(a)    If the bond is cancelled by the Underwriter due to non-payment of premium, the Underwriter shall deliver to the Named Insured or mail to the Named Insured by registered, certified or other first class mail, at the Named Insured's address shown in the Declarations, written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this bond shall be deemed cancelled as to all Insureds at the date and hour specified in such notice.

(b)    This bond may also be cancelled by the Underwriter because of a determination of any duly authorized governmental authority that continuation of the bond would violate, or would place the Underwriter in violation of, any provisions of the applicable state insurance law.

   If the bond is cancelled by the Underwriter due to reasons in paragraph (b) above, the Underwriter shall deliver to the Named Insured or mail to the Named Insured by registered, certified or other first class mail, at the Named Insured's address shown in the Declarations, written notice stating when, not less than ninety (90) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this bond shall be deemed cancelled as to all Insureds at the date and hour specified in such notice. If this bond shall be cancelled by the Underwriter, the Underwriter shall retain the pro rata proportion of the premium therein. Payment or tender of unearned premium by the Underwriter shall not be a condition precedent to the effectiveness of cancellation, but shall be made as soon as practicable.

(c)    This bond may also be cancelled by the Named Insured in the event the Underwriter's rating by A.M. Best, Standard & Poors or Moody's is downgraded by two rating grades within the Bond Period.

22

The bond may be cancelled by the Named Insured due to reasons in paragraph (c) above, by mailing written notice to the Underwriter ten (10) days before such cancellation shall be effective or by surrender of this bond to the underwriter or its authorized agent. The mailing of such notice as aforesaid shall be proof of notice. The Bond Period terminates at the date and hour specified in such notice, or at the date and hour of physical surrender of the bond. If this bond shall be cancelled by the Named Insured, the Underwriter shall retain the customary short rate proportion of the premium herein.

(d)    This bond shall also be deemed terminated or cancelled as an entirety:

    (i)    immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials; or

    (ii)    immediately upon the taking over of the Insured by another institution; or

    (iii)    immediately upon exhaustion of the Aggregate Bond Limit; or

    (iv)    immediately upon expiration of the Bond Period as set forth in the Declarations.

The Underwriter shall, on request, refund to the Insured the unearned premium, computed pro rata, if this bond be terminated or cancelled, as provided in subsections (d) (i) and (ii) of this paragraph.

(e)    This bond shall be deemed terminated or cancelled as to any Employee or any partner, officer or employee of any Processor:

    (1)    as soon as the Director of Corporate Risk and/or General Counsel shall learn of any dishonest or fraudulent act committed by such person at any time against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person; or (2) 15 days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel this bond as to such person;

        (i)    with respect to Employees, coverage is automatically reinstated provided that the dishonest or fraudulent act did not involve a value of more than $25,000; occurred prior to the Employee's employment by the Insured; and occurred more than three (3) years prior to the discovery of such dishonest or fraudulent act by the Insured.

Termination of this bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

(f)    This bond shall be also deemed terminated or cancelled as to any Service Bureau:

    (i)    as soon as the Director of Corporate Risk and/or General Counsel shall learn of any dishonest or fraudulent act committed by any partner, director, officer or employee of any such Service Bureau at any time against the Insured or any other person or entity, without prejudice to the loss of any property then in transit in the custody of such person; or

23

(ii)    fifteen (15) days after the receipt by the Insured of a written notice from Underwriters of their desire to terminate or cancel this bond as to such person.

## RIGHTS AFTER TERMINATION OR CANCELLATION

**Section 13.**

At any time prior to the termination or cancellation of this bond as an entirety, whether by the Insured or the Underwriter, the Insured may give to the Underwriter notice that it desires under this bond an additional period of 90 days within which to discover loss sustained by the Insured prior to the effective date of such termination or cancellation and shall pay an additional premium therefor.

Upon receipt of such notice from the Insured, the Underwriter shall give its written consent thereto; provided however, that such additional period of time shall terminate immediately:

(a)    on the effective date of any other insurance obtained by the Insured, its successor in business or any other party, replacing in whole or in part the insurance afforded by this bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

(b)    upon any takeover of the Insured's business by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed for this purpose without the necessity of the Underwriter giving notice of such termination. In the event that such additional period of time is terminated, as provided above, the Underwriter shall refund any unearned premium.

