# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br><br>       Plaintiff,<br><br>   v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>and<br><br>ACE AMERICAN INSURANCE COMPANY,<br><br>       Defendants. | Case No.:  1:05cv02462 RMU<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED COMPLAINT

Plaintiff, Federal National Mortgage Association ("Fannie Mae"), brings this action against Defendant, National Union Fire Insurance Co. of Pittsburgh, Pennsylvania ("National Union") and ACE American Insurance Company ("ACE"), and in support, alleges as follows:

## NATURE OF ACTION

1.    This action arises out of National Union's failure to honor its contractual obligations, under a Financial Institution Bond it sold to Fannie Mae, to provide coverage for the theft by Olympia Mortgage Corporation ("OMC") of loan payoff proceeds OMC was supposed to have remitted to Fannie Mae but instead stole.  OMC is a mortgage loan "Seller/Servicer" – an entity that sells loans to Fannie Mae and then services those loans for Fannie Mae.  The Financial Institution Bond specifically provides coverage for thefts by a Seller/Servicer, like OMC, in the course of its servicing of loans for Fannie Mae.  The Financial Institution Bond also provides

coverage for certain types of mortgage fraud that could be committed by a Seller/Servicer in the course of its sale of new loans to Fannie Mae. National Union, however, wrongfully and without reasonable basis asserts that the Financial Institution Bond does not provide coverage for the loss caused to Fannie Mae by OMC's theft.

2.      Fannie Mae's loss solely and directly resulting from OMC's theft exceeds $43 million. Fannie Mae seeks a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure and Section 2201 and 2202 of Title 28 of the United States Code, that: a) National Union is obligated to pay Fannie Mae the full limit of liability under the National Union Financial Institution Bond, which is $25 million after a $5 million deductible and b) ACE American Insurance Company ("ACE"), which provides $15 million in excess coverage over the National Union Financial Institution Bond, is obligated to pay the full limit of liability under the ACE Excess Financial Institution Bond. Fannie Mae also seeks damages for National Union's breach of contract by reason of its failure to honor its obligations under the National Union Financial Institution Bond, breach of its duty of good faith and fair dealing and bad faith, including Fannie Mae's attorneys fees and costs, pre-judgment interest and such other and further relief as the Court may deem just and proper.

## PARTIES

3.      Fannie Mae is a government-sponsored enterprise, which operates under a congressional charter, which directs Fannie Mae to channel its efforts into increasing the availability and affordability of homeownership for low, moderate and middle-income American individuals and families. In 1968, the government amended that charter and today Fannie Mae is also a shareholder-owned corporation.

4.      Defendant National Union is an insurance company.  Upon information and belief, National Union is a corporation organized under the laws of the state of Pennsylvania and maintains its principal place of business in New York.  It is licensed to transact and does transact business in the District of Columbia.

5.      Defendant ACE American Insurance Company is an insurance company.  Upon information and belief, ACE is a corporation organized under the laws of Pennsylvania, maintains its principal place of business in Philadelphia, Pennsylvania and is licensed to transact and does transact business in the District of Columbia.

## JURISDICTION AND VENUE

6.      Federal subject matter jurisdiction exists under 28 U.S.C. § 1332 in that the named parties to this action are of completely diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.  Fannie Mae is deemed to be a citizen of the District of Columbia for purposes of jurisdiction and venue (12 U.S.C. § 1717(a)(2)(B)).  This Court has personal jurisdiction over National Union and ACE because, upon information and belief, both are licensed to do business and do business in the District of Columbia.

7.      Federal subject matter jurisdiction also exists under 28 U.S.C. § 1331 as this matter also arises under 12 U.S.C. § 1723 a, which grants Fannie Mae authority "to sue and be sued, and to complain and defend, in any court of competent jurisdiction, State or Federal."

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b) because this District has personal jurisdiction over National Union and ACE and a substantial part of the events or omissions giving rise to the claim occurred in this District.

# **GENERAL ALLEGATIONS**

**A.     THE BONDS**

9.     Fannie Mae purchased from National Union Financial Institution Bond No. 600-97-48 effective June 30, 2004 through June 30, 2005 (the "Bond") (A true and accurate copy of the Bond is attached hereto as Exh. A).  The Bond provides coverage, over a $5 million deductible, up to $25 million per loss, beyond which Fannie Mae also maintains excess coverage.  Fannie Mae is the named insured under the Bond.

10.     The Bond covers loss "discovered" by Fannie Mae during the Bond Period. (Bond, Section 4).  "Discovery occurs when the Director of Corporate Risk and/or General Counsel first becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known." *Id*.

11.     The Bond specifically provides to Fannie Mae insurance coverage for thefts by a servicing contractor of moneys the servicing contractor, in the course of fulfilling its servicing duties, is supposed to remit to Fannie Mae.  Rider #2 (the "Servicing Contractor Insuring Agreement") of the Bond states that:

1.     This bond is extended to include the following Insuring Agreement (H):

(H)     Loss resulting solely and directly from one or more dishonest or fraudulent acts by a Servicing Contractor whether committed alone or in collusion with others, which acts are committed by the Servicing Contractor with the manifest intent,

(a)     to cause the Insured to sustain such loss; and

(b)     to obtain thereby an improper personal financial benefit for the Servicing Contractor,

and which acts in fact result in the Servicing Contractor obtaining such benefit.

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or any other benefits of a type which may be earned in the normal course of employment or performance of a servicing contract shall not constitute improper personal financial benefit.

(Bond, Rider #2, Para. 1).

12.    The term Servicing Contractor is defined to mean:

2.    . . . a natural person, partnership, corporation, limited liability company, real estate investment trust or other entity and their employees, duly authorized by the Insured (Fannie Mae) under written agreement with the Insured to perform servicing activities, including any of the following with respect to mortgage loans owned by the Insured and other types of loans the Insured is authorized by its charter to own:

(a)    collecting and recording borrower payments and remitting same to the insured;

while acting in that capacity.

13.    Coverage for certain types of mortgage fraud is provided for in Rider #3, which extends the Bond to include Insuring Agreement (I) (the "Mortgage Fraud Insuring Agreement") which provides coverage for, among other things:

(I)    Loss resulting directly from the Insured having in good faith and in the ordinary course of business purchased any Mortgage Loan which proves to:

*        *        *

(f)    be based on the fact that the Mortgage Loan has previously been sold to the Insured, in whole or in part; or

(g)    have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgage or grantor through trick, artifice, fraud or false pretenses.

14.    The Bond also provides Fannie Mae with up to $250,000 of "fidelity claim expense" or indemnity for:

(G)    Fees and expenses incurred and paid by the Insured with the prior approval of the Underwriter for independent outside accountants to determine the amount and extent of the loss covered under Insuring Agreements of this bond.

15.    The Bond contains various coverage exclusions, but none preclude coverage for Fannie Mae's loss.

16.    All conditions and requirements imposed on Fannie Mae by the Bond, including payment of premiums, giving notice of claim, and submission of proof of loss and information requested by the insurer, have been either satisfied or waived or are subject to an estoppel against National Union.

17.    Fannie Mae purchased from ACE Excess Financial Institution Bond No. DOX G21660061 effective June 30, 2004 through June 30, 2005 (the "Excess Bond") (A true and accurate copy of the Excess Bond is attached hereto as Exh. B).  The Excess Bond, which follows form to the National Union Bond, provides coverage up to a $15 million limit excess of the $25 million limit of the National Union Bond.  Fannie Mae is the named insured under the Excess Bond.

18.    All conditions and requirements imposed on Fannie Mae by the Excess Bond, including payment of premiums, giving notice of claim, and submission of proof of loss and information requested by the insurer, have been either satisfied or waived or are subject to an estoppel against ACE.

## B.    OMC'S THEFT OF FANNIE MAE PAYOFF PROCEEDS

### (1)    OMC's Servicer Obligations to Fannie Mae and the Loan Servicing Process.

19.    Fannie Mae does not originate mortgage loans but rather purchases loans from Seller/Servicers, like OMC, in the secondary mortgage market.

20.    Fannie Mae then often retains the Seller/Servicers to service the mortgage loans Fannie Mae purchases.

21.    Fannie Mae purchases loans through its Asset Acquisition & Custody ("AA&C") group.  After loans are acquired by the AA&C group, the loans are transferred to a separate group within Fannie Mae – Asset Development & Management ("AD&M") – which is responsible for the collection of principal and interest payments on such loans until the final payment or loan payoff amount is received by Fannie Mae.

22.    As is its usual practice, Fannie Mae purchased loans from OMC and retained OMC to service the loans.  The agreement that governed the relationship between Fannie Mae and OMC is called the "Mortgage Selling and Servicing Contract" (the "Contract").  The Contract incorporates by reference Fannie Mae's Servicing Guide, which sets forth additional obligations and responsibilities that OMC agreed to comport with as part of its relationship with Fannie Mae.

23.    Pursuant to Fannie Mae's Servicing Guide, OMC, as a servicer, was required, among other things, to:

- collect the monthly principal and interest ("P&I") payments, along with any tax, insurance, and other escrow payments, made by the borrower and to place the P&I payments into certain custodial bank accounts from which Fannie Mae can draft, on a monthly basis, the remittances due to Fannie Mae;

- collect and remit payoff amounts when a borrower, through a refinance or otherwise, pays off a loan;

- report (electronically via Fannie Mae's servicing system known as LASER) the status of each loan it services each month, informing Fannie Mae whether the loan is current and whether Fannie Mae should draft P&I or payoff payments from a custodial account; and

- deposit tax and insurance payments into separate custodial accounts, and ensure that taxes and insurance on the borrowers' properties are paid from those accounts.

24.    Additionally, under the Servicing Guide, all servicers, including OMC, have

certain responsibilities when a borrower, through a refinance or for any other reason, chooses to

pay off a loan.  For example, the Fannie Mae Servicing Guide specifically states:

- "The servicer must assure that the total amount required to satisfy the indebtedness – principal, interest, outstanding advances, etc. – is received and remitted to us." (III, 102.03:  Payments in Full);

- "As soon as the servicer verifies that the amount required to pay a mortgage in full has been received, it must take all the steps necessary to assure that . . . our share of the payoff proceeds is remitted in accordance with the remittance schedule established for the remittance type under which the mortgage is reported . . . .  The servicer must code the payoff as an Action Code 60." (VI, 101:  Notification of Mortgage Payoff);

- "The servicer must remit payoff proceeds to us as part of its regular monthly remittance." (VI, 106.03:  "Scheduled/Scheduled" Remittance Types);

- "A servicer must report removal transactions – payoff, repurchase, and foreclosure actions (Action Codes 60, 65, 67, 70, 71, and 72) -- in sufficient time for us to receive the notification by the second business day of the month following the cutoff date for the reporting period in which the activity occurred." (X, 103.01:  Removal Transactions).

25.    All of these servicing requirements applied to OMC as a servicer of Fannie Mae

loans.

26.    OMC and Fannie Mae maintained custodial accounts for the benefit of Fannie

Mae at two institutions, Independence Community Bank and Midwood Federal Credit Union,

under documents entitled "Letters of Authorization."  Each month, for loans OMC serviced on

Fannie Mae's behalf, OMC informed the AD&M group through LASER of the amounts of P&I

(including prepayments and payoffs) OMC deposited into the custodial accounts for Fannie Mae

to withdraw and the AD&M group withdrew such monies.

(2)    **The Fraud Perpetrated on Fannie Mae By OMC.**

27.    OMC acting in its role as a loan servicer, stole borrower payoff proceeds for 257 of the thousands of loans it was servicing for Fannie Mae.

28.    In each instance, borrowers obtained loans (the "B Loans") from OMC for the purpose of refinancing (through interest rate reductions and term modifications) outstanding loans (the "A Loans") on the same property.

29.    OMC sold the B Loans to Fannie Mae through Fannie Mae's AA&C group, and remitted to Fannie Mae monthly borrower principal and interest payments for the B Loans as is normal and to be expected.

30.    Because OMC was the servicer on the A Loans, when the outstanding principal balances of the A Loans were refinanced, OMC was obligated to report to Fannie Mae through LASER that the outstanding principal balances on those loans should be considered paid off and OMC, again as servicer, was obligated to remit those outstanding balances or Loan A final payoffs to Fannie Mae.

31.    OMC, however, failed to remit to Fannie Mae payoff proceeds for the A Loans, failing also to notify Fannie Mae's AD&M group through LASER that the A Loans were to be paid off.

32.    Instead, OMC stole the payoff amounts for its own purposes, demonstrating manifest intent to cause Fannie Mae to sustain a loss and to obtain an improper financial benefit for OMC.

33.    OMC also undertook elaborate efforts to conceal its theft of the loan payoff proceeds for the A Loans.

34.    After stealing the payoff proceeds on any given A Loan, OMC continued to report to Fannie Mae's AD&M group each month through LASER the loan as current. At the same time, OMC failed to report through LASER the required payoff code – Action Code 60.

35.    OMC then deposited into the Fannie Mae custodial account from OMC's own operating account the principal and interest payments that would have been due to Fannie Mae if the A Loans were current and not to be paid off.

36.    OMC informed Fannie Mae's AD&M group through LASER that the principal and interest payments were in the custodial account for Fannie Mae to withdraw, just as if the loans were, indeed, current.

37.    OMC tracked the loans for which it stole the payoff proceeds on a list referred to as the "Code 59 List."

38.    Each of the 257 A Loans for which OMC stole the payoff proceeds is on the Code 59 List Fannie Mae obtained from OMC after Fannie Mae suspected a problem.

39.    OMC tracked the principal and interest payments it used to cover up the fraud with a special notation – "branch payment" – within its servicing system. Further, whenever an A Loan was refinanced, the OMC servicing personnel would note the resulting required escrow account adjustments in the A Loan file and record the reason for the adjustment as "refinance."

40.    Fannie Mae's loss, resulting solely and directly from OMC's theft of loan payoff proceeds is **$43,918,500.42**, which represents the outstanding unpaid principal balance of the 257 loans as of October, 2004. Fannie Mae has also incurred in excess of **$540,000** for the work performed by a forensic accounting firm to determine, verify and calculate the loss.

    **(3)**    **Fannie Mae's Discovery of OMC's Fraud and Fannie Mae's Efforts to Mitigate its Losses.**

41.    On September 29, 2004, during the period of the Bond, Fannie Mae received information from an anonymous caller that a servicer had stolen loan payoff proceeds from Fannie Mae. After an internal review, Fannie Mae identified the servicer as OMC.

42.    Fannie Mae took immediate steps to determine which loans were at issue and to mitigate the loss.

43.    As part of its mitigation efforts, Fannie Mae, on October 20, 2004, delivered a formal notice of termination to OMC and took immediate action to transfer servicing of the loans being serviced by OMC to a new vendor (Cenlar, FSB). Fannie Mae also seized files related to the loans OMC had sold Fannie Mae and the loans it serviced for Fannie Mae.

44.    Fannie Mae initiated conversations with the New York Banking Commission and the FBI. In addition, Fannie Mae initiated a lawsuit on November 16, 2004 against OMC and Lieb Pinter (a former principal of OMC ) and obtained a court order putting in place a receiver ("Receiver") to oversee the orderly winding down of OMC's affairs and to assist in tracing the funds stolen by OMC. These matters are ongoing, and Fannie Mae has not yet recovered any of the payoff proceeds stolen by OMC.

    **(4)**    **National Union's Failure to Honor Its Contractual Obligations Under the Bond.**

45.    By letter dated October 28, 2004 addressed to Willis of New York (the broker of the Bond) and in accordance with the terms of the Bond, Fannie Mae provided timely notice to National Union and ACE of OMC's fraud and Fannie Mae's loss. Willis, in turn, provided formal written notice of Fannie Mae's loss to National Union and ACE by letter dated October 29, 2004.

46.     Subsequently, Fannie Mae has had at least four face-to-face meetings with National Union and several conference calls in which Fannie Mae has described OMC's theft and Fannie Mae's loss and answered National Union's questions about the same.

47.     Fannie Mae has also provided, on several occasions, detailed written responses to information requests propounded by National Union, and has made available and produced documents requested by National Union.

48.     On April 7, 2005, Fannie Mae submitted a detailed and documented draft proof of loss to National Union followed by a detailed sworn proof of loss, with supporting documentation, on June 23, 2005.  An updated proof of loss, containing information Fannie Mae had provided to National Union since submitting its original proof of loss, was submitted to National Union on December 22, 2005.   (A true and accurate copy of Fannie Mae's proof of loss, without exhibits, is attached hereto as Exh. C.)