The right to purchase such additional period for the discovery of loss may not be exercised by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed to take over the Insured's business for the operation or for the liquidation thereof or for any other purpose.

**RIDER #1**
**SECTION 1**

This rider effective  12:01 a.m.,        June 30, 2004        forms a part of
Rider number:        600-97-48
Issued to:           FANNIE MAE

By:        National Union Fire Insurance Company of Pittsburgh, Pa.

It is agreed that:

1.    The following shall be included as Insured:

      All Employee Welfare or Pension Benefit Plans owned, controlled or operated by the
      Insured.

2.    "Employee" as used in the attached bond shall include any natural person who is a director
      or trustee of the Insured while such director or trustee is engaged in handling funds or
      other property of any Employee Welfare or Pension Benefit Plan owned, controlled or
      operated by the Insured or any natural person who is a trustee, manager, officer or
      employee of any such Plan.

3.    If the bond, in accordance with the agreements, limitations and conditions thereof, covers
      loss sustained by two or more Employee Welfare or Pension Benefit Plans or sustained by
      any such Plan in addition to loss sustained by an Insured other than such Plan, it is the
      obligation of the Insured or the Plan Administrator(s) of such Plans under Regulations
      published by the Secretary of Labor implementing Section 13 of the Welfare and Pension
      Plan Disclosure Act of 1958 to obtain under one or more bonds issued by one or more
      Insurers an amount of coverage for each such Plan at least equal to that which would be
      required if such Plans were bonded separately.

4.    In compliance with the foregoing, payment by the Company in accordance with the
      agreements, limitations and conditions of the bond shall be held by the Insured, or if more
      than one by the Insured first named, for the use and benefit of any Employee Welfare or
      Pension Benefit Plan sustaining loss so covered and to the extent that such payment is in
      excess of the amount of coverage required by such Regulations to be carried by said Plan
      sustaining such loss, such excess shall be held for the use and benefit of any other such
      Plan also covered in the event that such other Plan discovers that it has sustained loss
      covered thereunder.

5.    If money or other property of two or more Employee Welfare or Pension Benefit Plans
      covered under the bond is commingled, recovery for loss of such money or other property
      through fraudulent or dishonest acts of Employees shall be shared by such Plans on a pro
      rata basis in accordance with the amount for which each such Plan is required to carry
      bonding coverage in accordance with the applicable provisions of said Regulations.

**RIDER #1 (continued)**
**SECTION 1**

6.  The Deductible Amount of this bond applicable to loss sustained by a Plan through acts committed by an Employee of the Plan shall be waived, but only up to an amount equal to the amount of coverage required to be carried by the Plan because of compliance with the provisions of the Employee Retirement Income Security Act of 1974.

7.  A one year discovery period applies to the coverage afforded by this Rider.

8.  Section 13., RIGHTS AFTER TERMINATION OR CANCELLATION, of the attached bond does not apply to the coverage afforded by this Rider.

9.  Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #2**
**SECTION 1**

This rider effective  12:01 a.m.,         June 30, 2004        forms a part of
Rider number:         600-97-48
Issued to:            FANNIE MAE

By:       National Union Fire Insurance Company of Pittsburgh, Pa.

In consideration of the premium charged for this bond, to which this rider is attached, it is understood and agreed that said bond shall be amended as follows:

1.     This bond is extended to include the following  Insuring Agreement (H):

### SERVICING CONTRACTORS

(H)     Loss resulting solely and directly from one or more dishonest or fraudulent acts by a Servicing Contractor whether committed alone or in collusion with others, which acts are committed by the Servicing Contractor with the manifest intent,

    (a)     to cause the Insured to sustain such loss; and

    (b)     to obtain thereby an improper personal financial benefit for the Servicing Contractor,

and which acts in fact result in the Servicing Contractor obtaining such benefit.

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or any other benefits of a type which may be earned in the normal course of employment or performance of a servicing contract shall not constitute improper personal financial benefit.