49.     The Servicing Contractor and Mortgage Fraud Insuring Agreements in the Bond were designed to cover losses to Fannie Mae resulting from the fraudulent servicing of loans for Fannie Mae or the fraudulent sale of loans to Fannie Mae.  Accordingly, the loss caused to Fannie Mae by OMC's theft of loan payoff proceeds OMC was obligated to remit to Fannie Mae is a classic example of the type of loss covered by National Union under the Bond.

50.     Nonetheless, on various occasions, starting with a "reservation of rights" letter dated August 2, 2005, National Union has suggested or asserted that the loss to Fannie Mae caused by OMC's fraud does not fall within either the Servicing Contractor Insuring Agreement or Mortgage Fraud Insuring Agreement.

51.     Though one of OMC's servicing functions was to report loan payoffs to Fannie Mae and remit to Fannie Mae the loan payoff amounts, National Union asserts that the OMC

fraud did not occur in the context of OMC performing its servicing function for Fannie Mae on the A Loans but rather in OMC's capacity as an originator of the B Loans and, for that reason, does not fall within the Servicing Contractor Insuring Agreement.

52.     At the same time, National Union asserts that any fraud OMC perpetrated in the origination and sale to Fannie Mae of the B Loans does not fall within the Mortgage Fraud Insuring Agreement.

53.     Upon information and belief, National Union's position is that none of the other insuring agreements of the Bond provide coverage either.

54.     Demonstrating National Union's own doubts about the validity of its position, National Union asserts in the alternative that even if the loss falls within the Servicing Contractor or Mortgage Fraud Insuring Agreements, then certain exclusions associated with those insuring agreements preclude coverage for Fannie Mae's loss.

55.     In a meeting on November 14, 2005 between an AIG (National Union's parent company) representative, National Union's outside counsel and representatives of Fannie Mae, National Union asserted that it needed no additional information or investigation to deny Fannie Mae's claim.

56.     Further demonstrating, however, that National Union itself does not believe that it has a reasonable basis upon which to formally deny Fannie Mae's claim or is recklessly disregarding that it lacks any reasonable basis upon which to deny Fannie Mae's claim, National Union, instead of denying Fannie Mae's claim in writing, chose to orally convey to Fannie Mae the coverage defenses that National Union has developed as well as National Union's position that it has sufficient information to deny Fannie Mae's claim.

57.    Counsel for Fannie Mae, by letter dated November 29, 2005, refuted National Union's stated bases for National Union's position that Fannie Mae's claim is not covered. In response, by letter dated December 19, 2005, National Union reaffirmed its arguments against coverage and asserted that "it is likely coverage is not afforded for the claim." And, notwithstanding that Fannie Mae has provided information about its loss to National Union orally and in writing many times, and has produced documents evidencing the loss and others requested by National Union, National Union suggested that it seeks yet additional information (though National Union has not said that there may be certain types of information it does not have that would, in fact, cause National Union to change its view – formulated over many months – that Fannie Mae's claim is not covered).

58.    The loss Fannie Mae suffered as a result of OMC's theft of the loan payoff amounts is covered under the terms of the Bond, and National Union was and is contractually obligated to pay the loss to Fannie Mae up to the $25 million limit of the Bond.

59.    National Union has failed to honor its contractual obligations to cover Fannie Mae's loss and, in doing so, has also breached its implied duty of good faith and fair dealing by, among other things: unreasonably asserting that the loss to Fannie Mae caused by OMC's theft of loan payoff proceeds is not covered under the Bond when National Union knew or should have known that there was no reasonable basis for denying coverage; disregarding Fannie Mae's legal and contractual interests and rights so as to advance National Union's interests; failing to evaluate Fannie Mae's claim in a fair, impartial and objective manner; and delaying payment of Fannie Mae's claim.

60.    Fannie Mae, accordingly, is deprived of the benefit of insurance coverage for which it paid substantial premiums and has suffered additional consequential damages, including

without limitation, attorney fees and other expenses in bringing this action, lost earnings on amounts wrongfully withheld by National Union, and lost executive time and productivity, which damages are not subject to the Bond's limit of liability.

61.     Upon information and belief, ACE is adopting the same or substantially the same coverage positions as National Union and/or is refusing to provide coverage under the Excess Bond until National Union provides coverage under the National Union Bond.

62.     Fannie Mae, accordingly, is deprived also of the benefit of excess insurance coverage for which it paid substantial premiums.

## COUNT ONE:  DECLARATORY JUDGMENT

63.     Fannie Mae incorporates paragraphs 1 through 62 as if fully set forth herein.

64.     This is a claim for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, to determine the parties' rights and obligations under the Bond with respect to coverage for the loss suffered by Fannie Mae resulting from OMC's theft of the loan payoff amounts.

65.     An actual and present controversy exists between Fannie Mae on the one hand and National Union and ACE on the other concerning National Union's and ACE's obligation to cover Fannie Mae's losses resulting from OMC's theft of the loan payoff amounts.

66.     Fannie Mae requests that this Court declare that National Union is obligated to provide coverage in the amount of the full limit of the Bond ($25 million) for Fannie Mae's loss above the $5 million deductible resulting from OMC's theft of loan payoff amounts.

67.     Fannie Mae requests that this Court declare that ACE is obligated to provide coverage for the remainder of Fannie Mae's loss (almost $14 million) resulting from OMC's theft of loan payoff amounts.

## COUNT TWO:  BREACH OF CONTRACT BY NATIONAL UNION (FAILURE TO PROVIDE COVERAGE)

68.     Fannie Mae incorporates paragraphs 1 through 67 as if fully set forth herein.

69.     National Union breached its contractual obligations under the Bond to cover the loss caused to Fannie Mae by OMC's theft of loan payoff amounts.

70.     As a direct result of National Union's breach of the Bond, Fannie Mae remains uncompensated by National Union for any portion of Fannie Mae's loss.

71.     As a direct and proximate result of National Union's breach of the Bond, Fannie Mae has yet to be paid the sums owed to it under the Excess Bond which provides $15 million in coverage in excess of the $25 million in coverage provided by National Union.

72.     As a direct and proximate result of National Union's breach of the Bond, Fannie Mae has incurred additional consequential damages, including without limitation, attorney fees and other expenses in bringing this action, lost earnings on amounts wrongfully withheld by National Union, and lost executive time and productivity, which damages are not subject to the Bond's limit of liability.

73.     As a direct and proximate result of the aforesaid actions by National Union, Fannie Mae has suffered damages in an amount to be proved at trial, but in excess of $75,000.00 exclusive of interests and costs.

## COUNT THREE:  BREACH OF CONTRACT BY NATIONAL UNION (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

74.     Fannie Mae incorporates paragraphs 1 through 73 as if fully set forth herein.

75.     National Union owes to Fannie Mae under the Bond a duty of good faith and fair dealing.

76.     National Union has breached its duty of good faith and fair dealing by, among other things:

(a)    unreasonably asserting that the loss to Fannie Mae caused by OMC's theft of loan payoff proceeds is not covered under the Bond when National Union knew or should have known that there was no reasonable basis for denying coverage;

(b)    disregarding Fannie Mae's legal and contractual interests and rights so as to advance National Union's interests;

(c)    failing to evaluate Fannie Mae's claim in a fair, impartial and objective manner;

(d)    failing to implement and/or adhere to appropriate claims-handling standards and procedures;

(e)    delaying payment of Fannie Mae's claim; and

(f)    making a settlement offer intended to force Fannie Mae to accept less than the true value of its compensable claim.

77.    By engaging in such improper and unfair tactics, National Union has destroyed or injured Fannie Mae's right to receive the benefits provided for under the Bond for this loss, is evading the spirit of the Bond, and is willfully rendering National Union's performance under the Bond imperfect.

78.    National Union's actions were oppressive or in willful and wanton disregard of Fannie Mae's rights under the Bond.

79.    National Union's breaches of the implied duty of good faith and fair dealing have caused Fannie Mae to suffer damages, including being deprived of the benefit of the Bond and the Excess Bond, attorney fees and other expenses in bringing this action, lost earnings on amounts wrongfully withheld by National Union, and lost executive time and productivity, which damages are not subject to the Bond's limit of liability.

**PRAYER FOR RELIEF**

WHEREFORE, Fannie Mae requests that the Court enter judgment against National Union and ACE as follows:

(i)    On Count One, a declaration that:  a) National Union is obligated to provide coverage in the amount of the full limit of the Bond for Fannie Mae's loss resulting from OMC's theft of loan payoff amounts and b) ACE is obligated to provide coverage for the remainder of Fannie Mae's loss (almost $14 million) resulting from OMC's theft of loan payoff amounts;

(ii)    On Count Two, judgment against National Union in the amount of twenty-five million dollars ($25 million Bond limit) plus compensatory and other damages, including but not limited to attorneys fees and costs incurred in connection with this suit, in amounts to be determined at trial, and interest according to law;

(iii)   On Count Three, judgment against National Union in the amount of twenty-five million dollars ($25 million Bond limit) plus compensatory and other damages, including but not limited to attorneys fees and costs incurred in connection with this suit, in amounts to be determined at trial, and interest according to law; and

(iv)    Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Matthew J. Schlesinger, DC Bar #429689
Edward J. McAndrew, DC Bar #457227
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 - East Tower
Washington, D.C. 20005-3373
202-414-9200
Fax 202-414-9299

Counsel for Plaintiff
FANNIE MAE

Dated: March 3, 2006

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FEDERAL NATIONAL MORTGAGE ASSOCIATION,

       Plaintiff,

      v.

NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA,

and

ACE AMERICAN INSURANCE COMPANY,

       Defendants.

Case No.:  1:05cv02462 RMU

JURY TRIAL DEMANDED

## DEMAND FOR JURY TRIAL

    Plaintiff Fannie Mae hereby demands trial by jury in the above-captioned civil action as

to all issues so triable.

            Respectfully submitted,

            Matthew J. Schlesinger, DC Bar #429689
            Edward J. McAndrew, DC Bar #457227
            REED SMITH LLP
            1301 K Street, N.W.
            Suite 1100 - East Tower
            Washington, D.C. 20005-3373
            202-414-9200
            Fax 202-414-9299

            Counsel for Plaintiff
            FANNIE MAE

Dated: March 3, 2006

# EXHIBIT A



# FINANCIAL INSTITUTUION BOND

# AND COMPUTER CRIME

## EFFECTIVE JUNE 30, 2004– JUNE 30, 2005

**INSURER:**
**NATIONAL UNION FIRE INSURANCE COMPANY**
**OF PITTSBURGH, PA**

Copy Control Number
FIB 006

**FINANCIAL INSTITUTION BOND**

**SECTION 1**

National Union Fire Insurance Company of Pittsburgh, Pa.
(A Stock Insurance Company, herein called the Company)

**DECLARATIONS**

Bond Number 600-97-48

Item 1.    Name of Insured (herein called Insured)

FANNIE MAE and all wholly owned or majority owned subsidiary companies or corporations as now or hereinafter constituted or acquired, and notified to Underwriters hereon with the provisions of General Agreement B of Financial Institution Bond and General Condition (C) of Electronic and Computer Crime Policy, and all Pension Plans or Trusts and Employee Welfare Plans or Trusts now or hereinafter owned and controlled by the Insured and all as agreed by Underwriter hereon.

Principal Address:
3900 Wisconsin Avenue N. W,
Washington, DC 20016-2899

Item 2.    Bond Period: from 12:01 a.m. on June 30, 2004 to 12:01 a.m. on June 30, 2005

Item 3.    The Aggregate Liability of the Underwriter during the Bond Period shall be $50,000,000 combined for Sections 1 and 2

Item 4.    Subject to Sections 3 and 11 hereof,
the Single Loss Limit of Liability is          $25,000,000
the Single Loss Deductible is               $  5,000,000

Provided, however, that if any amounts are inserted below opposite specified Insuring Agreements or Coverage, those amounts shall be controlling. Any amount set forth below shall be part of and not in addition to amounts set forth above. (If an Insuring Agreement or Coverage is to be deleted, insert "Not Covered.")

| Amount applicable to: | Single Loss Limit of Liability/Aggregate | Single Loss Deductible |
|---|---|---|
| Insuring Agreement (A)-FIDELITY | $25,000,000 | $5,000,000 |
| Insuring Agreement (B)-ON PREMISES | $25,000,000 | $5,000,000 |
| Insuring Agreement (C)-IN TRANSIT | $25,000,000 | $5,000,000 |
| Insuring Agreement (D)-FORGERY OR ALTERATION | $25,000,000 | $5,000,000 |
| Insuring Agreement (E)-SECURITIES | $25,000,000 | $5,000,000 |
| Insuring Agreement (F)-COUNTERFEIT CURRENCY | $25,000,000 | $5,000,000 |

1

Optional Insuring Agreements and Coverages:

| | | |
|---|---|---|
| Insuring Agreement (G)-FIDELITY CLAIM EXPENSE | $   250,000/$250,000 | NIL. |
| Insuring Agreement (H)-SERVICING CONTRACTORS | $25,000,000 | $5,000,000 |
| Insuring Agreement (I)-FORGED/FRAUDULENT MORTGAGES (with respect to credit unions and deposit taking institutions) | $25,000,000 | $3,000,000 |
| Insuring Agreement (I)-FORGED/FRAUDULENT MORTGAGES (all entities other than credit unions and deposit taking institutions) | $25,000,000 | $5,000,000 |
| Trading Loss Coverage | $25,000,000 | $5,000,000 |

If "Not Covered" is inserted above opposite any specified Insuring Agreement or Coverage, such Insuring Agreement or Coverage and any other reference thereto in this bond shall be deemed to be deleted therefrom.

Item 5.   The liability of the Underwriter is subject to the terms of the following riders attached hereto:
Section 1, Riders No. 1 through 5; Section 2, Rider No. 1; Sections 1 & 2, Riders No. 1 through 3

Item 6.   The Insured by the acceptance of this bond gives notice to the Underwriter terminating or canceling prior bond(s) or policy(ies) No.(s) 2825046 such termination or cancellation to be effective as of the time this bond/policy becomes effective.

Item 7.   LOSSES TO BE NOTIFIED TO:   WILLIS OF NEW YORK
7 HANOVER SQUARE
NEW YORK, NY 10004
ATTN: STEPHEN LEGGETT

By: _____
AUTHORIZED REPRESENTATIVE

2

## POLICYHOLDER DISCLOSURE STATEMENT
### UNDER
### TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage. The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act. Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

Unless you sign this form and return it to us rejecting Terrorism Coverage under the Federal Act, you will be covered for Terrorism as defined in the Act and your premium for that coverage is *$4,650* .

_____    I hereby reject coverage in accordance with the Act.


_____
Signature of Insured


_____
Print Name/Title


_____
Date

### COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *FANNIE MAE*


Policy Number: *600-97-48*
Policy Period Effective Date From: *June 30, 2004*    To: *June 30, 2005*

81285 (1/03)

The Underwriter, in consideration of an agreed premium, subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

## INSURING AGREEMENTS

## FIDELITY

(A)    (1)    Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.

Such dishonest or fraudulent acts must be committed by the Employee:

(a)    to cause the Insured to sustain such loss; or
(b)    to obtain financial benefit for the Employee or another person or entity.

Notwithstanding the foregoing, however, it is agreed that with regard to Loans and/or Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to make and which results in:

(i)     a financial benefit for the Employee;
(ii)    a financial benefit for another person or entity with whom the Employee committing the dishonest or fraudulent act was in collusion, provided that the Insured establishes that the Employee intended to participate in the financial benefit; or
(iii)   the intentional transfer of funds or Property to the benefit of an innocent third party, committed by the Employee in the knowledge that such third party was not lawfully entitled to such funds or Property and which funds or Property is not lawfully recoverable by the Insured.

(A)    (2)    Physical loss of or damage to Property, Electronic Data or Electronic Data Processing Media as a result of acts committed by an Employee (including malicious acts of Employees), whether committed alone or in collusion with others, which acts are committed with the intent to cause the Insured to sustain such loss.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions. The term "funds or Property" does not include any loan or transaction in the nature of or amounting to a loan or a lease or an extension of credit.

Notwithstanding the above, it is agreed that in determining the amount of any loss payable under this bond, the Insured may include payments to individual Employees which are bonuses, commissions and profit sharing as part of such loss provided that such payments have been solely as the result of the Employee committing a dishonest or fraudulent act as described in this Insuring Agreement.