2.     The term Servicing Contractor shall mean a natural person, partnership, corporation, limited liability company, real estate investment trust or other entity and their employees, duly authorized by the Insured (Fannie Mae) under written agreement with the Insured to perform servicing activities, including any of the following with respect to mortgage loans owned by the Insured and other types of loans the Insured is authorized by its charter to own:

    (a)     collecting and recording borrower payments and remitting same to the Insured;

    (b)     taking actions permitted under the terms of the loan to preserve and protect the loan security property and the lien thereon;

    (c)     administration of escrow accounts;

    (d)     handling borrower inquiries and requests;

    (e)     enforcing borrower covenants contained in the loan documents;

    (f)     exercising default remedies for the Insured and otherwise managing delinquent loans;

**RIDER #2 (continued)**
**SECTION 1**

(g)    managing loan security property owned by, or under the supervision or control of, the Insured;

(h)    disposing of loan security property; or

(i)    other acts similar or related to any of the above or to the objectives intended to be served by any of the above;

but only while such natural person, partnership, corporation, limited liability company, real estate investment trust or other entity or their employees is actually performing such services within the United States of America, the U.S. Virgin Islands, Guam, Puerto Rico or Canada and **NOT** while acting in any other capacity, whether on behalf of the Insured or otherwise, including but not limited to the making of any real estate mortgage or home improvement loans; provided that such Servicing Contractor is named in the Schedule. Each such Servicing Contractor and their partners, officers and employees shall collectively be deemed to be one person for all purposes of the coverage provided by this Insuring Agreement.

## SCHEDULE

The schedule of Servicing Contractors covered by this Insuring Agreement is as follows:

| NAME | LOCATION | SERVICING VOLUME AS AT |
|------|----------|------------------------|

### Schedule of Servicing Contractors is waived

3.    In addition to the Exclusions in the attached bond, the Servicing Contractors Insuring Agreement does not cover:

(a)    loss resulting directly or indirectly from any dishonest or fraudulent acts of any Servicing Contractor except when covered by Insuring Agreement (A), or except when covered by the Servicing Contractors Insuring Agreement; or

(b)    loss resulting from the insolvency, bankruptcy or taking over by a receiver or other liquidator or by State or Federal Officials of any depository institution, unless such depository is a Servicing Contractor covered under this bond and unless such insolvency, bankruptcy or taking over results from fraud or dishonesty of officers or employees of such depository institution; or

(c)    loss through the failure of any Servicing Contractor covered under this bond to collect or receive Money for the account of the Insured, any agreement between such Servicing Contractor and the Insured to the contrary notwithstanding; or

**RIDER #2 (continued)**
**SECTION 1**

(d)    loss of Money collected or received for the account of the Insured by any Servicing Contractor covered under this bond unless such Servicing Contractor is legally liable to the Insured on account of the loss of such Money; or

(e)    loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit made to a Servicing Contractor, including any such loan or transaction established to provided funds for interim financing or "warehousing" of mortgage loans, whether procured in good faith or through fraud of false pretenses, or loss resulting directly or indirectly from the failure of the Servicing Contractor to pay over Property held as security for any such loan or transaction, and NOTWITHSTANDING Exclusion (e) of this bond.

4.    By adding to Conditions and Limitations, Termination or Cancellation, Section 12., the following:

This bond shall be deemed canceled as to any Servicing Contractor (a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Servicing Contractor unless within five days after discovery of such act, the Insured shall give the Underwriter written notice thereof and in such event this bond shall be deemed canceled as to such Servicing Contractor at the expiration of thirty days after such discovery of such act, or (b) at 12:01 a.m. as aforesaid, upon the effective date specified in a written notice served upon the Insured or sent by mail. Such date, if the notice be served, shall be not less than thirty days after such service, or if sent by mail, not less than thirty-five days after the date of mailing. The mailing by the Underwriter of notice, as aforesaid, to the Insured at its Principal Office shall be sufficient proof of notice.

5.    By adding to Conditions and Limitations, Ownership, Section 10., the following:

This bond does not afford coverage in favor of any Servicing Contractor, and upon payment to the Insured by the Underwriter on account of any loss for which such Contractor is liable to the Insured, an assignment of such of the Insured's rights and causes of action as it may have against such Contractor by reason of such liability shall, to the extent of such payment, be given by the Insured to the Underwriter, and the Insured shall execute all papers necessary to secure to the Underwriter the rights herein provided for.

6.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #3**
**SECTION 1**

This rider effective  12:01 a.m.,          June 30, 2004          forms a part of
Rider number:            600-97-48
Issued to:                **FANNIE MAE**

By:        National Union Fire Insurance Company of Pittsburgh, Pa.