3

As used herein:

Loans means all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions in which the Insured assumes an existing creditor relationship.

Trading means trading or other dealings in securities, commodities, futures, options, foreign or Federal Funds, currencies, foreign exchange and the like.

Electronic Data means facts or information converted to a form useable in a Computer System and which is stored on Electronic Data Processing Media for use by computer programs.

Electronic Data Processing Media means punched cards, magnetic tapes, punched tapes or magnetic discs or other bulk media on which data is recorded.

## ON PREMISES

(B)  (1)  Loss of Property resulting directly from

    (a)  robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof, while the Property is lodged or deposited within offices or premises located anywhere, or

    (b)  theft, false pretenses, common law or statutory larceny, committed by a person

        (i)  present in an office of or on the premises of the Insured, or
        (ii)  present on the premises in which the Property is lodged or deposited.

  (2)  Loss of or damage to

    (a)  furnishings, fixtures, supplies or equipment within an office of the Insured covered under this bond resulting directly from larceny or theft in, or by burglary or robbery of, such office, or attempt thereat, or by vandalism or malicious mischief, or

    (b)  such office resulting from larceny or theft in, or by burglary or robbery of such office or attempt thereat, or to the interior of such office by vandalism or malicious mischief, provided that

        i)  the Insured is the owner of such furnishings, fixtures, supplies, equipment or office or is liable for such loss or damage, and
        ii)  the loss is not caused by fire.

4

**IN TRANSIT**

(C)  (1)   Loss of Property resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or otherwise made away with, and damage thereto or destruction thereof, while the Property is in the custody of a person designated by the Insured to act as its messenger (or a person acting as messenger or custodian during an emergency arising from the incapacity of such designated messenger) and while the Property is in transit anywhere, such transit to begin immediately upon receipt of such Property by said messenger and to end immediately upon delivery to the designated recipient or its agent.

(2)   Loss by reason of any non-negotiable instruments being lost from any peril set forth in paragraph (1) above while in transit in the custody of a carrier for hire, such transit to begin immediately upon receipt of such property by the transporting person(s) and to end immediately upon delivery to the designated recipient or its agent.

**FORGERY OR ALTERATION**

(D)  Loss resulting directly from

(1)   Forgery or alteration of, on or in any Negotiable Instrument (except an Evidence of Debt), Acceptance, withdrawal order, receipt for the withdrawal of Property, Certificate of Deposit or Letter of Credit,

(2)   transferring, paying or delivering any funds or Property or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices purport to have been signed or endorsed by any customer of the Insured or by any banking institution but which instructions or advices either bear a signature which is a Forgery or have been altered without the knowledge and consent of such customer or banking institution. Telegraphic, cable or teletype instructions or advices, as aforesaid, exclusive of transmissions of electronic funds transfer systems sent by a person other than the said customer or banking institution purporting to send such instructions or advices shall be deemed to bear a signature which is a Forgery.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

**SECURITIES**

(E)  Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,

(1)   acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any original

5

    (a)    Security,
    (b)    Document of Title,
    (c)    deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,
    (d)    Certificate of Origin or Title,
    (e)    Evidence of Debt,
    (f)    corporate, partnership or personal Guarantee, or
    (g)    Security Agreement
    (h)    statements of uncertificated securities of any book entry facility with written instructions

which

    i)    bears a signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity which is a Forgery, or
    ii)    is altered, or
    iii)    is lost or stolen;

(2)    guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, Guarantee, endorsement or any items listed in (a) through (h) above;

(3)    acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of, or otherwise acted upon, any item listed in (a) through (d) above which is a Counterfeit.

Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon such items.

A mechanically reproduced facsimile signature is treated the same as a handwritten signature.

## COUNTERFEIT CURRENCY

(F)    Loss resulting directly from the receipt by the Insured, in good faith, of any Counterfeit Money, coin or currency of the United States of America, Canada or any other country.

## FIDELITY CLAIM EXPENSE

(G)    Fees and expenses incurred and paid by the Insured with the prior approval of the Underwriter, for independent outside accountants to determine the amount and extent of loss covered under Insuring Agreements of this bond.

## GENERAL AGREEMENTS

### NOMINEES

A.  Loss sustained by any nominee organized by the Insured for the purpose of handling certain of its business transactions and composed exclusively of its officers, clerks or other employees shall, for all the purposes of this bond and whether or not any partner of such nominee is implicated in such loss, be deemed to be loss sustained by the Insured.

### ADDITIONAL OFFICES OR EMPLOYEES – CONSOLIDATION, MERGER OR PURCHASE OF ASSETS - NOTICE

B.  If the Insured shall, while this bond is in force, establish any additional offices, other than by consolidation or merger with, or purchase of assets of, another institution, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to the Underwriter or the payment of additional premium for the remainder of the premium period. If the Insured shall, while this bond is in force, consolidate or merge with, or purchase assets of, another institution, the Insured shall not have such coverage as is afforded under this bond for loss which

    (a)  has occurred or will occur in offices or premises, or

    (b)  has been caused or will be caused by an employee or employees of an institution, or

    (c)  has arisen or will arise out of the assets acquired by the Insured as a result of such consolidation, merger or purchase of assets; unless the Insured shall

        i)  give the Underwriter written notice of the proposed consolidation, merger or purchase of assets at least 60 days prior to the proposed effective date of the consolidation, merger or purchase of assets, and

        ii)  obtain the written consent of the Underwriter to extend the coverage provided by this bond to such additional offices or premises, Employees and other exposures, and

        iii)  pay to the Underwriter an additional premium computed pro rata from the date of such consolidation, merger or purchase of assets to the end of the current premium period.

Notwithstanding the foregoing, the Underwriter agrees to automatically extend such coverage as is afforded under this bond to any consolidated, merged or acquired institution which has less than twenty (20%) percent of the Insured's assets without the payment of additional premium for the remainder of the premium period provided, however, that the Insured gives the Underwriter written notice of such consolidation, merger or purchase, or acquisition of assets or liabilities within ninety (90) days after the effective date of such action.

7

## CHANGE OF CONTROL -NOTICE

C.     When the Insured learns of a transfer of its outstanding voting stock which results in a change of control of the Insured, it shall within sixty (60) days give written notice to the Underwriter setting forth

(a)     the names of the transferors and transferees (or the names of the beneficial owners if the shares are registered in another name), and

(b)     the total number of shares owned by the transferors and the transferees (or the beneficial owners), both immediately before and after the transfer, and

(c)     the total number of outstanding shares of voting stock.

As used in this General Agreement, control means the power to determine the management or policy of the Insured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of twenty (20%) percent or more of the outstanding voting stock of the Insured shall be presumed to result in a change of control for the purpose of the required notice.

Failure to give the required notice shall result in termination of coverage of this bond, effective upon the date of stock transfer, for any loss in which any transferee is implicated.

## WARRANTY

D.     No statement made by or on behalf of the Insured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

## JOINT INSURED

E.     If two or more Insureds are covered under this bond, the first named Insured shall act for all Insureds. Payment by the Underwriter to the first named Insured of loss sustained by any Insured shall fully release the Underwriter on account of such loss. If the first named Insured ceases to be covered under this bond, the Insured next named shall thereafter be considered as the first named Insured. Knowledge possessed or discovery made by any Insured shall constitute knowledge or discovery by all Insureds for all purposes of this bond. The liability of the Underwriter for loss or losses sustained by all Insureds shall not exceed the amount for which the Underwriter would have been liable had all such loss or losses been sustained by one Insured.

8

## COURT COSTS AND ATTORNEYS' FEES

**F.    (a)    Collectible Loss**

The Underwriter shall indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a collectible loss under this bond in excess of any Deductible Amount. Such indemnity shall be a part of the Aggregate Limit of Liability and the Sub-Limit for the applicable Insuring Agreement(s).

However, if multiple causes of action are alleged in any such suit or legal proceeding some of which causes of action, if established against the Insured, would not constitute a collectible loss under the bond, then the Insured shall bear for its own expense the court costs and attorneys' fees incurred in the defense of such alleged causes of action.

**(b)    Calculation of Costs and Fees**

**(1)    Aggregate Limit or sub-limit not reduced**

The following formula is to apply solely for the purpose of calculating how court costs and attorneys' fees are to be pro-rated when the Aggregate Limit of Liability or a sub-limit has not been reduced:

If the amount of the Insured's liability or alleged liability is greater than the amount recoverable under this bond, or if a Deductible Amount is applicable, or both, the liability of the Underwriter under this General Agreement F is limited to the proportion of court costs and attorneys' fees incurred and paid by the Insured or by the Underwriter that the amount recoverable under this bond bears to the total of such amount plus the amount which is not so recoverable.

**(2)    Aggregate Limit or sub-limit reduced**

The following formula is to be applied solely for the purpose of calculating how court costs and attorneys' fees are to be prorated when the Aggregate Limit of Liability or a sub-limit has been reduced in part:

If the amount of the Insured's liability or alleged liability is greater than the reduced amount recoverable under this bond at the time court costs and attorneys' fees are to be calculated, or if a Deductible Amount is applicable, or both, the liability of the Underwriter under this General Agreement F is limited to the proportion of court costs and attorneys' fees incurred and paid by the Insured or by the Underwriter that the reduced amount recoverable under this bond bears to the total of such amount plus  the amount which is not so recoverable.

9

(c)    **Reimbursement of Excess Payment**

If the Underwriter pays court costs and attorneys' fees in excess of its proportionate share of such costs and fees, the Insured shall promptly reimburse the Underwriter for such excess.

(d)    **Reduction of Aggregate Limit of Liability or sub-limit**

Court costs and attorneys' fees indemnified to the Insured under this General Agreement F. shall be a part of, and not in addition to, the Aggregate Limit of Liability or applicable sub-limit and payments made under this bond, including payments of court costs and attorneys' fees shall reduce the amount of the Aggregate Limit of Liability or sub-limit stated in Item 3. of the Declarations.

(e)    **Notice of Legal Proceedings**

The Insured shall promptly give notice to the Underwriter of the institution of any suit or legal proceeding referred to in paragraph (a) above and at the request of the Underwriter shall furnish it copies of all pleadings and other papers therein.

(f)    **Election to Defend**

At the Underwriter's election, the Insured shall permit the Underwriter to conduct the defense of such suit or legal proceeding, in the Insured's name, through attorneys of the Underwriter's selection.

In such event, the Insured shall give all reasonable information and assistance which the Underwriter shall deem necessary to the defense of such suit or legal proceeding.

(g)    **Payment of Court Costs and Attorneys' Fees**

The Underwriter shall not be liable to indemnify the Insured for court costs and attorneys' fees until after final judgment or settlement of any suit or legal proceeding.

## CONDITIONS AND LIMITATIONS

### DEFINITIONS

Section 1. As used in this bond:

(a)    Acceptance means a draft which the drawee has, by signature written thereon, engaged to honor as presented.

(b)    Certificate of Deposit means an acknowledgment in writing by a financial institution of receipt of Money with an engagement to repay it.

(c)    **Certificate of Origin or Title** means a document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(d)    **Counterfeit** means an imitation which is intended to deceive and to be taken as an original.

(e)    **Document of Title** means a bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers and must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

(f)    **Employee** means

    (1)    an officer or other employee of the Insured, while employed in, at or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises;

    (2)    an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured;

    (3)    a person provided by an employment contractor to perform employee duties for the Insured under the Insured's supervision at any of the Insured's offices or premises covered hereunder;

    (4)    an employee of an institution merged or consolidated with the Insured prior to the effective date of this bond;

    (5)    each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured, herein called Processor. (Each such Processor, and the partners, officers and employees of such Processor shall, collectively, be deemed to be one Employee for all the purposes of this bond, excepting, however, the second paragraph of Section 12. A Federal Reserve Bank or clearing house shall not be construed to be a processor);

    (6)    each natural person, partnership, or corporation authorized by the Insured to design, prepare, supply or service electronic instructions for the Insured's computer systems herein called Independent Software Contractors. Each such Independent Software Contractor and its parent, officers, and employees shall collectively be deemed to be one employee;

    (7)    consultants that have a valid written contract with the Insured.

11

(g)   Evidence of Debt means an instrument, including a Negotiable Instrument, executed by a customer of the Insured and held by the Insured which in the regular course of business is treated as evidencing the customer's debt to the Insured.

(h)   Forgery means the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose.

(i)   Guarantee means a written undertaking obligating the signer to pay the debt of another to the Insured or its assignee or to a financial institution from which the Insured has purchased participation in the debt, if the debt is not paid in accordance with its terms.

(j)   Letter of Credit means an engagement in writing by a bank or other person made at the request of a customer that the bank or other person will honor drafts or other demands for payment upon compliance with the conditions specified in the Letter of Credit.

(k)   Money means a medium of exchange in current use authorized or adopted by a domestic or foreign government as a part of its currency.

(l)   Negotiable Instrument means any writing:

   (1)   signed by the maker or drawer; and

   (2)   containing an unconditional promise or order to pay a sum certain in Money and no other promise, order, obligation or power given by the maker or drawer; and

   (3)   is payable on demand or at a definite time; and

   (4)   is payable to order or bearer.

(m)   Property means Money, Securities, Negotiable Instruments to include negotiable mortgage notes and any other negotiable instruments used by FANNIE MAE, Certificates of Deposit, Documents of Title, Acceptances, Evidences of Debt, Security Agreements, withdrawal orders, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, tokens, unsold state lottery tickets, books of account and other records whether recorded in writing or electronically, gems, jewelry, precious metals in bars or ingots, and tangible items of personal property which are not hereinbefore enumerated.

(n)   Security means an instrument which

   (1)   is issued in bearer or registered form; and

   (2)   is of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

   (3)   is either one of a class or series or by its terms is divisible into a class or series of instruments; and

    (4)    evidences a share, participation or other interest in property or in an enterprise or evidences an obligation of the issuer.

(o)    Security Agreement means an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation.

## EXCLUSIONS

Section 2.  This bond does not cover:

(a)    loss resulting directly or indirectly from Forgery or alteration, except when covered under Insuring Agreements (A),(D),(E) or (F);

(b)    loss due to riot or civil commotion outside the United States of America and Canada; or loss due to military, naval or usurped power, war or insurrection unless such loss occurs in transit in the circumstances recited in Insuring Agreement (C), and unless, when such transit was initiated, there was no knowledge of such riot, civil commotion, military, naval or usurped power, war or insurrection on the part of any person acting for the Insured in initiating such transit;

(c)    loss resulting directly or indirectly from the effects of nuclear fission or fusion or radioactivity; provided, however, that this paragraph shall not apply to loss resulting from industrial uses of nuclear energy;

(d)    loss resulting directly or indirectly from any acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured;

(e)    loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit, whether involving the Insured as a lender or as a borrower, including the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such loan or transaction was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (D), (E) or (I);

(f)    loss of Property contained in customers' safe deposit boxes, except when the Insured is legally liable therefor and the loss is covered under Insuring Agreement (A);

(g)    loss through cashing or paying forged or altered travelers' checks or travelers' checks bearing forged endorsements, except when covered under Insuring Agreement (A); or loss of unsold travelers' checks or unsold money orders placed in the custody of the Insured with authority to sell, unless (a) the Insured is legally liable for such loss and (b) such checks or money orders are later paid or honored by the drawer thereof, except when covered under Insuring Agreement (A);

13

(h)    loss caused by an Employee, except when covered under Insuring Agreement (A) or when covered under Insuring Agreement (B) or (C) and resulting directly from misplacement, mysterious unexplainable disappearance or destruction of or damage to Property;

(i)    loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any Employee in connection with any account relating to such trading, indebtedness, or balance, except when covered under Insuring Agreements (A), (D) or (E);

(j)    shortage in any teller's cash due to error, regardless of the amount of such shortage, and any shortage in any teller's cash which is not in excess of the normal shortage in the tellers' cash in the office where such shortage shall occur shall be presumed to be due to error;

(k)    loss resulting directly or indirectly from the use of credit, debit, charge, access, convenience, identification or other cards

    (1)    in obtaining credit, or

    (2)    in gaining access to automated mechanical devices which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans, or

    (3)    in gaining access to point of sale terminals, customer-bank communication terminals, or similar electronic terminals of electronic funds transfer systems,

whether such cards were issued, or purport to have been issued, by the Insured or by anyone other than the Insured, except when covered under Insuring Agreement (A);

(l)    loss involving automated mechanical devices which, on behalf of the Insured, disburse Money, accept deposits, cash checks, drafts or similar written instruments or make credit card loans, unless such automated mechanical devices are situated within an office of the Insured which is permanently staffed by an Employee whose duties are those usually assigned to a bank teller, even though public access is from outside the confines of such office, but in no event shall the Underwriter be liable for loss (including loss of Property)

    (1)    as a result of damage to such automated mechanical devices from vandalism or malicious mischief perpetrated from outside such office, or

    (2)    as a result of failure of such automated mechanical devices to function properly, or

    (3)    through misplacement or mysterious unexplainable disappearance while such Property is located within any such automated mechanical devices, except when covered under Insuring Agreement (A);

14

(m) loss through the surrender of Property away from an office of the Insured as a result of a threat

    (1) to do bodily harm to any person, except loss of Property in transit in the custody of any person acting as messenger provided that when such transit was initiated there was no knowledge by the Insured of any such threat, or

    (2) to do damage to the premises or property of the Insured,

except when covered under Insuring Agreement (A);

(n) loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving erroneous credits to such account, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or except when covered under Insuring Agreement (A);

(o) loss resulting directly or indirectly from payments made or withdrawals from a depositor's account involving items of deposit which are not finally paid for any reason, including but not limited to Forgery or any other fraud, unless such payments or withdrawals are physically received by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or except when covered under Insuring Agreement (A);

(p) loss resulting directly or indirectly from counterfeiting, except when covered under Insuring Agreements (A), (E), (F) or (I);

(q) loss of any tangible item of personal property which is not specifically enumerated in the paragraph defining Property and for which the Insured is legally liable, if such property is specifically insured by other insurance of any kind and in any amount obtained by the Insured, and in any event, loss of such property occurring more than 60 days after the Insured shall have become aware that it is liable for the safekeeping of such property, except when covered under Insuring Agreements (A) or (B)(2);

(r) loss of Property while in the mail or with a carrier for hire (other than an armored motor vehicle company), except when covered under Insuring Agreement (A) or Insuring Agreement (C)(2);

(s) loss of potential income or profit including, but not limited to, interest, dividends, commissions and the like;

(t) damages of any type for which the Insured is legally liable, except direct compensatory damages arising from a loss covered under this bond;

(u) costs, fees and other expenses incurred by the Insured in establishing the existence of, or amount of, loss covered under this bond, except when covered under Insuring Agreement (G) FIDELITY CLAIM EXPENSE;

(v) indirect or consequential loss of any nature.