In consideration of the premium charged for this bond to which this rider is attached, it is understood and agreed that said bond shall be amended as follows:

1.     This bond is extended to include the following Insuring Agreement (I):

## FORGED AND FRAUDULENT MORTGAGES

(I)     Loss resulting directly from the Insured having in good faith and in the ordinary course of business purchased any Mortgage Loan which proves to:

   (a)   be based upon an original Mortgage, deed of trust, or other instrument creating or discharging a first or second lien upon real property, which bears a forged signature of any person signing in a material capacity, or which has been fraudulently altered in material sense or which is lost or stolen, or which is counterfeited; or

   (b)   be fraudulently made upon real property which does not in fact exist; or

   (c)   be fraudulently made in the name of a person who is in fact fictitious; or

   (d)   be fraudulently made in the name of a person who does not have title to the real property securing such mortgage loan; or

   (e)   be based upon the fact that the Mortgage Loan has also been sold or pledged to another party, in whole or in part; or

   (f)   be based upon the fact that the Mortgage Loan has previously been sold to the Insured, in whole or in part; or

   (g)   which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

2.     By adding to Conditions and Limitations, Definitions, Section 1., the following:

"Document Custodian" shall mean an independent third party, designated by the Insured to act as custodian of the Mortgage Loan file pursuant to a written custodial agreement.

"Mortgage" shall mean the mortgage, deed of trust, or other instrument creating a first or second lien on an unsubordinated estate in fee simple in real property securing a mortgage note.

**RIDER #3 (continued)**
**SECTION 1**

"Mortgage Loan" shall mean an individual mortgage loan purchased by the Insured and shall be deemed to include the original mortgage note and original Mortgage or deed of trust in recordable form together with all other documents included in the Mortgage Loan file delivered to the Insured or its designated Document Custodian upon purchase.

3.   In addition to the Exclusions in the attached bond, the Forged and Fraudulent Mortgages Insuring Agreement does not cover:

   (a)   loss resulting from acts committed subsequent to the purchase of Mortgage Loans by the Insured;

   (b)   loss resulting from acts committed prior to purchase of Mortgage Loans by the Insured, except as defined by this Insuring Agreement;

   (c)   loss resulting solely from any negligent act or error or omission by the Insured or any of its agents, including the failure to satisfy the legal procedures required to complete an effective transfer to the Insured of any Mortgage Loan under the Uniform Commercial Code or real property law of the applicable state and/or equivalent Federal statute;

   (d)   loss resulting from the insolvency, bankruptcy, or taking over by a receiver, liquidator, State or Federal Officials of any institution originating Mortgage Loans to the Insured, unless otherwise covered under this Insuring Agreement.

4.   The following warranty applies in respect to this Insuring Agreement (I):

## WARRANTY

It is a condition precedent to the Insured having in good faith purchased any Mortgage Loan that the Insured shall not have released any funds prior to having received each Mortgage Loan or Participation Agreement or having received a certification or receipt from its designated Document Custodian.

5.   Coverage afforded by this rider shall only apply as excess over all valid and collectible insurance or indemnity obtained by the Insured or by any originator of Mortgage Loans or by any Document Custodian and when all other recoveries or sources have been collected.

6.   It is understood and agreed that, with respect to this Insuring Agreement, one deductible will apply to any batch of fraudulent mortgages, if resulting from a single fraudulent act or related fraudulent acts, rather than having the deductible apply per individual mortgage.

7.   Insuring Agreement (E) SECURITIES, Section (1) (c), is hereby deleted in its entirety.

8.   Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #4**
**SECTION 1**

This rider effective  12:01 a.m.,          June 30, 2004          forms a part of
Rider number:          600-97-48
Issued to:              FANNIE MAE

By:          National Union Fire Insurance Company of Pittsburgh, Pa.

It is agreed that:

1.      Section 1., Definitions, paragraph (f) is extended to include any such person who resigns or retires from the Insured during the bond period;

      provided, however, that this extension applies only:

        (i)     for a period of 90 days subsequent to such resignation or retirement (but not beyond the date of expiration or termination of the bond);

        (ii)    if such resignation or retirement has not arisen from or in connection with the discovery by the Insured of any actual or alleged dishonest, fraudulent, unauthorized or criminal act(s) of such person.

      In consideration of the granting of this extension, the Insured agrees that any deletion from their "Authorized Signatures" list will be sent to their correspondents within 30 days following the withdrawal of such authority; and that an "Authorized Signatures" list will be reviewed and sent to correspondents annually.