## AGGREGATE LIMIT OF LIABILITY/NON-ACCUMULATION OF LIABILITY

**Section 3.**

The total liability of the Underwriter for all losses discovered during the Bond Period set forth in Item 2. of the Declarations and including court costs and attorneys' fees is limited to the Aggregate Limit of Liability stated in Item 3. of the Declarations of this bond or amendments thereto. The sub-limit of any Insuring Agreement(s) is part of and not in addition to the Aggregate Limit of Liability and the total liability of the Underwriter for all losses, including court costs and attorneys' fees, concerning any such Insuring Agreement(s) is limited to the amount of the sub-limit, irrespective of the total amount of such loss or losses.

The Aggregate Limit of Liability shall be reduced by the amount of any payment made under this bond. Upon the exhaustion of the Aggregate Limit of Liability by such payments, the Underwriter shall have no further liability:

  (a)  to indemnify the Insured under any Insuring Agreement(s) of this bond for any loss or losses; and/or

  (b)  to indemnify the Insured under General Agreement F. of this bond for any court costs and attorneys' fees; and/or

  (c)  to continue the defense of the Insured under General Agreement F. of this bond, in the event of Underwriter's election to conduct the defense of any suit or legal proceedings. Upon notice by the Underwriter to the Insured that the Aggregate Limit of Liability has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

In addition to the Aggregate Limit of Liability being reduced, the sub-limit of any applicable Insuring Agreement(s) stated in Item 4. of the Declarations shall be reduced by the amount of any payment made in connection with said Insuring Agreement(s). Upon exhaustion of the sub-limit applicable to said Insuring Agreement(s) by such payments, the Underwriter shall have no further liability:

  (a)  to indemnify the Insured under said Insuring Agreement(s) of this bond for loss or losses; and/or

  (b)  to indemnify the Insured under General Agreement F. of this bond for any court costs and attorneys' fees incurred in connection with said loss or losses; and/or

  (c)  to continue the defense of the Insured under General Agreement F. of this bond in the event of the Underwriter's election to conduct the defense of any suit or legal proceeding in connection with said loss or losses. Upon notice by the Underwriter to the Insured that the sub-limit has been exhausted, the Insured shall assume all responsibility for its defense at its own cost.

16

If, by reason of payments made under this bond, the Aggregate Limit of Liability is reduced to an amount less than the amount stated for any sub-limit in Item 4. of the Declarations of this bond, then the amount of any such sub-limit shall be accordingly reduced so that the total amount available under such sub-limit for any loss or losses, including court costs and attorneys' fees, does not exceed the reduced amount remaining available under the Aggregate Limit of Liability.

Neither the Aggregate Limit of Liability nor any sub-limit shall be reinstated in whole or in part by any recovery effected subsequent to any payment made under this bond.

Regardless of the number of years this bond shall continue in force or any subsequent renewals or replacements and the number of premiums which shall be payable or paid, the liability of the Underwriter shall not be cumulative in amounts from year to year or from period to period.

If a loss is covered under more than one Insuring Agreement, the maximum amount payable with respect to such loss shall not exceed the largest amount available under any one Insuring Agreement.

In the event that a loss of Property discovered during the Bond Period set forth in Item 2. of the Declarations of this bond is settled by the Underwriter through the use of a lost instrument bond or indemnity agreement, such loss, to the extent that the Underwriter is not called upon to pay under said lost instrument bond or indemnity agreement or otherwise remains unpaid by the Underwriter, shall not reduce the Aggregate Limit of Liability or any applicable sub-limit remaining for the payment of any loss or losses. However, any payment by the Underwriter under such lost instrument bond or indemnity agreement shall be deemed to be a payment under this bond.

The exhaustion or reduction of the Aggregate Limit of Liability or any sub-limit shall not affect the Underwriter's obligations in connection with any lost instrument bond or indemnity agreement issued prior to the exhaustion or reduction of the Aggregate Limit of Liability or any applicable sub-limit.

## DISCOVERY

Section 4.

This bond applies to loss discovered by the Insured during the bond period.  Discovery occurs when the Director of Corporate Risk and/or General Counsel first becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Director of Corporate Risk and/or General Counsel receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would create a loss under this bond.

## NOTICE/PROOF – LEGAL PROCEEDINGS

Section 5.

(a)    At the earliest practicable moment, not to exceed ninety (90) days after notification to the Director of Corporate Risk and/or General Counsel of discovery of loss, the Insured shall give the Underwriter hereon notice thereof.

17

(b)    Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

(c)    Lost Certificated Securities listed in a proof of loss shall be identified by certificate or bond numbers if such securities were issued therewith.

(d)    Legal proceedings for the recovery of any loss hereunder shall not be brought prior to the expiration of 60 days after the original proof of loss is filed with the Underwriter or after the expiration of 24 months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against the Insured in any suit mentioned in General Agreement F, or to recover attorneys' fees paid in any such suit, shall be brought within 24 months from the date upon which the judgment in such suit shall become final.

(e)    If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to equal the minimum period of limitation provided by such law.

(f)    This bond affords coverage only in favor of the Insured. No suit, action or legal proceedings shall be brought hereunder by anyone other than the named Insured.

<center>VALUATION</center>

Section 6.

Any loss of Money, or loss payable in Money, shall be paid, at the option of the Insured, in the Money of the country in which the loss was sustained or in the United States of America dollar equivalent thereof determined at the rate of exchange published by the Wall Street Journal at the time of such loss.

<u>Securities</u>

The Underwriter shall settle in kind its liability under this bond on account of loss of any Securities or, at the option of the Insured shall pay to the Insured the cost of replacing such Securities, determined by the market value thereof at the time of such settlement. In case of a loss of subscription, conversion or redemption privileges through the misplacement or loss of Securities, the amount of such loss shall be the value of such privileges immediately preceding the expiration thereof. If such Securities cannot be replaced or have no quoted market value or if such privileges have no quoted market value their value shall be determined by agreement or arbitration.

However, if prior to the settlement of the claim by the Underwriter, the Insured shall be compelled by law or by market rules with force of law to purchase equivalent Securities and give written notification of this to the Underwriter, the cost incurred by the Insured shall be taken as the value of those Securities.

<center>18</center>

If the applicable coverage of this bond is subject to a Deductible Amount and/or is not sufficient in amount to indemnify the Insured in full for the loss of Securities for which claim is made hereunder, the liability of the Underwriter under this bond is limited to the payment for or the duplication of so much of such Securities as has value equal to the amount of such applicable coverage.

Securities held in book entry form or in bulk by the issuer, clearing agency or custodian, may be identified in proof of loss by the presentation of the statement(s) of such issuers, clearing agency or custodian reflecting the Insured's interest therein, instead of by certificate number.

Books of Account and Other Records

In case of loss, or damage to, any books of account or other records used by the Insured in its business, the Underwriter shall be liable under this bond only if such books or records are actually reproduced and then for not more than the cost of the blank books, blank pages or other materials plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such books and other records.

Property other than Money, Securities or Records

In case of loss of, or damage to, any Property other than Money, Securities, books of account or other records, or damage covered under Insuring Agreement (B)(2), the Underwriter shall not be liable for more than the actual cash value of such Property, or of items covered under Insuring Agreement (B)(2). The Underwriter may, at its election, pay the actual cash value of, replace or repair such Property. Disagreement between the Underwriter and the Insured as to the cash value or as to the adequacy of repair or replacement shall be resolved by arbitration.

Electronic Data Processing Media

In case of loss of, or damage to Electronic Data Processing Media used by the Insured in its business, the Underwriter shall be liable under this bond only if such items are actually reproduced by other Electronic Data Processing Media of the same kind or quality and then for not more than the cost of the blank media plus the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such Electronic Data Processing Media, subject of course, to the applicable Limit of Liability.

Electronic Data

In case of loss of Electronic Data, the Underwriter shall be liable under this bond only if such data is actually reproduced by other Electronic Data of the same kind and quality and then for not more than the cost of labor for the actual transcription or copying of data which shall have been furnished by the Insured in order to reproduce such Electronic Data subject, of course, to the applicable Limit of Liability.

However, if such Electronic Data cannot be reproduced and said Electronic Data represents Securities, or financial instruments having a value, including Evidences of Debt, then such loss will be valued as indicated in the Securities and other Property paragraphs of this Section.

## Computation of Loss

In determining the amount collectible under this bond for any loss, all Money received by the Insured from any source whatsoever in connection with any matter from which a claimed loss has arisen, including payments and receipts of principal, interest, dividends, commissions and the like whenever received, shall be deducted from the amount actually paid out, advanced, withdrawn, taken or otherwise lost. The value of all Property received by the Insured from any source whatsoever and whenever received in connection with any matter from which a claimed loss has arisen shall likewise be deducted from the Insured's claimed loss.

## ASSIGNMENT - SUBROGATION - RECOVERY - COOPERATION

**Section 7.**

(a)   In the event of payment under this bond, the Insured shall deliver, if so requested by the Underwriter an assignment of such of the Insured's rights, title and interest and causes of action as it has against any person or entity to the extent of the loss payment.

(b)   In the event of payment under this bond, the Underwriter shall be subrogated to the Insured's rights of recovery therefor against any person or entity to the extent of such payment.

(c)   Recoveries, whether effected by the Underwriter or by the Insured, shall be applied net of the expense of such recovery first to the satisfaction of the Insured's loss in excess of the amount paid under this bond, secondly, to the Underwriter as reimbursement of amounts paid in settlement of the Insured's claim, and thirdly, to the Insured in satisfaction of any Deductible Amount. Recovery on account of loss of Securities as set forth in the second paragraph of Section 6. or recovery from reinsurance and/or indemnity of the Underwriter shall not be deemed a recovery as used herein.

(d)   Upon the Underwriter's request and at reasonable times and places designated by the Underwriter the Insured shall

  (1)   submit to examination by the Underwriter and subscribe to the same under oath; and

  (2)   produce for the Underwriter's examination all pertinent records; and

  (3)   cooperate with the Underwriter in all matters pertaining to the loss.

(e)   The Insured shall execute all papers and render assistance to secure to the Underwriter the rights and causes of action provided for herein. The Insured shall do nothing after discovery of loss to prejudice such rights or causes of action.

## LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE

**Section 8.**

With respect to any loss covered by this bond which is recoverable or recovered in whole or in part under any other bonds or policies issued by the Underwriter to the Insured or to any predecessor in interest of the Insured and terminated or canceled or allowed to expire and in which the period of discovery has not expired at the time any such loss thereunder is discovered, the total liability of the Underwriter under this bond and under such other bonds or policies shall not exceed, in the aggregate, the amount carried hereunder on such loss or the amount available to the Insured under such other bonds or policies, as limited by the terms and conditions thereof, for any such loss if the latter amount is larger.

If the coverage of this bond supersedes in whole or in part the coverage of any other bond or policy of insurance issued by an Insurer other than the Underwriter and terminated, canceled or allowed to expire, the Underwriter, with respect to any loss sustained prior to such termination, cancellation or expiration and discovered within the period permitted under such other bond or policy for the discovery of loss thereunder, shall be liable under this bond only for that part of such loss covered by this bond as is in excess of the amount recoverable or recovered on account of such loss under such other bond or policy, anything to the contrary in such other bond or policy notwithstanding.

## OTHER INSURANCE OR INDEMNITY

**Section 9.**

Coverage afforded hereunder shall apply only as excess over any valid and collectible insurance or indemnity obtained by the Insured, or by one other than the Insured on Property subject to exclusion (q), or by an armored motor vehicle company, or by another entity on whose premises the loss occurred or which employed the person causing the loss or the messenger conveying the Property involved.

## OWNERSHIP

**Section 10.**

This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable. This bond is for the sole use and benefit of the Insured named in the Declarations.

However, coverage provided under the Insuring Agreements of this bond shall be deemed to include amounts which the Insured is legally liable to pay a third party as a direct result of loss otherwise meeting the conditions and limitations of this bond. It is understood by the Underwriter and the Insured that the addition of this rider to the bond is not an admission that such coverage did or did not already exist under this bond.

21

## DEDUCTIBLE AMOUNT

**Section 11.**

The Underwriter shall be liable hereunder, subject to the Aggregate Limit of Liability or any sub-limit, only for the amount by which each and every loss exceeds the Deductible Amount for the Insuring Agreement applicable to such loss.

If a loss is covered under more than one Insuring Agreement, the largest Deductible Amount of any one Insuring Agreement shall be applicable to such loss.

## TERMINATION OR CANCELLATION

**Section 12.**

This bond may not be cancelled by the Underwriter or the Named Insured except: (i) by the Underwriter in the event of the Named Insured's non-payment of premium; or (ii) in accordance with the conditions described in paragraphs (b) or (c) of this clause.

    (a)    If the bond is cancelled by the Underwriter due to non-payment of premium, the Underwriter shall deliver to the Named Insured or mail to the Named Insured by registered, certified or other first class mail, at the Named Insured's address shown in the Declarations, written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this bond shall be deemed cancelled as to all Insureds at the date and hour specified in such notice.

    (b)    This bond may also be cancelled by the Underwriter because of a determination of any duly authorized governmental authority that continuation of the bond would violate, or would place the Underwriter in violation of, any provisions of the applicable state insurance law.

        If the bond is cancelled by the Underwriter due to reasons in paragraph (b) above, the Underwriter shall deliver to the Named Insured or mail to the Named Insured by registered, certified or other first class mail, at the Named Insured's address shown in the Declarations, written notice stating when, not less than ninety (90) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this bond shall be deemed cancelled as to all Insureds at the date and hour specified in such notice. If this bond shall be cancelled by the Underwriter, the Underwriter shall retain the pro rata proportion of the premium therein. Payment or tender of unearned premium by the Underwriter shall not be a condition precedent to the effectiveness of cancellation, but shall be made as soon as practicable.

    (c)    This bond may also be cancelled by the Named Insured in the event the Underwriter's rating by A.M. Best, Standard & Poors or Moody's is downgraded by two rating grades within the Bond Period.