      Failure to comply with this requirement due to circumstances beyond the Insured's control will not void coverage under this extension.  This agreement remains subject to the provisions Section 12., Termination or Cancellation, and also to all other bond terms and conditions.

2.      Negotiable mortgage notes in which the Insured has an interest, while in the custody of a Transportation Company in a conveyance other than an armored motor vehicle, shall be deemed covered Property under the **ON PREMISES** and **IN TRANSIT** Insuring Agreements.

3.      Home Star Mortgage Services, LLC is considered a covered servicer under Insuring Agreement (H), **SERVICING CONTRACTORS.**

4.      Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions or limitations of the attached bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #5**
**SECTION 1**

This rider effective 12:01 a.m.,      June 30, 2004     forms a part of
Rider number:     600-97-48
Issued to:        FANNIE MAE

By:      National Union Fire Insurance Company of Pittsburgh, Pa.

**WASHINGTON, D.C. AMENDATORY**
**CANCELLATION/NON-RENEWAL**

Wherever used in this endorsement:

1) "we", "us", "our", and "Insurer" means the insurance company which issued this policy; and

2) "you", "your", "named insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declaration page; and

3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, it is understood and agreed that the cancellation/non-renewal provisions of this policy are amended to read as follows:

A)   CANCELLATION

If this policy has been in effect for thirty (30) days or more, the Insurer may cancel this policy only if one or more of the following reasons apply:

1) Insured has refused or failed to pay a premium due under the terms of the policy;

2) Insured or Other Insured(s) have made a material and willful misstatement or omission of fact to the Insurer or its employees, agents or brokers in connection with any application to, or claim against the Insurer; or

3) Property or other interest of the Insured shall have been transferred to a person other than the Insured or beneficiary, unless the transfer is permissible under the terms of the policy, or unless the property, interest or use thereof shall have materially changed with respect to its insurability.

The Insurer will mail or deliver to the named Insured notice of cancellation at least thirty (30) days prior to the date of cancellation. For cancellation as described under 2) and 3) above, the Insurer will mail or deliver a copy of the notice to the Superintendent of Insurance at least thirty (30) days before the date of cancellation.

**RIDER #5 (continued)**
**SECTION 1**

B)    **NON-RENEWAL**

If the Insurer decides not to renew this policy, the Insurer will mail or deliver to the named Insured the Insurer's notice of non-renewal at least thirty (30) days before the end of the policy period.  The Insurer will mail or deliver notice of cancellation or non-renewal to the agent or broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

The Notice of cancellation or non-renewal will be mailed or delivered to the Insured's last known address and will include the reason(s) for cancellation or non-renewal.  The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.**

AUTHORIZED REPRESENTATIVE

**Electronic and Computer Crime Policy**
(Edition of December, 1993)

## SECTION 2

Policy No. 600-97-48

**NATIONAL UNION FIRE INSURANCE COMPANY**
**OF PITTSBURGH, PA.**
A Capital Stock Company
**ADMINISTRATIVE OFFICES**
**70 PINE STREET, NEW YORK, N.Y. 10270**
(Herein Called the Underwriter)

## DECLARATIONS

Item 1. NAME OF INSURED: **FANNIE MAE** and all wholly owned or majority owned subsidiary companies or corporations as now or hereinafter constituted or acquired, and notified to Underwriters hereon with the provisions of General Agreement B of Financial Institution Bond and General Condition (C) of Electronic and Computer Crime Policy, and all Pension Plans or Trusts and Employee Welfare Plans or Trusts now or hereinafter owned and controlled by the Insured and all as agreed by Underwriter hereon.

Principal Address: 3900 Wisconsin Avenue N.W., Washington, DC 20016-2899

Item 2. POLICY PERIOD: from 12:01 a.m. on June 30, 2004 to 12:01 a.m. on June 30, 2005

Item 3. PREMIUM: As Agreed

Item 4. APPLICATION FORM: The Application Form together with any correspondence relative thereto signed by or on behalf of the Insured shall be the basis of the insurance.

Item 5. AGGREGATE POLICY LIMIT: $50,000,000 combined for Sections 1 and 2

Item 6. SINGLE LOSS LIMIT:

The Limit of Liability under this Policy for any Single Loss subject to the Aggregate Policy Limit and subject to General Condition (H), shall be $25,000,000.