The bond may be cancelled by the Named Insured due to reasons in paragraph (c) above, by mailing written notice to the Underwriter ten (10) days before such cancellation shall be effective or by surrender of this bond to the underwriter or its authorized agent. The mailing of such notice as aforesaid shall be proof of notice. The Bond Period terminates at the date and hour specified in such notice, or at the date and hour of physical surrender of the bond. If this bond shall be cancelled by the Named Insured, the Underwriter shall retain the customary short rate proportion of the premium herein.

(d)    This bond shall also be deemed terminated or cancelled as an entirety:

    (i)    immediately upon the taking over of the Insured by a receiver or other liquidator or by State or Federal officials; or

    (ii)    immediately upon the taking over of the Insured by another institution; or

    (iii)    immediately upon exhaustion of the Aggregate Bond Limit; or

    (iv)    immediately upon expiration of the Bond Period as set forth in the Declarations.

The Underwriter shall, on request, refund to the Insured the unearned premium, computed pro rata, if this bond be terminated or cancelled, as provided in sub-sections (d) (i) and (ii) of this paragraph.

(e)    This bond shall be deemed terminated or cancelled as to any Employee or any partner, officer or employee of any Processor:

    (1)    as soon as the Director of Corporate Risk and/or General Counsel shall learn of any dishonest or fraudulent act committed by such person at any time against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person; or (2) 15 days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel this bond as to such person;

        (i)    with respect to Employees, coverage is automatically reinstated provided that the dishonest or fraudulent act did not involve a value of more than $25,000; occurred prior to the Employee's employment by the Insured; and occurred more than three (3) years prior to the discovery of such dishonest or fraudulent act by the Insured.

Termination of this bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

(f)    This bond shall be also deemed terminated or cancelled as to any Service Bureau:

    (i)    as soon as the Director of Corporate Risk and/or General Counsel shall learn of any dishonest or fraudulent act committed by any partner, director, officer or employee of any such Service Bureau at any time against the Insured or any other person or entity, without prejudice to the loss of any property then in transit in the custody of such person; or

23

(ii)    fifteen (15) days after the receipt by the insured of a written notice from Underwriters of their desire to terminate or cancel this bond as to such person.

## RIGHTS AFTER TERMINATION OR CANCELLATION

**Section 13.**

At any time prior to the termination or cancellation of this bond as an entirety, whether by the Insured or the Underwriter, the Insured may give to the Underwriter notice that it desires under this bond an additional period of 90 days within which to discover loss sustained by the Insured prior to the effective date of such termination or cancellation and shall pay an additional premium therefor.

Upon receipt of such notice from the Insured, the Underwriter shall give its written consent thereto; provided however, that such additional period of time shall terminate immediately:

(a)    on the effective date of any other insurance obtained by the Insured, its successor in business or any other party, replacing in whole or in part the insurance afforded by this bond, whether or not such other insurance provides coverage for loss sustained prior to its effective date; or

(b)    upon any takeover of the Insured's business by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed for this purpose without the necessity of the Underwriter giving notice of such termination. In the event that such additional period of time is terminated, as provided above, the Underwriter shall refund any unearned premium.

The right to purchase such additional period for the discovery of loss may not be exercised by any State or Federal official or agency, or by any receiver or liquidator, acting or appointed to take over the Insured's business for the operation or for the liquidation thereof or for any other purpose.

24

RIDER #1
SECTION 1

This rider effective 12:01 a.m.,        June 30, 2004        forms a part of
Rider number:        600-97-48
Issued to:        FANNIE MAE

By:        National Union Fire Insurance Company of Pittsburgh, Pa.

It is agreed that:

1.    The following shall be included as insured:

      All Employee Welfare or Pension Benefit Plans owned, controlled or operated by the
      Insured.

2.    "Employee" as used in the attached bond shall include any natural person who is a director
      or trustee of the Insured while such director or trustee is engaged in handling funds or
      other property of any Employee Welfare or Pension Benefit Plan owned, controlled or
      operated by the Insured or any natural person who is a trustee, manager, officer or
      employee of any such Plan.

3.    If the bond, in accordance with the agreements, limitations and conditions thereof, covers
      loss sustained by two or more Employee Welfare or Pension Benefit Plans or sustained by
      any such Plan in addition to loss sustained by an Insured other than such Plan, it is the
      obligation of the Insured or the Plan Administrator(s) of such Plans under Regulations
      published by the Secretary of Labor implementing Section 13 of the Welfare and Pension
      Plan Disclosure Act of 1958 to obtain under one or more bonds issued by one or more
      Insurers an amount of coverage for each such Plan at least equal to that which would be
      required if such Plans were bonded separately.

4.    In compliance with the foregoing, payment by the Company in accordance with the
      agreements, limitations and conditions of the bond shall be held by the Insured, or if more
      than one by the Insured first named, for the use and benefit of any Employee Welfare or
      Pension Benefit Plan sustaining loss so covered and to the extent  that such payment is in
      excess of the amount of coverage required by such Regulations to be carried by said Plan
      sustaining such loss, such excess shall be held for the use and benefit of any other such
      Plan also covered in the event that such other Plan discovers that it has sustained loss
      covered thereunder.

5.    If money or other property of two or more Employee Welfare or Pension Benefit Plans
      covered under the bond is commingled, recovery for loss of such money or other property
      through fraudulent or dishonest acts of Employees shall be shared by such Plans on a pro
      rata basis in accordance with the amount for which each such Plan is required to carry
      bonding coverage in accordance with the applicable provisions of said Regulations.

**RIDER #1 (continued)**
**SECTION 1**

6.    The Deductible Amount of this bond applicable to loss sustained by a Plan through acts committed by an Employee of the Plan shall be waived, but only up to an amount equal to the amount of coverage required to be carried by the Plan because of compliance with the provisions of the Employee Retirement Income Security Act of 1974.

7.    A one year discovery period applies to the coverage afforded by this Rider.

8.    Section 13., RIGHTS AFTER TERMINATION OR CANCELLATION, of the attached bond does not apply to the coverage afforded by this Rider.

9.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #2**
**SECTION 1**

This rider effective  12:01 a.m.,         June 30, 2004        forms a part of
Rider number:         600-97-48
Issued to:            FANNIE MAE

By:      National Union Fire Insurance Company of Pittsburgh, Pa.

In consideration of the premium charged for this bond, to which this rider is attached, it is understood and agreed that said bond shall be amended as follows:

1.     This bond is extended to include the following Insuring Agreement (H):

### SERVICING CONTRACTORS

(H)     Loss resulting solely and directly from one or more dishonest or fraudulent acts by a Servicing Contractor whether committed alone or in collusion with others, which acts are committed by the Servicing Contractor with the manifest intent,

(a)     to cause the Insured to sustain such loss; and
(b)     to obtain thereby an improper personal financial benefit for the Servicing Contractor,

and which acts in fact result in the Servicing Contractor obtaining such benefit.

Salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or any other benefits of a type which may be earned in the normal course of employment or performance of a servicing contract shall not constitute improper personal financial benefit.

2.     The term Servicing Contractor shall mean a natural person, partnership, corporation, limited liability company, real estate investment trust or other entity and their employees, duly authorized by the Insured (Fannie Mae) under written agreement with the Insured to perform servicing activities, including any of the following with respect to mortgage loans owned by the Insured and other types of loans the Insured is authorized by its charter to own:

(a)     collecting and recording borrower payments and remitting same to the Insured;
(b)     taking actions permitted under the terms of the loan to preserve and protect the loan security property and the lien thereon;
(c)     administration of escrow accounts;
(d)     handling borrower inquiries and requests;
(e)     enforcing borrower covenants contained in the loan documents;
(f)     exercising default remedies for the Insured and otherwise managing delinquent loans;

RIDER #2 (continued)
SECTION 1

(g)    managing loan security property owned by, or under the supervision or control of, the Insured;

(h)    disposing of loan security property; or

(i)    other acts similar or related to any of the above or to the objectives intended to be served by any of the above;

but only while such natural person, partnership, corporation, limited liability company, real estate investment trust or other entity or their employees is actually performing such services within the United States of America, the U.S. Virgin Islands, Guam, Puerto Rico or Canada and NOT while acting in any other capacity, whether on behalf of the Insured or otherwise, including but not limited to the making of any real estate mortgage or home improvement loans; provided that such Servicing Contractor is named in the Schedule. Each such Servicing Contractor and their partners, officers and employees shall collectively be deemed to be one person for all purposes of the coverage provided by this Insuring Agreement.

## SCHEDULE

The schedule of Servicing Contractors covered by this Insuring Agreement is as follows:

| NAME | LOCATION | SERVICING VOLUME AS AT |
|------|----------|------------------------|

### Schedule of Servicing Contractors is waived

3.    In addition to the Exclusions in the attached bond, the Servicing Contractors Insuring Agreement does not cover:

(a)    loss resulting directly or indirectly from any dishonest or fraudulent acts of any Servicing Contractor except when covered by Insuring Agreement (A), or except when covered by the Servicing Contractors Insuring Agreement; or

(b)    loss resulting from the insolvency, bankruptcy or taking over by a receiver or other liquidator or by State or Federal Officials of any depository Institution, unless such depository is a Servicing Contractor covered under this bond and unless such insolvency, bankruptcy or taking over results from fraud or dishonesty of officers or employees of such depository Institution; or

(c)    loss through the failure of any Servicing Contractor covered under this bond to collect or receive Money for the account of the Insured, any agreement between such Servicing Contractor and the Insured to the contrary notwithstanding; or

**RIDER #2 (continued)**
**SECTION 1**

(d)    loss of Money collected or received for the account of the Insured by any Servicing Contractor covered under this bond unless such Servicing Contractor is legally liable to the Insured on account of the loss of such Money; or

(e)    loss resulting directly or indirectly from the complete or partial non-payment of, or default upon, any loan or transaction in the nature of a loan or extension of credit made to a Servicing Contractor, including any such loan or transaction established to provided funds for interim financing or "warehousing" of mortgage loans, whether procured in good faith or through fraud of false pretenses, or loss resulting directly or indirectly from the failure of the Servicing Contractor to pay over Property held as security for any such loan or transaction, and NOTWITHSTANDING Exclusion (e) of this bond.

4.    By adding to Conditions and Limitations, Termination or Cancellation, Section 12., the following:

This bond shall be deemed canceled as to any Servicing Contractor (a) immediately upon discovery by the Insured of any dishonest or fraudulent act on the part of such Servicing Contractor unless within five days after discovery of such act, the Insured shall give the Underwriter written notice thereof and in such event this bond shall be deemed canceled as to such Servicing Contractor at the expiration of thirty days after such discovery of such act, or (b) at 12:01 a.m. as aforesaid, upon the effective date specified in a written notice served upon the Insured or sent by mail. Such date, if the notice be served, shall be not less than thirty days after such service, or if sent by mail, not less than thirty-five days after the date of mailing. The mailing by the Underwriter of notice, as aforesaid, to the Insured at its Principal Office shall be sufficient proof of notice.

5.    By adding to Conditions and Limitations, Ownership, Section 10., the following:

This bond does not afford coverage in favor of any Servicing Contractor, and upon payment to the Insured by the Underwriter on account of any loss for which such Contractor is liable to the Insured, an assignment of such of the Insured's rights and causes of action as it may have against such Contractor by reason of such liability shall, to the extent of such payment, be given by the Insured to the Underwriter, and the Insured shall execute all papers necessary to secure to the Underwriter the rights herein provided for.

6.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #3**
**SECTION 1**

This rider effective 12:01 a.m.,        June 30, 2004        forms a part of
Rider number:        600-97-48
Issued to:        FANNIE MAE

By:        National Union Fire Insurance Company of Pittsburgh, Pa.

In consideration of the premium charged for this bond to which this rider is attached, it is understood and agreed that said bond shall be amended as follows:

1.    This bond is extended to include the following Insuring Agreement (I):

**FORGED AND FRAUDULENT MORTGAGES**

(I)    Loss resulting directly from the Insured having in good faith and in the ordinary course of business purchased any Mortgage Loan which proves to:

(a)    be based upon an original Mortgage, deed of trust, or other instrument creating or discharging a first or second lien upon real property, which bears a forged signature of any person signing in a material capacity, or which has been fraudulently altered in material sense or which is lost or stolen, or which is counterfeited; or

(b)    be fraudulently made upon real property which does not in fact exist; or

(c)    be fraudulently made in the name of a person who is in fact fictitious; or

(d)    be fraudulently made in the name of a person who does not have title to the real property securing such mortgage loan; or

(e)    be based upon the fact that the Mortgage Loan has also been sold or pledged to another party, in whole or in part; or

(f)    be based upon the fact that the Mortgage Loan has previously been sold to the Insured, in whole or in part; or

(g)    which prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

2.    By adding to Conditions and Limitations, Definitions, Section 1., the following:

"Document Custodian" shall mean an independent third party, designated by the Insured to act as custodian of the Mortgage Loan file pursuant to a written custodial agreement.

"Mortgage" shall mean the mortgage, deed of trust, or other instrument creating a first or second lien on an unsubordinated estate in fee simple in real property securing a mortgage note.

### RIDER #3 (continued)
### SECTION 1

"Mortgage Loan" shall mean an individual mortgage loan purchased by the Insured and shall be deemed to include the original mortgage note and original Mortgage or deed of trust in recordable form together with all other documents included in the Mortgage Loan file delivered to the Insured or its designated Document Custodian upon purchase.

3.   In addition to the Exclusions in the attached bond, the Forged and Fraudulent Mortgages Insuring Agreement does not cover:

    (a)   loss resulting from acts committed subsequent to the purchase of Mortgage Loans by the Insured;

    (b)   loss resulting from acts committed prior to purchase of Mortgage Loans by the Insured, except as defined by this Insuring Agreement;

    (c)   loss resulting solely from any negligent act or error or omission by the Insured or any of its agents, including the failure to satisfy the legal procedures required to complete an effective transfer to the Insured of any Mortgage Loan under the Uniform Commercial Code or real property law of the applicable state and/or equivalent Federal statute;

    (d)   loss resulting from the insolvency, bankruptcy, or taking over by a receiver, liquidator, State or Federal Officials of any institution originating Mortgage Loans to the Insured, unless otherwise covered under this Insuring Agreement.

4.   The following warranty applies in respect to this Insuring Agreement (I):

### WARRANTY

It is a condition precedent to the Insured having in good faith purchased any Mortgage Loan that the Insured shall not have released any funds prior to having received each Mortgage Loan or Participation Agreement or having received a certification or receipt from its designated Document Custodian.

5.   Coverage afforded by this rider shall only apply as excess over all valid and collectible insurance or indemnity obtained by the Insured or by any originator of Mortgage Loans or by any Document Custodian and when all other recoveries or sources have been collected.

6.   It is understood and agreed that, with respect to this Insuring Agreement, one deductible will apply to any batch of fraudulent mortgages, if resulting from a single fraudulent act or related fraudulent acts, rather than having the deductible apply per individual mortgage.

7.   Insuring Agreement (E) SECURITIES, Section (1) (c), is hereby deleted in its entirety.

8.   Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, limitations or provisions of the attached bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #4**
**SECTION 1**

This rider effective  12:01 a.m.,        June 30, 2004        forms a part of
Rider number:        600-97-48
Issued to:           FANNIE MAE

By:        National Union Fire Insurance Company of Pittsburgh, Pa.

It is agreed that:

1.    Section 1., Definitions, paragraph (f) is extended to include any such person who resigns or retires from the Insured during the bond period;

      provided, however, that this extension applies only:

      (i)    for a period of 90 days subsequent to such resignation or retirement (but not beyond the date of expiration or termination of the bond);

      (ii)   if such resignation or retirement has not arisen from or in connection with the discovery by the Insured of any actual or alleged dishonest, fraudulent, unauthorized or criminal act(s) of such person.

      In consideration of the granting of this extension, the Insured agrees that any deletion from their "Authorized Signatures" list will be sent to their correspondents within 30 days following the withdrawal of such authority; and that an "Authorized Signatures" list will be reviewed and sent to correspondents annually.

      Failure to comply with this requirement due to circumstances beyond the Insured's control will not void coverage under this extension.  This agreement remains subject to the provisions Section 12., Termination or Cancellation, and also to all other bond terms and conditions.

2.    Negotiable mortgage notes in which the Insured has an interest, while in the custody of a Transportation Company in a conveyance other than an armored motor vehicle, shall be deemed covered Property under the ON PREMISES and IN TRANSIT Insuring Agreements.

3.    Home Star Mortgage Services, LLC is considered a covered servicer under Insuring Agreement (H), SERVICING CONTRACTORS.

4.    Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions or limitations of the attached bond/policy other than as above stated.

AUTHORIZED REPRESENTATIVE

**RIDER #5**
**SECTION 1**

This rider effective  12:01 a.m.,      June 30, 2004      forms a part of
Rider number:       600-97-48
Issued to:          FANNIE MAE

By:        National Union Fire Insurance Company of Pittsburgh, Pa.

**WASHINGTON, D.C. AMENDATORY**
**CANCELLATION/NON-RENEWAL**

Wherever used in this endorsement:

1)    "we", "us", "our", and "insurer" means the insurance company which issued this policy;
      and
2)    "you", "your", "named insured", "First Named Insured", and "Insured" mean the Named
      Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the
      Declaration page; and
3)    "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, it is understood and agreed that the cancellation/non-
renewal provisions of this policy are amended to read as follows:

A)    CANCELLATION

      If this policy has been in effect for thirty (30) days or more, the insurer may cancel this
      policy only if one or more of the following reasons apply:

      1)    Insured has refused or failed to pay a premium due under the terms of the policy;
      2)    Insured or Other Insured(s) have made a material and willful misstatement or omission
            of fact to the insurer or its employees, agents or brokers in connection with any
            application to, or claim against the insurer; or
      3)    Property or other interest of the Insured shall have been transferred to a person other
            than the Insured or beneficiary, unless the transfer is permissible under the terms of
            the policy, or unless the property, interest or use thereof shall have materially
            changed with respect to its insurability.

The insurer will mail or deliver to the named insured notice of cancellation at least thirty
(30) days prior to the date of cancellation.  For cancellation as described under 2) and 3)
above, the insurer will mail or deliver a copy of the notice to the Superintendent of
Insurance at least thirty (30) days before the date of cancellation.

**RIDER #5 (continued)**
**SECTION 1**

B)    **NON-RENEWAL**

If the Insurer decides not to renew this policy, the Insurer will mail or deliver to the named Insured the Insurer's notice of non-renewal at least thirty (30) days before the end of the policy period.  The Insurer will mail or deliver notice of cancellation or non-renewal to the agent or broker at least five (5) days prior to the Insurer's mailing of notice to the named Insured.

The Notice of cancellation or non-renewal will be mailed or delivered to the Insured's last known address and will include the reason(s) for cancellation or non-renewal.  The envelope containing the notice shall be labeled "Important Insurance Notice" in at least 18 point type or larger.

**ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.**

AUTHORIZED REPRESENTATIVE

**Electronic and Computer Crime Policy**
**(Edition of December, 1993)**

## SECTION 2

Policy No. 600-97-48

### NATIONAL UNION FIRE INSURANCE COMPANY
### OF PITTSBURGH, PA.
A Capital Stock Company
ADMINISTRATIVE OFFICES
70 PINE STREET, NEW YORK, N.Y. 10270
(Herein Called the Underwriter)

## DECLARATIONS

Item 1.   NAME OF INSURED:   FANNIE MAE and all wholly owned or majority owned subsidiary companies or corporations as now or hereinafter constituted or acquired, and notified to Underwriters hereon with the provisions of General Agreement B of Financial Institution Bond and General Condition (C) of Electronic and Computer Crime Policy, and all Pension Plans or Trusts and Employee Welfare Plans or Trusts now or hereinafter owned and controlled by the Insured and all as agreed by Underwriter hereon.

Principal Address:   3900 Wisconsin Avenue N.W.,
Washington, DC 20016-2899

Item 2.   POLICY PERIOD:   from 12:01 a.m. on June 30, 2004 to 12:01 a.m. on June 30, 2005

Item 3.   PREMIUM:   As Agreed

Item 4.   APPLICATION FORM: The Application Form together with any correspondence relative thereto signed by or on behalf of the Insured shall be the basis of the insurance.

Item 5.   AGGREGATE POLICY LIMIT:  $50,000,000 combined for Sections 1 and 2

Item 6.   SINGLE LOSS LIMIT:

The Limit of Liability under this Policy for any Single Loss subject to the Aggregate Policy Limit and subject to General Condition (H), shall be $25,000,000.

25

# EXHIBIT B



## ace usa

### (ACE American Insurance Company)
### EXCESS BOND FORM

**This Bond is issued by the stock Insurance company listed above (herein "Insurer").**

## DECLARATIONS

| Bond No. | DOX G21660061 002 | |
|---|---|---|
| **Item 1.** | Insured Company<br>Principal Address: | Fannie Mae<br>3900 Wisconsin Ave., NW<br>Washington, DC 20016 |
| **Item 2.** | Coverage Provided: | Excess Financial Institution Bond and Computer Crime |
| **Item 3.** | Followed Bond:<br>Insurer: National Union Fire Insurance Company of Pittsburgh, PA<br>Bond Number: 600-97-48 | |
| **Item 4.** | Bond Period:<br>From 12:01A.M. June 30, 2004  To 12:01 A.M.  June 30, 2005<br>(Local time at the address shown in Item 1.) | |
| **Item 5.** | Limit of Liability:<br>$15,000,000 Single Loss subject to a $30,000,000 annual aggregate for all Loss paid on behalf of all Insureds arising from all Claims in the Bond Period. | |
| **Item 6.** | Premium:<br>$189,116 | |
| **Item 7.** Notice to Insurer: | Director of Claims<br>ACE Professional Risk<br>140 Broadway<br>40th Floor<br>New York, NY 10005 | |
| All other notices: | Chief Underwriting Officer<br>ACE Professional Risk<br>140 Broadway<br>40th Floor<br>New York, NY 10005 | |

XSBD001 (03/03)

**Item 8.**    Schedule of Underlying Bonds:

| Insurer | Bond Number | Limits | Bond Period |
|---|---|---|---|
| Primary Bond: National Union Fire Insurance Company of Pittsburgh, PA | 600-97-48 | $25,000,000 | 6/30/04- 6/30/05 |

Excess Bonds:

**THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION AND THE BOND FORM ATTACHED HERETO, CONSTITUTE THE BOND.**

DATE: 9/17/04
MO/DAY/YR.

Gregg C. Rentko, CPCU

**AUTHORIZED REPRESENTATIVE**

XSBD001 (03/03)

EXCESS BOND POLICY

I.    INSURING CLAUSE

In consideration of the payment of the premium and in reliance upon all statements made in the application including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Bond, the Insurer agrees to provide Bond coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Bond, except as otherwise provided herein.

II.   LIMIT OF LIABILITY

A.    It is expressly agreed that liability for any covered Loss shall attach to the Insurer only after the insurers of the Underlying Policies shall have paid, in the applicable legal currency, the full amount of the Underlying Limit and the Insureds shall have paid the full amount of the deductible, if any, applicable to the primary Underlying Bond. The Insurer shall then be liable to pay only covered Loss in excess of such Underlying Limit up to its Aggregate Limit of Liability as set forth in Item 5 of the Declarations, which shall be the maximum aggregate liability of the Insurer under this Bond with respect to all Loss on account of all Claims in the Bond Period irrespective of the time of payment by the Insurer.

B.    In the event and only in the event of the reduction or exhaustion of the Underlying Limit by reason of the insurers of the Underlying Policies paying, in the applicable legal currency, Loss otherwise covered hereunder, then this Bond shall, subject to the Aggregate Limit of Liability set forth in Item 5 of the Declarations: (i) in the event of reduction, pay excess of the reduced Underlying Limit, and (ii) in the event of exhaustion, continue in force as primary Bond; provided always that in the latter event this Bond shall only pay excess of the deductible applicable to the exhausted primary Underlying Bond, which deductible shall be applied to any subsequent Loss in the same manner as specified in such primary Underlying Bond.

C.    Notwithstanding any of the terms of this Bond which might be construed otherwise, this Bond shall drop down only in the event of reduction or exhaustion of the Underlying Limit and shall not drop down for any other reason including, but not limited to, uncollectibility (in whole or in part) of any Underlying Limits. The risk of uncollectibility of such Underlying Limits (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the Insurer.

III.  DEFINITIONS

A.    The terms "Claim" and "Loss" have the same meanings in this Bond as are attributed to them in the Followed Bond. The terms "Insurer", "Followed Bond", "Underlying Policies", "Bond Period" and "Aggregate Limit of Liability" have the meanings attributed to them in the Declarations.

B.    The term "Insureds" means those individuals and entities insured by the Followed Bond.

C.    The term "Bond Period" means the period set forth in Item 4 of the Declarations, subject to prior termination.

D.    The term "Underlying Limit" means an amount equal to the aggregate of all limits of liability as set forth in Item 8 of the Declarations for all Underlying Policies, plus the deductible, if any, applicable to the primary Underlying Bond.

IV.   UNDERLYING BOND

A.    This Bond is subject to the same representations as are contained in the Application for any Underlying Bond and the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the Bond period and except as otherwise provided herein) as are contained in or as may be

added to the Followed Bond and, to the extent coverage is further limited or restricted thereby, to any other Underlying Policies. In no event shall this Bond grant broader coverage than would be provided by any of the Underlying Policies.

B.   It is a condition of this Bond that the Underlying Policies shall be maintained in full effect with solvent insurers during the Bond Period except for any reduction or exhaustion of the aggregate limits contained therein by reason of Loss paid thereunder (as provided for in Section II (B) above). If the Underlying Policies are not so maintained, the Insurer shall not be liable under this Bond to a greater extent than it would have been had such Underlying Policies been so maintained.

C.   If during the Bond Period the terms, definitions, conditions, exclusions or limitations of the Followed Bond are changed in any manner, the Insureds shall as a condition precedent to coverage under this Bond give to the Insurer written notice of the full particulars thereof as soon as practicable but in no event later than 30 days following the effective date of such change. This Bond shall become subject to any such changes upon the effective date of the changes in the Followed Bond, provided that the Insureds shall pay any additional premium reasonably required by the Insurer for such changes.

D.   As a condition precedent to coverage under this Bond, the Insureds shall give to the Insurer as soon as practicable written notice and the full particulars of (i) the exhaustion of the aggregate limit of liability of any Underlying Bond, (ii) any Underlying Bond not being maintained in full effect during the Bond Period, or (iii) an insurer of any Underlying Bond becoming subject to a receivership, liquidation, dissolution, rehabilitation or similar proceeding or being taken over by any regulatory authority.

## V.   GENERAL CONDITIONS

A.   Application of Recoveries: All recoveries or payments recovered or received subsequent to a Loss settlement under this Bond shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insureds and the Insurer, provided always that the foregoing shall not affect the time when Loss under this Bond shall be payable.

B.   Notice: All notices under this Bond shall be given as provided in the Followed Bond and shall be properly addressed to the appropriate party at the respective address as shown in the Declarations.

C.   Cooperation: The Insureds shall give the Insurer such information and cooperation as it may reasonably require.

D.   Claim Participation: The Insurer shall have the right, but not the duty, and shall be given the opportunity to effectively associate with the Insureds in the investigation, settlement or defense of any Claim even if the Underlying Limit has not been exhausted.

E.   Changes and Assignment: Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Bond or estop the Insurer from asserting any right under the terms of this Bond. The terms, definitions, conditions, exclusions and limitations of this Bond shall not be waived or changed, and no assignment of any interest under this Bond shall bind the Insurer, except as provided by endorsement issued to form a part hereof, signed by the Insurer or its authorized representative.

F.   Headings: The descriptions in the headings and sub-headings of this Bond are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

XSBD002 (03/03)                                   Page 2

# SIGNATURES

| Named Insured<br>**Fannie Mae** | | | Endorsement Number<br>**1** |
|---|---|---|---|
| Policy Symbol<br>**DOX** | Policy Number<br>**G21660061 002** | Policy Period<br>**06/30/2004 to 06/30/2005** | Effective Date of Endorsement<br>**06/30/2004** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**BANKERS STANDARD FIRE AND MARINE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**BANKERS STANDARD INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE INDEMNITY INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE AMERICAN INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE PROPERTY AND CASUALTY INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**INSURANCE COMPANY OF NORTH AMERICA**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**PACIFIC EMPLOYERS INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

**ACE FIRE UNDERWRITERS INSURANCE COMPANY**
1601 Chestnut Street, P.O. Box 41484, Philadelphia, Pennsylvania 19101-1484

GEORGE D. MULLIGAN, Secretary

SUSAN RIVERA, President

**WESTCHESTER FIRE INSURANCE COMPANY**
1133 Avenue of the Americas, 32nd Floor, New York, NY 10036

GEORGE D. MULLIGAN, Secretary

BRIAN E. DOWD, President

Authorized Agent
Gregg C. Rentko, CPCU

CC-1K11d  (04/02) Ptd.in U.S.A.

# WAR OR TERRORISM EXCLUSION

| Named Insured<br>**Fannie Mae** | | | | Endorsement Number<br>**2** |
|---|---|---|---|---|
| Policy Symbol<br>**DOX** | Policy Number<br>**G21660061 002** | Policy Period<br>**06/30/2004 to 06/30/2005** | | Effective Date of Endorsement<br>**06/30/2004** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**A.** Provisions to the contrary notwithstanding, the following exclusion is added to the policy:

**Exclusions**

This insurance does not apply to:

**I. War or Terrorism**

Any Loss (including Defense Costs) arising, directly or indirectly, out of:

(1) War, including undeclared or civil war; or

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these; or

(4) "Terrorism", including any action taken in hindering or defending against an actual or expected incident of "terrorism"

regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

However, with respect to "terrorism", this exclusion only applies if one or more of the following are attributable to an incident of "terrorism":

(1) The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

(2) Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

(a) Physical injury that involves a substantial risk of death; or

(b) Protracted and obvious physical disfigurement; or

(c) Protracted loss of or impairment of the function of a bodily member or organ; or

(3) The "terrorism" involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

(4) The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

(5) Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials.

Paragraphs (1) and (2), immediately preceding, describe the thresholds used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether the Terrorism Exclusion will apply to that incident. When the Terrorism Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part.

In the event of any incident of "terrorism" that is not subject to the Terrorism Exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

Multiple incidents of "terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

**B.** The following definition is added to the **Definitions** Section:

"Terrorism" means activities against persons, organizations or property of any nature:

1. That involve the following or preparation for the following:

   a. Use or threat of force or violence; or

   b. Commission or threat of a dangerous act; or

   c. Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2. When one or both of the following applies:

   a. The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

   b. It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

All other terms and conditions remain unchanged.

Gregg C. Rentko, CPCU

_____

Authorized Agent

CC-1e15 Printed in U.S.A.

**ACE**

## ace usa

| | ACE American Insurance Company |
|---|---|
| | Insurance Company |
| | G21660061 002 |
| | Policy Number |
| Fannie Mae | WILLIS OF NEW YORK INC |
| Policy Holder | Broker/Producer |

### POLICYHOLDER DISCLOSURE
### NOTICE OF TERRORISM INSURANCE COVERAGE

You have been notified that under the Terrorism Risk Insurance Act of 2002, effective November 26, 2002, you were given the right to purchase insurance coverage for losses arising out of acts of terrorism, *as defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States — to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

RESPONSIBILITY FOR COMPENSATION UNDER THE ACT IS SHARED BETWEEN INSURANCE COMPANIES COVERED BY THE ACT AND THE UNITED STATES.  ANY COVERAGE PURCHASED FOR LOSSES CAUSED BY ACTS OF TERRORISM DEFINED IN THE ACT IS PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW.  UNDER THE FORMULA, THE UNITED STATES PAYS 90% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE.  THE PREMIUM FOR THE TERRORISM COVERAGE DEFINED IN THE ACT SET FORTH BELOW DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

You elected **NOT** to purchase terrorism coverage under the Act at the price indicated.  ACCORDINGLY, WE WILL **NOT** PROVIDE THIS COVERAGE AND YOU DO NOT OWE THE ADDITIONAL PREMIUM FOR THAT COVERAGE INDICATED BELOW.

> Terrorism coverage described by the Act under your policy was made available to you for additional premium in the amount of $1,891 , however you elected to decline such coverage.

Notice Form 5

TRIA15  (1/03)

# EXHIBIT C

# Proof of Loss

# Federal National Mortgage Association

## National Union Fire Insurance Company
## Of Pittsburgh, Pa.
## Financial Institution Bond No. 600-97-48

## National Union Claim Nos.: 165-029680, 165-029681
## Matter: Olympia Mortgage

# Submitted 6/23/05 and Updated 12/21/05

**Table of Contents**

                                                                                                 **Page**
I.      Introduction................................................................................................................1

II.     Olympia's Servicer Obligations to Fannie Mae and the Loan Servicing Process ...............1

III.    Description of the Theft .............................................................................................4

        A.      The Fraud Perpetrated on Fannie Mae by Olympia.............................................4

        B.      Olympia's Concealment of the Theft.................................................................4

        C.      Fannie Mae's Discovery of Olympia's Fraud.......................................................5

IV.     Identification of the Loans and Summary of Verification Procedures Undertaken
        by Fannie Mae and Navigant Consulting...................................................................7

        A.      Introduction....................................................................................................7

        B.      Proof that Olympia and the Borrowers Entered into the 257 Refinance
                Transactions That Gave Rise to the Theft.........................................................7

        C.      Proof That Olympia Received Payments For The B Loans...................................8

        D.      Proof That Olympia Failed to Remit Payoff Payments to Fannie Mae .................9

V.      Ongoing Efforts to Mitigate the Loss .........................................................................10

VI.     Summary ..................................................................................................................10

<u>**Attachments to Addendum:**</u>

Attachment A:    **List of 257 Loans and Unpaid Principal Balance of Each**

Attachment B:    **Mortgage Selling and Servicing Contract Entered Into by Olympia
                 Mortgage Corporation**

Attachment C:    **Sample Loan and Olympia Generated Documents**

Attachment D:    **Wire Transfer Payments For Refinance Loans**

Attachment E:    **Sample Wire Transfer Information**

Attachment F:    **Sample Cover Up Check Payments**

<u>Proof of Loss – Olympia Mortgage Matter</u>

## I.    INTRODUCTION

Olympia Mortgage Corporation ("Olympia") stole payoff proceeds for 257 loans it was servicing for Federal National Mortgage Association ("Fannie Mae").[1]  Specifically, Olympia failed to remit loan payoff proceeds to Fannie Mae for such loans, failed to report to Fannie Mae as required that the loans were to be paid off, and engaged in elaborate efforts to conceal its theft.[2]  In each instance, borrowers executed loan documents (the "B Loans") with Olympia for the purpose of reducing their interest rates or modifying the terms of outstanding loans (the "A Loans") on the same property.  Olympia sold the B Loans to Fannie Mae.  But, Olympia, as servicer of the A Loans, failed to remit funds to Fannie Mae to payoff the outstanding balance of the A Loans.  Rather, Olympia stole the payoff proceeds for its own purposes.  Olympia took numerous steps to conceal its fraud, including continuing to report to Fannie Mae the A Loans as open and current.  The loss to Fannie Mae as a result of Olympia's fraud is:  the non-recovered outstanding balance of the 257 A Loans (**$43,918,500.42**);[3] and amounts, now in excess of **$540,000**, that Fannie Mae has incurred (and will incur) for the work performed by Navigant Consulting to determine, verify and calculate the loss.

This document provides further evidence and support for Fannie Mae's claim for coverage for Fannie Mae's loss under National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") Financial Institution Bond No. 600-97-48 and excess bonds.  To assist in the investigation of this fraud and the preparation of Fannie Mae's claim, Fannie Mae engaged Navigant Consulting, Inc. ("Navigant Consulting"), a national consulting firm that focuses on complex business litigation and forensic accounting issues.  Navigant Consulting reviewed and analyzed various documents prepared by both Fannie Mae and Olympia.  These documents include loan files, transactional documents involving the sales of various mortgage notes, electronic listings of mortgages, wire transfers and various business records of Olympia.  Navigant Consulting and Fannie Mae also interviewed various current and former Olympia personnel.  Information developed by Navigant Consulting and from Fannie Mae forms the support for Fannie Mae's claim.

## II.    OLYMPIA'S SERVICER OBLIGATIONS TO FANNIE MAE AND THE LOAN SERVICING PROCESS

Fannie Mae is a private, shareholder-owned company that channels its efforts into increasing the availability and affordability of homeownership for low-, moderate-, and middle-

---

[1]  As Fannie Mae reserved its rights to do when it submitted its proof of loss on June 23, 2005, Fannie Mae submits this updated proof of loss to provide its further understanding of the fraud committed by Olympia and address misimpressions National Union appears to have based on Fannie Mae's June 23, 2005 proof of loss.  Neither the amount of Fannie Mae's loss stated in the June 23, 2005 proof of loss nor the attachments thereto have changed.

[2]  A list of the 257 loans along with their outstanding balances as of the end of October 2004, shortly after Olympia was terminated, is attached hereto as Attachment A.

[3]  The outstanding balance of the loans at issue is approximately $2.6 million less than when Olympia stole the payoff funds because, to hide the fraud, Olympia itself made payments on the loans thereby reducing their outstanding balance.

---

Proof of Loss – Olympia Mortgage Matter

---

income Americans.  Fannie Mae does not originate mortgage loans but rather purchases loans from mortgage lenders, like Olympia, in the secondary mortgage market.  Fannie Mae then often retains lenders (or "Seller/Servicers") to service the mortgage loans Fannie Mae purchases.

Fannie Mae purchases loans through its Asset Acquisition & Custody ("AA&C") group.  After loans are acquired by the AA&C group, the loans are transferred to a separate group within Fannie Mae – the Asset Development & Management ("AD&M") group – which is responsible for the collection of principal and interest payments on such loans until the final payment or loan payoff amount is received by Fannie Mae.

As is its usual practice, Fannie Mae, through its AA&C group, purchased loans from Olympia and retained Olympia to "service" the loans.  The agreement that governed the relationship between Fannie Mae and Olympia is called the "Mortgage Selling and Servicing Contract" (the "Contract").[4]  The Contract incorporates by reference Fannie Mae's Servicing Guide, which sets forth additional obligations and responsibilities that Olympia agreed to comport with as part of its relationship with Fannie Mae.

Olympia agreed to diligently perform all servicing duties (Contract §V(A)(1)) and to service the loans in accordance with Fannie Mae's Servicing Guide (Contract §V(A)(3)).  Pursuant to Fannie Mae's Servicing Guide, Olympia, as a servicer, was required, among other things, to:

- collect the monthly principal and interest ("P&I") payments, along with any tax, insurance, and other escrow payments, made by the borrower and to place the P&I payments into certain custodial bank accounts from which Fannie Mae can draft, on a monthly basis, the remittances due to Fannie Mae;

- collect and remit payoff amounts when a borrower, through a refinance or otherwise, pays off a loan;

- report (electronically via Fannie Mae's LASER system, as described below) the status of each loan it services each month, informing Fannie Mae whether the loan is current and whether Fannie Mae should draft P&I or payoff payments from a custodial account;

- deposit tax and insurance payments into separate custodial accounts, and ensure that taxes and insurance on the borrowers' properties are paid from those accounts.

Under the Servicing Guide, all servicers have certain responsibilities when a borrower, through a refinance or for any other reason, chooses to pay off a loan.  For example, the Fannie Mae Servicing Guide specifically states:

---

[4] The Contract is attached hereto at Attachment B.

2

Proof of Loss – Olympia Mortgage Matter

- "The servicer must assure that the total amount required to satisfy the indebtedness – principal, interest, outstanding advances, etc. – is received and remitted to us." (III, 102.03: Payments in Full);

- "As soon as the servicer verifies that the amount required to pay a mortgage in full has been received, it must take all the steps necessary to assure that . . . our share of the payoff proceeds is remitted in accordance with the remittance schedule established for the remittance type under which the mortgage is reported . . . . The servicer must code the payoff as an Action Code 60." (VI, 101: Notification of Mortgage Payoff);

- "The servicer must remit payoff proceeds to us as part of its regular monthly remittance." (VI, 106.03: "Scheduled/Scheduled" Remittance Types);

- "A servicer must report removal transactions – payoff, repurchase, and foreclosure actions (Action Codes 60, 65, 67, 70, 71, and 72) -- in sufficient time for us to receive the notification by the second business day of the month following the cutoff date for the reporting period in which the activity occurred." (X, 103.01: Removal Transactions);

All of these servicing requirements applied to Olympia as a servicer of Fannie Mae loans.

Olympia and Fannie Mae maintained custodial accounts for the benefit of Fannie Mae at two institutions: Independence Community Bank and Midwood Federal Credit Union under documents entitled "Letters of Authorization." Pursuant to the Letters of Authorization, each month Fannie Mae withdrew monies from the P&I custodial accounts to collect repayment of principal (including prepayments and payoffs) and payment of interest on loans being serviced by Olympia on Fannie Mae's behalf.

Servicers communicate to Fannie Mae or, more specifically, to Fannie Mae's AD&M group, the status of outstanding loans they are servicing through an automated Fannie Mae loan servicing system known as LASER. As stated in Fannie Mae's Servicing Guide, "[t]he LASER Reporting System is an integrated investor reporting system that is used to capture loan-level detail for all regularly amortizing mortgages that a servicer services for Fannie Mae. . . . Under LASER, the servicer must report information on all of its mortgage portfolio each month. . . ." (X, Chapter 1: General Requirements). Accordingly, it is through LASER that a servicer, like Olympia, is required to inform Fannie Mae's AD&M group of the amounts of principal and interest being deposited into the custodial account for Fannie Mae to withdraw. Servicers are also required to use LASER to inform Fannie Mae's AD&M group that a loan is paid off and that AD&M should withdraw the payoff amount from the custodial account. Olympia used LASER in connection with the loans Olympia serviced for Fannie Mae, including the 257 at issue.

In sum, under the Servicing Guide, when a loan was to be paid off (whether through a refinancing or otherwise), Olympia had an obligation to notify Fannie Mae's AD&M group of that fact through LASER and to deposit the outstanding balance into the custodial account for

Proof of Loss – Olympia Mortgage Matter

Fannie Mae to withdraw.  After notification, AD&M would withdraw the payoff amounts from the custodial account and close the loan.

## III.    DESCRIPTION OF THE THEFT

### A.    The Fraud Perpetrated on Fannie Mae by Olympia

With respect to each loan that is the subject of the fraud committed by Olympia, borrowers modified or refinanced outstanding mortgage loans (the A Loans) through Olympia for the purpose of obtaining lower rate (or modified term) mortgage loans (the B Loans) from Olympia on the same property.[5]   Olympia sold the B Loans to Fannie Mae, and remitted to Fannie Mae monthly borrower principal and interest payments for the B Loans as is normal and to be expected.  Because Fannie Mae had previously purchased the A Loans from Olympia, the outstanding principal balances of the refinanced A Loans were owed to Fannie Mae, and Olympia, as the servicer of the A Loans, was to have remitted those outstanding balances or final Loan A payoffs to Fannie Mae.[6]

Olympia, though, as the servicer of the 257 A Loans at issue, failed to remit payoff proceeds to Fannie Mae (or specifically to the appropriate custodial account Olympia shared with Fannie Mae), failing also to notify Fannie Mae's AD&M group through LASER that the first loans (A Loans) were to be paid off.  Instead, Olympia stole the payoff amounts for its own purposes.  As described below, Olympia, as servicer of the A Loans, then took numerous steps to conceal its theft of the Loan A payoff proceeds.  In contrast to the 257 A Loans at issue, Olympia routinely notified Fannie Mae's AD&M group through LASER that other loans it refinanced and sold to Fannie Mae were to be paid off and remitted the payoff proceeds into the appropriate custodial account for Fannie Mae to withdraw.

### B.    Olympia's Concealment of the Theft

Olympia, functioning as a servicer, undertook elaborate efforts to conceal its theft of the loan payoff proceeds for the A Loans.  First, after stealing the payoff proceeds on any given loan, Olympia continued to report to Fannie Mae's AD&M group each month through LASER the loan as current.  At the same time, Olympia failed to report through LASER the required payoff

---

[5] The document executed by borrowers is referred to as a Reduction, Extension, and Modification Agreement ("REMA") (also commonly called a Consolidated, Extension, and Modification Agreement ("CEMA")).  The REMA is used to conduct mortgage rate reductions or term modifications ("refinances") pursuant to a practice in New York and some other states that allows a borrower to limit the amount of mortgage recording tax he/she must pay when "refinancing" a mortgage.  From a practice and systems perspective, the REMA or B Loan is treated as a refinance of the A Loan.

[6] Two hundred thirty-five of the A Loans previously had been placed by Fannie Mae into various pools of mortgage backed securities ("MBS") while twenty-two of the A Loans remained in Fannie Mae's own loan portfolio.  In the late January and February 2005 time period, Fannie Mae, as required by the terms of its MBS guaranty obligation (as described in the MBS trust indenture and MBS Prospectus) and as trustee of the MBS Trusts, paid the full principal balance of the 235 MBS loans from Fannie Mae's own funds to the holders of the various MBS certificates.  Fannie Mae also wrote off the remaining twenty-two A Loans that were in Fannie Mae's portfolio.  Olympia has never reimbursed Fannie Mae for any of these amounts.

4

code – Action Code 60.    Olympia then deposited into the custodial account from its own operating account the principal and interest payments that would have been due to Fannie Mae if the A Loans were current and not to be paid off.    Then, Olympia informed Fannie Mae's AD&M group through LASER that the principal and interest payments were in the custodial account for Fannie Mae to withdraw, just as if the loans were, indeed, current.

Olympia also discontinued its customer service functions for the A Loans.    For example, Olympia made sure that the borrowers did not continue to receive payment booklets for the A Loans or any other correspondence the borrowers would have received from Olympia had the borrowers not refinanced the A Loans.    Olympia also stopped collecting from the borrowers the tax and insurance or escrow payments for the A Loans.

All of these efforts to conceal the theft of the payoff proceeds were performed by Olympia through its servicing of the A Loans for Fannie Mae.    Olympia tracked the loans for which it kept the payoff proceeds on a list referred to as the "Code 59 List."    Each of the 257 A Loans at issue is on the Code 59 List Fannie Mae obtained from Olympia after Fannie Mae suspected a problem (as described below).    Olympia servicing personnel knew Olympia was reporting the Code 59 List loans to Fannie Mae's AD&M group through LASER as current and that checks were being written from the Olympia's operating account to the custodial account for the principal and interest payments the borrowers would have made had the A Loans not been refinanced.    Olympia tracked the principal and interest payments it used to cover up the fraud with a special notation – "branch payment" – within its servicing system.    Further, whenever an A Loan was refinanced, the Olympia servicing personnel would note the resulting required escrow account adjustments in the A Loan file and record the reason for the adjustment as "refinance."    Notwithstanding that the servicing personnel accordingly were aware that the A Loan was refinanced, they continued to report to Fannie Mae's AD&M group the A Loan as current and make the expected monthly principal and interest payments as if such payments were being made by the borrowers themselves.

## C.    Fannie Mae's Discovery of Olympia's Fraud

### 1.    The Anonymous Call

On September 29, 2004, Fannie Mae received information from an anonymous caller that led it to investigate Olympia.    The anonymous caller said that a friend of his was an officer with a mortgage lender that was headquartered on the east coast and had west coast operations, and the lender was not a depository institution.    The caller also described the owners of the company.

The caller said further that his friend had become aware that the lender appeared to be refinancing loans that had been sold to Fannie Mae but not remitting the final payoff proceeds for the outstanding loans to Fannie Mae.    According to the caller, in order to avoid detection the lender itself would continue to make payments on the loan.    In addition, the caller stated that the lender was also delivering to Fannie Mae the new, refinanced mortgages and remitting the payments made by the borrowers on them.

On the basis of the information provided by the anonymous caller, Fannie Mae was able to identify Olympia as the company most likely to be the one described.    Fannie Mae undertook

a search of its records to see if Olympia had delivered to Fannie Mae multiple first lien loans secured by the identical property. Fannie Mae came to suspect that, in fact, Olympia had failed to report and remit the payoff proceeds for certain loans it serviced for Fannie Mae.

### 2. Fannie Mae's Immediate Efforts To Investigate and Mitigate the Loss

Upon completing its initial review, Fannie Mae took immediate steps to mitigate the loss and further determine which loans were at issue. First, Fannie Mae took steps to move the remaining balance of funds held in the custodial accounts to other accounts, outside the control of Olympia. Then Fannie Mae officials visited Olympia's offices unannounced on October 19, 2004 to confirm what Fannie Mae had suspected and to review Olympia's records as they pertained to Fannie Mae's accounts.

At Olympia, Fannie Mae met with Barry Goldstein, one of Olympia's principals. Mr. Goldstein, upon being informed about Fannie Mae's suspicions, reviewed the information against Olympia's books and confirmed the existence of the multiple first lien loans on the same property. Mr. Goldstein then provided Fannie Mae with access to Olympia's books, records and staff.

The following day, Fannie Mae delivered a formal notice of termination to Olympia and took immediate action to transfer servicing of the loans being serviced by Olympia to a new vendor (Cenlar, Inc.). Fannie Mae also seized files related to the loans Olympia had sold Fannie Mae and the loans it serviced for Fannie Mae. Over the course of the next few weeks, through a review of Olympia's files and interviews with its employees, evidence of a large-scale fraud began to emerge. As a result, Fannie Mae initiated conversations with the New York Banking Commission and the FBI. In addition, as discussed more fully below, Fannie Mae initiated a lawsuit on November 16, 2004 against Olympia and Lieb Pinter[7] and obtained a court order putting in place a receiver ("Receiver") to oversee the orderly winding down of Olympia's affairs and to assist in tracing the funds stolen by Olympia.

### 3. Fannie Mae's Notice to Bond Carriers

By letter dated October 28, 2004 addressed to Willis of New York and in accordance with the terms of the Bond, Fannie Mae provided notice to its Bond insurers of Olympia's fraud and Fannie Mae's loss.[8]

---

[7] Lieb Pinter is a former principal of Olympia.

[8] Fannie Mae also provided notice of this loss under Olympia's Mortgage Bankers Bond (MBB-03-00195). According to counsel for the underwriters of that Bond, the aggregate limit of liability is $1,350,000 with a retroactive date of April 1, 2004 for the last $100,000 of such limit. It is unclear whether the Receiver intends to file a proof of loss under this Bond.

Proof of Loss – Olympia Mortgage Matter

IV.    IDENTIFICATION OF THE LOANS AND SUMMARY OF VERIFICATION PROCEDURES
UNDERTAKEN BY FANNIE MAE AND NAVIGANT CONSULTING

A.    **Introduction**

Using the property addresses on Olympia's "Code 59 List" (the list Olympia used to track the loans for which it kept the payoff proceeds), Fannie Mae confirmed within its system 257 outstanding loans for which Olympia should have remitted payoff proceeds but did not. Olympia personnel have admitted, in interviews conducted by Fannie Mae representatives, that Olympia failed to report the 257 loans as paid off, failed to remit to Fannie Mae the payoff proceeds for these loans and engaged in efforts to conceal the theft of the borrower payoff proceeds. Set forth below is a description of documents that demonstrate the fraud and support Fannie Mae's proof of loss.

B.    **Proof that Olympia and the Borrowers Entered into the 257 Refinance
Transactions That Gave Rise to the Theft**

Various forms of documentary evidence demonstrate that borrowers entered into the modification or refinance transactions creating the B Loans. For most of the 257 loans, Fannie Mae has the HUD-1 and/or Reduction, Extension, and Modification Agreement ("REMA") forms executed by borrowers when obtaining the refinanced B Loans. The HUD-1 is a closing statement or settlement sheet that lists all closing costs on a real estate purchase or refinance transaction, including, if a modification or refinance, the existing lien that is to be paid off. The REMA (also commonly known as a "CEMA") is a document used to conduct mortgage interest rate reductions or term modifications ("refinances") under the statutory provisions of New York pursuant to a practice that is used in New York and some other states. In practice, REMAs are treated as refinances (or new loans). These documents, as well as the Uniform Residential Loan Application, show the borrowers' instructions to Olympia to modify or "refinance" their outstanding loans (A Loans) creating Olympia's obligation to payoff the A Loans on the borrowers' properties.

Attachment C is a compilation of various documents used in the loan process and documents that demonstrate Olympia's fraud for one of the 257 loans (Loan No. 257 – "          " – on Attachment A). The first set of documents within Attachment C is the loan application, HUD-1 and REMA for the loan that should have been paid off by Olympia – Loan A. The documents demonstrate that the address of the property is                    and the original balance of the outstanding loan (which itself happened to be a refinance of an earlier loan) on that property was $293,777.00. The Loan A REMA shows that the loan was originated by Olympia on November 24, 2003 and that its Olympia loan number was          .

The next set of documents in the attachment includes the loan application, HUD-1 and REMA for the refinanced loan – Loan B. These documents show that the amount of the existing lien on the property located at                    was $290,575.00 and that the purpose of the new loan is a rate/term refinance of the outstanding loan – Loan A. The HUD-1 indicates that the principal amount of the refinance is $290,575.00 – the same

7

amount as the existing mortgage lien. The REMA shows that Olympia originated the refinance – the Loan B – on July 21, 2004 and that the Olympia loan number for it was                 .

Attachment C also includes a copy of the Olympia list of "Code 59" loans (or A Loans) as it existed on October 25, 2004. Again, this is the list of the loans, as maintained by Olympia, for which Olympia deliberately and fraudulently failed to remit the payoff proceeds to Fannie Mae. The outstanding           loan, including the Olympia loan number           for it and street address of the property, is on this list and is highlighted in yellow on the top of the third page.

Finally, a loan history report generated from Olympia's loan servicing system for the initial loan (i.e., Loan A) is provided. Note that within the loan history of the original loan, the term "branch payment" appears for all P&I payments made after Olympia was supposed to have remitted funds to Fannie Mae to pay off the initial loan – further evidence of Olympia's efforts to cover up the fraud.

While Attachment C contains documents for one specific loan, similar information has been complied for each of the 257 loans.

## C.    Proof That Olympia Received Payments For The B Loans

Wire transfer documents show that Fannie Mae paid Olympia for the B Loans (the "refinance" loans). Fannie Mae's wire transfer data is maintained electronically for 2000-2004 and in hard copy for the pre-2000 time period.

Most Fannie Mae wire transfers to Olympia show payment for a series of loans or loan pools or sub-pools.[9]  These wire transfers specifically identify the date, time and amount of the funds transfer. Separate electronic files detail the loan pools (or, more frequently, sub-pools) and/or specific loans (where a loan was purchased individually rather than as part of a pool) that were purchased pursuant to these wire transfers. Also, an individual loan that is part of a pool or sub-pool can be identified using Fannie Mae's loan servicing system. When the wire transfers are viewed with the individual loan data, one can identify the specific wire transfer that served as payment for each loan purchased by Fannie Mae from Olympia during the relevant time period.

Navigant Consulting, accordingly, identified wire transfers that were used to pay for the B Loans.[10]  A summary list of the wires used to pay for each Loan B (along with the loan purchased through each wire) is included as Attachment D. The majority of the 257 loans were

[9] Fannie Mae's process of securitizing its acquired loans involves the placement of these loans into mortgage loan "pools." These pools are generally assigned a six-digit number (e.g., "253626"). These pools combine loans from various lenders around the country so as to diversify the various risks associated with these securities. Olympia could make several contributions of loans to a loan pool during the course of a month (e.g., 4 loans on the 3rd of the Month, 6 loans on the 12th of the month, and 3 loans on the 23rd of the month). Each of these contributions are considered to be a "sub-pool" and are labeled accordingly by Fannie Mae (e.g., the first contribution during a month would be Pool 253626-A, the second contribution would be 253626-B, etc.).

[10] Fannie Mae has provided wire transfer information to the government in response to a grand jury subpoena.

purchased using wire transfers that were directly deposited into Olympia's operating account at Independence Community Bank.[11]

Attachment E contains exemplars of the wire transfer information used to create the list in Attachment D. These exemplars relate, once again, to the          loan (see Attachment C). Attachment E contains three documents. The first document is a report prepared by Navigant Consulting that summarizes Fannie Mae's electronic wire transfer and loan information. As the report demonstrates, the          loan was one of twenty-four loans purchased by Fannie Mae through a $3,037,595 wire transfer processed on July 23, 2004. The amount paid for the loan was $286,137.[12] The second and third documents within Attachment E trace the flow of the $3,037,595 from Fannie Mae's account into Olympia's operating account at Independence Community Bank. The second document is a Fannie Mae electronic wire transfer summary, which identifies all wire transfers from Fannie Mae to Olympia for 2004. Page fourteen of that report shows the July 23, 2004 transfer from Fannie Mae to Independence Community Bank for $3,037,595. The final document is the July 2004 bank statement for the Olympia operating account at Independence Community Bank. The third page of this bank statement shows the receipt by Olympia of the $3,037,595 wire transfer from Fannie Mae on July 23, 2004. In combination, these three documents demonstrate that Fannie Mae purchased the refinanced          loan from Olympia and transferred into Olympia's bank account the funds necessary to pay for that purchase. Proof of payment from Fannie Mae to Olympia for the other refinance loans has also been compiled.

**D.    <u>Proof That Olympia Failed to Remit Payoff Payments to Fannie Mae</u>**

Among the evidence of Olympia's failure to notify Fannie Mae's AD&M group of the payoffs (and the failure to subsequently transmit the payoff proceeds) is that all 257 A Loans were reported by Olympia in LASER as current and performing after Olympia should have reported the loans as closed and remitted the payoff proceeds. Olympia's failure to remit the payoff proceeds for the 257 A Loans is further demonstrated by the P&I payments that Olympia reported to Fannie Mae's AD&M group and made to conceal the fraud.

Tellingly, after Olympia was shut down in October 2004, and servicing was transferred to the new servicer (Cenlar), the principal and interest payments on the A Loans ceased to be made. Once the fraud was uncovered and Olympia was no longer servicing the loans, the ruse of making payments on the "Code 59" loans (or A Loans) could no longer continue. In contrast,

---

[11] Prior to late 2001, the operating account was maintained at Citibank. In a few instances, moneys were wired to other operating accounts maintained by Olympia.

[12] Fannie Mae forwarded to Olympia a significant portion of the purchase price of many of the refinance loans within 72 hours of the receipt (and acceptance) of the refinance loan documents from Olympia. The remaining amounts were forwarded to Olympia when the pools within which the loans were placed were closed. In this case, the original loan amount for the          loan was $290,575 (see Loan B in Attachment C) and the amount wired on July 23 was $286,137 (approximately 98.5% of the total loan amount). The balance of the monies due to Olympia, net of certain fees and discounting, was remitted to Olympia as part of a second wire transfer (for $131,273.24) on August 3, 2004.

Proof of Loss – Olympia Mortgage Matter

the principal and interest payments on the refinanced loans (or B Loans) and other loans that were not the subject of this theft continued to be made by the borrowers.

Navigant Consulting has specifically identified individual checks that were written by Olympia to cover the P&I payments for A Loans after Olympia stole the payoff proceeds for such loans. A sample of a check written for the            loan is included as Attachment F. As noted, the Olympia check registers show that a significant number of P&I checks were written each month by Olympia's servicing personnel as part of Olympia's effort to conceal the fraud. Examples of P&I checks written by Olympia have been compiled for other loans.

## V.    ONGOING EFFORTS TO MITIGATE THE LOSS

In an attempt to recover the unpaid principal balances, on November 16, 2004 Fannie Mae brought suit against Olympia and Lieb Pinter, one of its principals, in Federal District Court in the Eastern District of New York for breach of contract and fraud. By way of preliminary relief, Fannie Mae sought the appointment of a receiver to accomplish the orderly transition of the servicing and administration of outstanding loans and to search for and secure assets. By Order dated November 23, 2004, Judge Nina Gershon appointed Karen Balmer to serve as receiver to identify, secure and recover Olympia assets for the benefit of Olympia's creditors. Fannie Mae is also taking other steps to identify recoverable assets and other potentially liable persons or entities. To date, Fannie Mae has recovered no portion of the **$43,918,500.42** outstanding balance of the 257 A Loans.

## VI.   SUMMARY

Olympia stole payoff proceeds that it was supposed to have reported to Fannie Mae through LASER and remitted to Fannie Mae with respect to 257 A Loans Olympia was servicing for Fannie Mae. The financial loss to Fannie Mae resulting directly from Olympia's theft of the payoff proceeds is the total unpaid principal balance for the 257 A Loans as of the end of October 2004, which amounts to **$43,918,500.42**. These balances reflect the application of all payments received from Olympia prior to Fannie Mae's transfer of servicing for these loans from Olympia to a new servicer. Fannie Mae has also incurred (and will continue to incur) costs in excess of **$540,000** for the work Navigant Consulting has done to determine and verify the amount and extent of Fannie Mae's loss.[13]

As Fannie Mae's investigation into Olympia's fraud continues, Fannie Mae reserves the right to supplement this proof of loss as necessary and appropriate.

---

[13] Fannie Mae has incurred (and continues to incur) other costs as well, including significant sums on efforts to mitigate its loss and recover amounts stolen.

CLAIM #: <u>165-029680, 165-029681</u>



**AIG** TS

A I G Technical Services, Inc.
175 Water Street
New York, NY 10038

## FIDELITY BOND CLAIM DEPARTMENT PROOF OF LOSS

| EACH STATEMENT MUST BE MADE UNDER OATH |
|---|

**ORIGINALLY SUBMITTED 6/23/05 AND UPDATED 12/21/05**

1. Claim is hereby made upon the National Union Fire Insurance Company of Pittsburgh, PA

   pursuant to the terms of Bond No./Policy No. <u>600-97-48</u>  for a loss sustained in the amount of

   $ <u>See Attached</u> , consisting of property and/or money as described in the schedule (Item #4) submitted

   below, which loss was discovered by us on the _____ day of the month of <u>See Attached</u> ,

   20____.

2. The loss *is* a direct result of (check and complete one of the boxes below):

| 1 | | **Employee Dishonesty (Give Name of Employee(s))** |
|---|---|---|
| 2 | | **Loss on the Premises (Give Loss Location)** |
| 3 | | **Loss Away From the Premises (Give Loss Location)** |
| 4 | | **Forgery or Alteration** of a Negotiable Instrument (Attach Forged Instrument and Affidavit of Forgery) |

3. And occurred under the following circumstances:

   **See Attached**

4. The loss consisted of property valued as itemized and described in the table below, (Use extra pages as necessary).

| Date of Loss | Owner | Quanity And Description | Approximate Date Purchased | Place Purchased | Actual Cost | Amount Claimed |
|---|---|---|---|---|---|---|
| | | | See Attached | | | |

Claim # <u>165-029680, 165-029681</u>

| | |
|---|---|
| Total | $ See Attached |
| Less salary, commission, profit, etc. | $ |
| *Net Loss* | $ See Attached |

(SEE REVERSE SIDE)

5.  The Insured has no other suretyship/property insurance or other insurance under which the above claim, or any part thereof, is claimable, except the following:

6.  Circumstances were reported to the police department as follows:

| Police Department | Officer | Phone No. | Case No. | Date |
|---|---|---|---|---|
| | | | | |

7.  It is understood and agreed that the furnishing of this form to the insured or its preparation by any representative of the Company, or the acceptance or retention of the proof thereafter by the Company shall not constitute a waiver of any of the conditions fo the polcy.

Federal National Mortgage Association
_____
                                                                Insured

Date _12-22-05_                          By _____
                                                    Name and Title of Officer Making Affidavit
                                                    **David Hisey, Senior Vice President and Controller**

Subscribed and sworn to before me, the undersigned, at _____

on the _22_ day of the month of _December 2005_

_Betty A. Ferrier_
Betty A. Ferrier
Notary Public
Notary Public, District of Columbia
My Commission Expires February 14, 2007

### INSTRUCTIONS FOR MAKING PROOF

Statement of loss should be an itemized account showing names, dates, amounts, and description of individual items, of money, securities or property, misappropriated, stolen or embezzled, as nearly as can be ascertained, and if representing collections made, the dates, names and addresses of the persons, firms or corporations from which the collections were made.
Credits should be similarly entered in detail, as to commissions or salary due and unpaid and any securities, notes, etc., should he listed individually with full description.
Attach to proof all original vouchers, or otherwise verified copies of same and any further evidence in explanation or support of the amount or amounts for which claim is made.
If other security, indemnity or surety against loss is held, list the amounts, names and addresses of the indemnities or sureties with Ml description of Same.

### NOTICE TO NEW YORK APPLICANTS

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

### NOTICE TO OHIO APPLICANTS:

Any person who, with intent to defraud of knowing that he is facilitating a fraud against an insurer, submits an application or film s claim containing a false or deceptive statement is guilty of insurance fraud.

### NOTICE TO KENTUCKY APPLICANTS:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals for the purpose of misleading, information omitting any fact material thereto commits a fraudulent insurance act, which is a crime.

2